# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALSTOM TRANSPORTATION INC.,<br>641 Lexington Ave, 28th Floor<br>New York, New York 10022,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL RAILROAD ADMINISTRATION,<br>1200 New Jersey Ave SE<br>Washington, DC 20003;<br><br>AMIT BOSE, solely in his Official Capacity as Administrator of the Federal Railroad Administration,<br>1200 New Jersey Ave SE<br>Washington, DC 20003;<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION,<br>1200 New Jersey Ave SE<br>Washington, DC 20003;<br><br>PETE BUTTIGIEG, solely in his Official Capacity as Secretary of Transportation,<br>1200 New Jersey Ave SE<br>Washington, DC 20003<br><br>*Defendants*. | Civil Action No. 1:24-cv-2098<br><br>**COMPLAINT** |

Plaintiff Alstom Transportation Inc. ("Alstom"), by and through its undersigned counsel, alleges as follows:

## INTRODUCTION

1. Congress made the policy judgment that when the Federal Railroad Administration ("FRA") deploys federal funds on rail projects, those projects must prioritize goods manufactured

in the United States. Congress did, however, grant the FRA the authority to waive this "Buy America" mandate in the event, among other things, that goods necessary to the project are not available here.

2.      In this case, the FRA invoked the narrow "nonavailability" exception to Congress's Buy America mandate to grant a waiver of that prescription to one of two bidders unable to manufacture trainsets here. But the other bidder, Alstom, stands ready and able to manufacture the trainsets in the United States. Alstom now brings this action to enforce Congress's policy judgment reflected in the Buy America mandate, and to correct the FRA's violation of law.

3.      Alstom and its affiliates have more than 40 years of experience manufacturing high-speed trains in countries around the world, including the trainset commercialized as the next generation Acela.[1] In order to comply with Congress's Buy America mandate, Alstom invested more than $80 million to build a manufacturing plant in Hornell, New York, where Alstom has been able to manufacture trains domestically.

4.      The statute worked as intended in the case of the Hornell manufacturing plant. Alstom employs hundreds of American workers there, and also spends millions of dollars each year with various American suppliers, purchasing goods and services from the viable supply chain it established across more than 20 states. And the local economy has greatly benefited too: As the Hornell Industrial Development Agency explained, "Building the Avelia Liberty locally resulted in public and private investments worth $200+ million in the City of Hornell. This means new housing, hotels, and restaurants, and the preservation of the local hospital, all infrastructure that is

---

[1] https://www.amtrak.com/next-generation-high-speed-trains ("Building on Amtrak's expertise as the only high-speed rail operator in the U.S. and Alstom's record of delivering world class, proven, high speed trainsets — Amtrak and Alstom have partnered to introduce the next generation of Acela.")

critical to this community of 8,000 people who exemplify the soul of America. There's no reason to go anyplace else. Towns like Hornell, NY with American labor have proven they can and have built the engine that drives America forward."[2]

5.    Alstom recently submitted a bid to supply trainsets for another domestic rail project that was to receive federal funds. On account of its substantial prior domestic investment, Alstom was the only bidder with the capability to build those high-speed trainsets domestically.

6.    Nevertheless, the FRA granted a waiver of the relevant Buy America mandate to the one other potential bidder who submitted a proposal, thereby permitting that other bidder to construct some trainsets abroad. In granting the waiver, the FRA invoked a provision of the statute granting it authority to waive the Buy America mandates only in the event the relevant manufactured goods are *not* available here. That statutory exemption plainly did not and does not apply—indeed, as is undisputed, Alstom *can* manufacture all the trainsets in the United States and does not require the waiver the other bidder requested, meaning the goods *are* available here.

7.    Alstom is now paying the price. Had the FRA properly performed its statutorily required function, Alstom would have been the only bidder that could have performed the lucrative, government-funded contract, in compliance with law, and its hundreds of employees in New York would have been the ones to handle the work.

## THE PARTIES

8.    Plaintiff Alstom is part of a global conglomerate that manufactures trainsets and provides other technology and services for the rail industry. Over the past decade, it has invested substantially in the United States and now has an extensive domestic footprint that includes

---

[2] https://clone.railwayage.com/passenger/high-performance/alstom-releases-hsr-in-america-webpage/ (last visited July 16, 2024).

production and services sites from coast to coast. Among other things, it manufactures a broad range of rolling stock and components at facilities in Hornell and Plattsburgh, NY, and West Mifflin, PA. Alstom is incorporated and has its principal place of business in New York.

9. Defendant FRA is an agency within the United States Department of Transportation that is charged with administering the relevant "Buy America" mandate and waiver provisions at issue in this Complaint. 49 U.S.C. § 22905; 49 C.F.R. § 1.89(a).

10. Defendant Amit Bose is the Administrator—the highest-ranking position—of the FRA and was confirmed by the Senate on January 12, 2022. Defendant Bose is being sued only in an official capacity.

11. Defendant United States Department of Transportation is a federal agency that contains the FRA.

12. Defendant Pete Buttigieg is the Secretary of Transportation. He is being sued only in an official capacity.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction because this action arises under the APA, 5 U.S.C. §§ 703–07, 49 U.S.C. § 22905(a)(10), and because it seeks relief against an officer or agency of the United States. 28 U.S.C. §§ 1331, 1346(a)(2).

14. The "Hobbs Act," 28 U.S.C. §§ 2342 & 2344, does not apply to this action, and thus does not require (or permit) that it be filed in the first instance in a federal court of appeals. This is because the FRA's decision is not a "final order reviewable under this chapter," § 2344, as it does not fall within the sweep of any of the government orders set forth in § 2342. Among other things, the D.C. Circuit has interpreted § 2342(5) as covering certain suits challenging "functions transferred from the [Interstate Commerce Commission] to the Secretary [of Transportation] in

1966." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Pena*, 996 F.2d 338, 340–41 (D.C. Cir. 1993). But the "authority exercised by the agency" in this matter—its power to waive Buy America requirements—"was not transferred from the Interstate Commerce Commission to the Department of Transportation" in 1966. Order, *United Steel v. FHA*, No. 13-1036 (July 8, 2023); *accord Trescott v. Fed. Highway Admin.*, 275 F. App'x 15, 16 (D.C. Cir. 2008) (holding lawsuit must be filed in district court).

15. Sovereign immunity poses no bar to this action. 5 U.S.C. § 702.

16. Venue is proper under 28 U.S.C. § 1391(e) because this is a civil action against an officer or agency of the United States.

## BACKGROUND

### I. THE BUY AMERICA REQUIREMENTS & WAIVER PROCESS

17. The FRA has the authority to deploy federal funding for rail projects under the Federal-State Partnership for Intercity Passenger Rail Program. 49 U.S.C. § 22902(a).

18. To receive federal funding, a project must comply with the FRA's "Buy America Requirements," which require, among other things, that "manufactured goods used in the project are produced in the United States." *Id.* § 22905(a)(1). The Buy America Requirements are essential for ensuring that the U.S. government "procure[s] goods, products, materials, and services from sources that will help American business compete in strategic industries and help America's workers thrive." Executive Order 14005, 86 FR 7475 (Jan. 25, 2021).

19. Congress granted the FRA discretion to waive the domestic-production mandate only if it finds that one of four circumstances exists. 49 U.S.C. § 22905(a).

20. The statutory authority invoked by the FRA here, referred to in this Complaint as the "nonavailability waiver," permits the FRA to issue a waiver if it finds that "the steel, iron, and

goods produced in the United States are not produced in a sufficient and reasonably available amount or are not of a satisfactory quality." *Id.* § 22905(a)(2)(B).

21. For completeness, Congress set forth three other statutory grounds for granting a waiver, although none was invoked here. These are also delineated in § 22905(a)(2), and are:

- (A) applying [the Buy America Requirements] would be inconsistent with the public interest; . . .

- (C) rolling stock or power train equipment cannot be bought and delivered in the United States within a reasonable time; or

- (D) including domestic material will increase the cost of the overall project by more than 25 percent

22. Congress permitted the FRA to issue a waiver if it finds that one of these four statutory bases exists and, "before the date on which such finding [i.e., the waiver] takes effect," the FRA "(A) publish[es] in the Federal Register a detailed written justification as to why the waiver is needed; and (B) provide[s] notice of such finding and an opportunity for public comment on such finding . . . ." *Id.* § 22905(a)(4). The FRA must then reasonably address all comments to issue a final waiver decision.

23. Under Section 22905, "[a] party adversely affected by an agency action under this subsection shall have the right to seek review under section 702 of title 5" (i.e., the APA). *Id.* § 22905(a)(10).

II. **THE HIGH-SPEED RAIL PROJECT AND THE WAIVER REQUESTS**

24. On December 26, 2023, the FRA published a notice in the Federal Register proposing to exercise its authority to waive the Buy America mandate in connection with a new

6

rail project.  88 FR 89015 (Dec. 26, 2023).  The notice is enclosed as Ex. A, and incorporated herein by reference.

25. As the FRA explained, earlier in 2023, the Nevada Department of Transportation ("NVDOT") "submitted an application for FSP Program funding expressing its intent to partner with Brightline West, a privately-owned railroad, to advance a high-speed passenger rail system between Las Vegas, NV and Rancho Cucamonga, CA" (the "Project").  Ex. A at 1.  This rail system would require ten complete trainsets.

26. The FRA explained that "Brightline sought to identify a domestic supplier for the rolling stock and signal system components of the Project." *Id*. at 2.  The term "rolling stock" refers to the trainsets required for the Project.

27. Brightline received two responses from suppliers of rolling stock: one from Alstom, and the other from non-party Siemens.  *Id.*  Both companies represented, and it was not disputed for purposes of the waiver, that "they could provide the high-speed rail components that meet Brightline West's specifications and applicable FRA safety requirements." *Id*.

28. As part of their responses, both Siemens and Alstom certified that they would be required to obtain certain non-domestic components, namely the external shells used to build the trainsets. *Id.*

29. However, Siemens also stated that it would need to build the first two trainsets at a manufacturing plant in Germany, and proposed to build the remaining eight trainsets at a new facility that did not yet exist but that it proposed to construct in Nevada. *Id.*

30. By contrast, Alstom represented that it could build all ten of its trainsets in its existing manufacturing plant in New York.[3]  *Id.*

31. Because of the non-domestic components in the proposals, NVDOT and Brightline requested a waiver of the Buy America requirements for both potential suppliers.

### III. THE FRA'S NOTICE OF PROPOSED WAIVER

32. The FRA's December 2023 notice proposed granting all the waivers to the Buy America mandate requested for the Project and solicited public comment as required to grant the waivers.  Ex. A at 3.

33. The FRA's notice specified that the proposed waiver was based on the "domestic nonavailability of such components."  *Id.* at 1.

34. At this time, Brightline had still "not selected its preferred vendor for rolling stock," and the FRA proposed to grant the waiver for Alstom if it were selected as well as for Siemens if it were to be selected.  *Id.*

### IV. PUBLIC COMMENTS

35. As stated in the FRA's final order, which is enclosed as Exhibit C hereto and incorporated by reference herein, the FRA received 619 unique comments regarding its proposed waiver, including comments from Alstom.  Ex. C at 1.

36. In its comments (which are enclosed as Exhibit B), Alstom objected to the FRA's proposed waiver to the extent it applied to Siemens' rolling stock proposal.  More specifically,

---

[3] Alstom initially indicated that it would need non-domestic brake control units, but later indicated that domestic units were available, and therefore that it did not need a waiver for these components. Ex. B at 2; Ex. C at 2 n.4 (89 FR 45934 (May 24, 2024)).  Brightline also noted that the Project would require certain other non-domestic components—such as fire-alarm systems—regardless of which company was selected to supply rolling stock.  Ex. A at 2.  Those other components are not relevant to the analysis.

8

Alstom stated that it "does not believe that the portion of the proposed waiver that would allow for another manufacturer to build the first two complete trainsets in Germany complies with the Administration's statutory Buy America waiver authority or the waiver principles set forth in the OMB Guidance," when Alstom stood ready and able to complete the manufacturing work domestically, and thus that "aspect of the proposed waiver should be denied." *Id.* at 2.

37. Alstom noted that the FRA had granted a superficially similar waiver in 2014 to Amtrak permitting it to contract with a rolling stock vendor for production of up to two trainsets abroad while a domestic facility was put in place. Alstom explained, however, that this waiver could be granted in 2014 only because at the time no entity could manufacture a train meeting that project's required specifications in the United States, whereas "here Alstom currently has domestic manufacturing facilities to assemble all the trainsets in the U.S." *Id.* at 3.

38. In addition, Alstom explained that "[n]ot upholding Buy America commitments puts an unfair tax on companies like ours that have spent years and tens of millions of dollars establishing a US presence and supply chain" in reliance on those requirements. *Id.* at 2 ("Based on the promise that Buy America is the law of the land, we invested $80M into our facilities in Hornell," New York).

39. Alstom also commented that "allowing the production of the first two trains outside the United States increases the likelihood and volume of maintenance spares to be procured from outside the United States during revenue service, as suppliers and materials specifications are established for non-Buy American spares for these first two trains." *Id.* at 3.

40. Others also provided comments to the FRA objecting to Siemens' proposal to manufacture the first two trainsets in Germany on similar grounds, including that such a waiver

9

would "undermine domestic investment and create unfair advantages to those entities that receive such waivers." *See* Ex. C at 4.

V. **THE FRA'S FINAL WAIVER DECISION**

41. On May 24, 2024, the FRA published a final decision in the Federal Register granting Brightline's request for a waiver, including as to the two trainsets that Siemens proposed manufacturing overseas. Ex. C at 5 (granting "final waiver" for "First Two Complete Trainsets").

42. Consistent with the December 2023 notice, the waiver was solely based on "domestic nonavailability." *Id.* at 1 ("FRA is waiving its requirements for the first two Siemens trainsets, car shells, signal systems, high-speed rail turnout, and fire alarm systems based on the domestic nonavailability of these components . . . ."); *id.* at 4 (invoking authority under "49 U.S.C. 22905(a)(2)(B)," the nonavailability provision).

43. In responding to Alstom and others who objected to Siemens' rolling stock waiver request, the FRA explained that there was "no domestic facility equipped to manufacture" the Siemens-manufactured trainsets that Siemens was proposing to deploy: a next generation "Velaro NOVO Electric-Multiple-Unit (EMU) trainset" (the "Velaro NOVO"). *Id*. at 3. The FRA acknowledged that Alstom "has established a robust domestic manufacturing base" in New York, and that Alstom represented it would be able to build all ten of its trainsets in New York by adapting its existing Avelia trainsets—"which would be consistent with performance achieved by Alstom's TGV trains in Europe." *Id*. at 4. The FRA stated that it nonetheless determined the statutory precondition for issuing a nonavailability waiver was still met because the Velaro NOVO and Avelia trainsets are "two distinct trainsets designs and technology." *Id*. at 4.

44. The FRA did not explain what these differences were, or how they were material to the Project (or the waiver analysis). Nor did the FRA find that Alstom's Avelia trainsets were

"not produced in a sufficient and reasonably available amount or [we]re not of a satisfactory quality" as required by the statute. 49 U.S.C. § 22905(a)(2)(B). Instead, the FRA stated, without elaboration, "the domestic availability of trainset components varies by technology." Ex. C at 4.

45. The FRA also stated that it expected that the Siemens proposal would promote the ability to "build capacity for future demand" in the United States, *id.*, without explaining how such an interest in building future capacity, a capacity which Alstom already invested in and built out domestically, has any relevance to satisfying the statutory precondition for a waiver on the basis of then-present domestic nonavailability. *See* 49 U.S.C. § 22905(a)(2)(B) (using present tense).

46. As the FRA recited, Brightline had selected Siemens as its preferred rolling stock vendor before the final waiver issued, so the FRA did not issue a final waiver as to Alstom's rolling stock proposal. *Id.* at 1, 5. "However, the FRA conclude[d] that Alstom's proposal would have also met the criteria for a waiver if Brightline West had selected Alstom." *Id.* at 5.

47. The FRA's waiver flouts Congress's purposes, and if the decision is permitted to stand, it risks negatively affecting the health of the domestic rolling-stock industrial base. Businesses make capital-investment decisions and elect to participate in projects based on the expectation that the Government will execute the law faithfully and evenhandedly, in line with legislative intent and precedent. When that expectation falls apart, businesses no longer have the incentives to make domestic investments in reliance on the regulatory regime enacted by Congress, to the detriment of the U.S. economy and labor market.

48. Alstom, "[a] party adversely affected" by the FRA's decision, now invokes its statutory "right to seek review" under the APA. 49 U.S.C. § 22905(a)(10). The FRA's final waiver decision adversely affects Alstom in multiple ways. Among other things, Alstom was one of only two bidders and potential suppliers of rolling stock for the Project. If the FRA had followed

the law, then it would be the only bidder who could legally supply rolling stock for the Project. Alstom now stands to lose out on millions of dollars of income under the Project, and has found that the value of its investment of more than $80 million in the existing manufacturing facilities has diminished as against its reasonable expectations. The FRA's unlawful actions have deprived Alstom of the ability to participate in a legally valid procurement process. Instead, Alstom was subjected to an unfair process that did not comply with federal law, given that the only other bidder was permitted to avoid a domestic-manufacturing requirement imposed by federal law, even though Alstom could comply with the same requirement.

### COUNT 1 - 5 U.S.C. § 706(2)(C)

### THE FRA EXCEEDED ITS STATUTORY AUTHORITY AND CONTRAVENED LAW

49. Alstom repeats and realleges each and every allegation in paragraphs 1 to 48 above, as if fully set forth here.

50. Congress permitted funding "for a project only if the . . . manufactured goods used in the project are produced in the United States." 49 U.S.C. § 22905(a)(1). Congress granted the Government limited statutory authority to issue a waiver of this mandate on the basis of domestic nonavailability under § 22905(a)(2)(B). More specifically, the FRA must find that "the . . . [manufactured] goods produced in the United States are not produced in a sufficient and reasonably available amount or are not of a satisfactory quality." *Id.* § 22905(a)(2).

51. The FRA exceeded its authority under § 22905(a)(2)(B) by finding the rolling stock to be unavailable here despite the fact that Alstom could manufacture rolling stock domestically, and without making either of the requisite findings—namely, that the "goods produced in the United States are not produced in a sufficient and reasonably available amount or are not of a satisfactory quality." *Id.* § 22905(a)(2).

52. The FRA's decision to issue a waiver on the basis that there is no domestic capacity to build Siemens' Velaro NOVO trainsets exceeded its statutory authority and contravened the statute. Under § 22905(a), the term "manufactured goods" refers to the category of goods that meet the project's specification, namely, the "rolling stock" to be provided by either Alstom or Siemens, rather than the particular rolling stock provided by an individual supplier. Indeed, Congress required use of domestically "manufactured goods used in the project" even if slightly better or cheaper foreign goods exist, except if the good is "not produced in a sufficient and reasonably available amount or not of a satisfactory quality." *Id.* § 22905(a)(2). This plainly implies that multiple manufacturers, some domestic and some foreign, may manufacture the same category of "manufactured goods used in the project," and that in determining whether the goods are available domestically and "of a satisfactory quality," the government must look to the category of goods needed rather than the identity of the manufacturer or the nature of the technology. Indeed, it is worth emphasizing that the statute specifically calls out "rolling stock" and "power train equipment" as two categories of goods, *id.* § 22905(a)(2)(C), and it gave no indication that such goods must have identical technologies or designs.

53. The premise of the FRA's waiver decision—that two types of rolling stock are different "manufactured goods" even if both satisfy the project requirements simply because they are manufactured by different suppliers—would "eviscerate . . . significant aspects of the statutory text." *American Hospital Ass'n v. Becerra*, 596 U.S. 724, 737 (2022) (rejecting the government's interpretation). Indeed, under the Government's view, the FRA would be able to use the nonavailability waiver despite two goods in the same category (such as fire-alarm panels) satisfying a project's requirements—and despite the two suppliers providing the needed goods "in a sufficient and reasonably available amount" and "of a satisfactory quality"—just because they

13

were provided by different suppliers claiming to have slightly different "designs" or "technology," without any explanation regarding why these differences mean that they are different goods for purposes of the statute. This would render the Buy America requirements meaningless.

54. In addition, the FRA's decision exceeded its authority because it based its decision on reasons unrelated to nonavailability, such as that applying the waiver would support the building of new domestic manufacturing capacity. This is not a permitted basis to grant a waiver on the basis of then-present nonavailability under § 22905(a)(2)(B).

55. For these and other reasons to be further articulated in Alstom's forthcoming legal submissions, the FRA lacked the statutory authority under 49 U.S.C. § 22905(a)(2)(B) to issue a nonavailability waiver for the Siemen's rolling stock proposal, and exceeded the scope of its authority in doing so, in violation of the APA and 49 U.S.C. § 22905.

## COUNT 2 - 5 U.S.C. § 706(2)(A)

## ARBITRARY-AND-CAPRICIOUS AGENCY ACTION

56. Alstom repeats and reallege each allegation in paragraphs 1 to 48 above as if fully set forth here.

57. Just as it exceeded its statutory authority in issuing its waiver decision, the APA's action was also unlawful because it was arbitrary and capricious.

58. Without limitation, the FRA (1) failed to explain why claimed differences in design and/or technology between the Siemens and Alstom trainsets mattered under the statute; (2) failed to address certain of the comments Alstom raised during the notice-and-comment period; (3) issued a decision inconsistent with other federal regulations and guidance, such as the relevant OMB Guidance requiring agencies to "consider whether the recipient has . . . adequately considered, where appropriate, qualifying alternate items, products, or materials." M-22-11 (April

18, 2022); and (4) otherwise failed to reasonably explain its decision, let alone in a manner that complied with the statute.

59.     The FRA's decision to grant a waiver permitting Siemens to build two trainsets abroad is arbitrary and capricious under 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Alstom demands judgment against Defendants ordering and declaring as follows:

(a) That the FRA's May 2024 waiver decision, 89 FR 45934, be vacated insofar as and to the extent that it provides a Buy America waiver as to "The First Two Complete Trainsets" manufactured by Siemens;

(b) Declaratory judgment that the FRA's waiver decision, 89 FR 45934, was unlawful and contrary to law, contravened statutory authority, and was arbitrary and capricious, insofar as and to the extent that it provides a Buy America waiver as to "The First Two Complete Trainsets" manufactured by Siemens;

(c) Permanent injunctive relief enjoining the FRA from disbursing or deploying funds to or on the Project to the extent the Project proposes to obtain rolling stock manufactured by Siemens abroad;

(d) An award of all costs and attorneys' fees pursuant to any applicable statute or authority, including 28 U.S.C. § 2412;

(e) Such other and further relief as this Court may deem just and proper.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: July 17, 2024 | /s/ *Vincent Levy*<br>Vincent Levy (NY0487)<br>Jack Millman (application pending)<br>Jessica Marder-Spiro (application pending)<br>HOLWELL SHUSTER & GOLDBERG LLP<br>425 Lexington Ave<br>New York, New York 10017<br>T: 646-837-5120<br>E: vlevy@hsgllp.com<br><br>*Attorneys for Plaintiff* |