IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALSTOM TRANSPORTATION, INC.,

Plaintiff,

v.

FEDERAL RAILROAD ADMINISTRATION,

AMIT BOSE, Administrator of the Federal Railroad Administration,

US DEPARTMENT OF TRANSPORTATION,

PETE BUTTIGIEG, Secretary of Transportation,

Defendants,

and

DESERTXPRESS ENTERPRISES, LLC d/b/a BRIGHTLINE WEST, et al.,

Defendant-Intervenors.

Civil Action No.: 1:24-cv-2098-JMC

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT-INTERVENOR DESERTXPRESS ENTERPRISES, LLC d/b/a BRIGHTLINE WEST'S MOTION TO DISMISS OR CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION .......... 1

BACKGROUND .......... 1

ARGUMENT .......... 6

A. This Action Should Be Dismissed for Lack of Standing .......... 7

B. Alternatively, Brightline and Defendants are Entitled to Summary Judgment .......... 9

1. The Record Supports FRA's Determination That There are no Domestic Manufacturers of High-Speed Trainsets and Components Meeting the Project's Requirements .......... 10

2. FRA's Waiver Was Fact-Specific and Based on the Project's Minimum Requirements .......... 12

3. FRA's Waiver Decision Complies with OMB's Guidance .......... 15

4. FRA Considered and Addressed Alstom's Comments in the Nonavailability Waiver .......... 16

C. Remand Without Vacatur Is the Proper Remedy For any Identified Error .......... 17

CONCLUSION .......... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) .......... 10

*American Coalition for Competitive Trade v. Clinton*,
128 F.3d 761 (D.C. Cir. 1997) .......... 7

*Camp v. Pitts*,
411 U.S. 138 (1973) .......... 10

*Cubic Transportation Systems, Inc. v. Mineta*,
357 F. Supp. 2d 261 (D.D.C. 2004) .......... 7, 8

*Loma Linda Univiversity Medical Center v. Sebelius*,
684 F. Supp. 2d 42 (D.D.C. 2010) .......... 9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 7

*Mideast Systems & China Civil Construction Saipan Joint Venture, Inc. v. Hodel*,
792 F.2d 1172 (D.C. Cir. 1986) .......... 8

*North Carolina v. EPA*,
531 F.3d 896 (D.C. Cir. 2008), modified, 550 F.3d 1176 (D.C. Cir. 2008) .......... 17

*Richards v. INS*,
554 F.2d 1173 .......... 9

*Seneca Foods Corporation v. United States*,
663 F. Supp. 3d 1325 (Ct. Int'l Trade 2023) .......... 15

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 7

*Stuttering Foundation of America v. Springer*,
498 F. Supp. 2d 203 (D.D.C. 2007), *aff'd*, 408 F. App'x 383 (D.C. Cir. 2010) .......... 10

*United States v. Hays*,
515 U.S. 737 (1995) .......... 7

**Statutes**

49 U.S.C. § 22905 .......... *passim*

5 U.S.C. § 706(2) ..... 1

**Other Authorities**

49 C.F.R. § 661.3 ..... 2

49 C.F.R. § 661.5 ..... 2

79 Fed. Reg. 71504 (Dec. 2, 2014) ..... 14

80 Fed. Reg. 8131 (Feb. 13, 2015) ..... 15

80 Fed. Reg. 70074 (Nov. 12, 2015) ..... 14

81 Fed. Reg. 40395 (June 21, 2016) ..... 14

81 Fed. Reg. 40755 (June 22, 2016) ..... 14

86 Fed. Reg. 28673 (May 27, 2021) ..... 14

Fed. R. Civ. P. 12(b)(1) ..... 1, 7

Fed. R. Civ. P. 56(a) ..... 1, 9

## INTRODUCTION

This case involves the application of the Federal Railroad Administration's ("FRA") statutory authority to waive its "Buy America" requirements for a project that will deliver the first high-speed passenger rail system in the United States. Plaintiff Alstom Transportation, Inc. ("Alstom" or "Plaintiff") alleges that FRA's decision to waive the "Buy America" requirements based on the domestic nonavailability of high-speed trainsets for this project exceeds FRA's statutory authority and is arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

The Federal Defendants' Memorandum of Points and Authorities in Support of its Motion to Dismiss and Cross-Motion for Summary Judgment establishes that Alstom lacks standing to bring this action and refutes each of Alstom's arguments. *See* Dkt. 35-1. Accordingly, for those reasons and the additional reasons set forth below, Plaintiff's Complaint should be dismissed or, alternatively, summary judgment should be entered in favor of the Federal Defendants and Defendant-Intervenor DesertXpress Enterprises, LLC, doing business as Brightline West ("Brightline").

## BACKGROUND

Brightline refers this Court to the detailed factual background provided by the Federal Defendants in their Memorandum, Dkt. 35-1 at 4-10, and provides the following overview of relevant facts.

The Brightline West High-Speed Passenger Rail System is a $12 billion project to deliver a 218-mile rail service between Las Vegas and Southern California ("the Project"). It will improve traffic flow and safety along the regional interstate highway between those destinations, create thousands of union jobs, remove greenhouse gases from the environment, and establish

the first high-speed rail system capable of operating at speeds of 186 mph or higher in the United States. FRA0031, FRA0057.

In partnership with Brightline, the Nevada Department of Transportation ("NDOT") sought $3.75 billion in federal grant funding for the Project through a federal program administered by FRA, the Federal-State Partnership for Intercity Passenger Rail Program ("FSP"), which is designed to establish new intercity passenger rail service. *See* FRA0002. The Project was ultimately selected for federal funding under the FSP, and the grant agreement incorporated FRA's "Buy America" requirements. *See* FRA0002.

Under the "Buy America" statute, FRA ordinarily may authorize funding to carry out an FRA-funded project only if the steel, iron, and manufactured goods used in the project are produced in the United States. 49 U.S.C. § 22905(a). However, FRA may waive those requirements in limited circumstances, including, as relevant here, if there is a finding that "the steel iron, and goods produced in the United States are not produced in a sufficient and reasonably available amount or are not of a satisfactory quality." 49 U.S.C. § 22905(a)(2)(B).

FRA relies on regulations issued by the Federal Transit Administration ("FTA") as guidance in implanting its "Buy America" statute. FRA0187. Under those regulations, for manufactured goods, including the vehicles that run on a railway ("rolling stock"), to be considered produced in the United States, all of the manufacturing processes for the product must take place in the United States. 49 C.F.R. § 661.5(a). Additionally, all of the components of the manufactured end product must be of U.S. origin. 49 C.F.R. § 661.5(d)(2), § 661.3; *see also* FRA0187. FTA defines a "component" as "any article, material, or supply, whether manufactured or unmanufactured, that is directly incorporated into the end product at the final assembly location." 49 C.F.R. § 661.3; *see also* FRA0188.

Prior to selecting grant recipients for the FSP program, FRA invited high-speed rail project sponsors to submit their domestic sourcing and workforce plans to demonstrate how they would maximize the use of domestic goods, products and materials, consistent with FRA's Buy America requirements. FRA0002. In their domestic sourcing plan, NDOT and Brightline included requests for waivers of FRA's Buy America requirements for high-speed trainsets and certain required components that are not produced in the United States. FRA0002. Brightline intended to use high-speed trainsets (capable of operating speeds of up to 186 mph) for the Project, which are not currently produced domestically. FRA0002. The plan therefore included requests for "Buy America" waivers for the two rolling stock manufacturers that Brightline was considering to provide high-speed trainsets for the Project at the time the plan was submitted, Alstom and Defendant-Intervenor Siemens Mobility, Inc. ("Siemens"). FRA0002; *see also* FRA0075-0130.

Based on the waiver requests and domestic sourcing plan, FRA noted that Alstom proposed to "adapt" its Avelia technology, which it has contracted with Amtrak to provide for the Northeast Corridor, by increasing the power capacity and traction of the Avelia trainsets to achieve the required speed and performance capability for the Project. That proposed "adaption" would occur at Alstom's facility in Hornell, New York, where Alstom proposed to build the 10 trainsets required for the Project. FRA0003; *see also* FRA0060.

Siemens, in turn, proposed to use the Velaro NOVO Electric-Multiple-Unit (EMU, for the Project. Those trainsets are the latest generation of the service proven Siemens High-Speed Rail Velaro platform trainsets, which are capable of operating at speeds up to 220mph and are certified overseas for those speeds. FRA0003; *see also* FRA0094. Siemens proposed to manufacture and assemble the first two trainsets in its German headquarters with American

workers present for training purposes and then manufacture and assemble the remaining eight trainsets at a new domestic facility in the United States. FRA0003.

Both rolling stock vendors included overlapping waiver requests for a non-domestically-produced component (namely, the car body shell). FRA0003; *see also* FRA0061. Alstom noted that no manufacturers with proven capability to produce the required car body shells exist in the United States. FRA0003; *see also* FRA0076, FRA 0077. Likewise, Siemens's efforts to identify industry suppliers for structural passenger rail carshells were unsuccessful and it too determined that no manufacturing exists today for such carshells in the United States. See FRA0003; *see also* FRA0108.

Each rolling stock vendor also requested a separate waiver. Alstom, for example, requested a waiver to provide painted aluminum car body shells to protect the car body shells from corrosion. FRA0007; *see also* FRA0078. Alstom also originally requested a waiver with regard to brake-control units but subsequently advised that it could produce those components in the United States. FRA0002.

Siemens, for its part, requested a waiver for two of its high-speed trainsets to allow them to be manufactured abroad based on the fact that existing domestic manufacturing capability is for conventional rail and transit systems operating at lower speeds. FRA0003; FRA0007; *see also* FRA0094. Accordingly, Siemens requested a waiver for the production of its first two complete trainsets. FRA0003, FRA0007; FRA0095. While the first two trainsets are being manufactured in Siemens' established high speed rail facility overseas, Siemens will establish a trainset assembly facility in the U.S. and a local supply chain for the necessary components, so it can then manufacture the remaining eight trainsets in the U.S. FRA0003, FRA0007; FRA0095.

On May 1, 2024, while FRA was still considering the foregoing waiver requests, Brightline chose Siemens as its high-speed trainset manufacturer. FRA0001. On May 24, 2024, FRA published its final determination granting a domestic nonavailability waiver to NDOT and Brightline. *Id.* FRA explained that, because it was a "project-specific waiver," FRA's final waiver applied to "the vendor selected to deliver rolling stock and other components for the Brightline West project," *i.e.*, Siemens. FRA0003.

Based on review of the waiver requests and domestic sourcing plan submitted by NDOT and Brightline, FRA made a nonavailability determination with respect to the manufactured end products, stating that "there are currently no domestic manufacturers of high-speed trainsets[.]" FRA0003. It recognized that "Alstom's facilities in New York are capable of producing domestic rolling stock and trainset components for conventional rail and transit systems" but "Alstom does not currently manufacture high-speed rail trainsets at its facilities in New York." FRA0003. Alstom had explained that it would have to "adapt the Avelia technology planned for deployment on the NEC [Northeast Corridor] for use in the Project by increasing power capacity and traction to achieve the speed and performance capability required by Brightline West." FRA0004. Similarly, with respect to Siemens' high-speed trainsets, the waiver noted that "there is no domestic manufacturing capacity for Siemens' Velaro NOVO Electric-Multiple-Unit (EMU) trainsets." FRA0003.

FRA also made a domestic nonavailability determination with regard to rolling stock components, noting that there was no domestic manufacturing capacity for the aluminum car body shells required by both vendors. Prior to making that determination, "FRA consulted with the National Institute of Standards and Technology Manufacturing Extension Partnership (NIST–MEP) through its supplier scouting program to research whether any domestic manufacturers

produce the identified components." FRA0002. It also reviewed more than 619 unique comments on the proposed waiver. FRA0003. "FRA did not identify any domestic location that can produce aluminum car body shells that meet the safety standards required for high-speed passenger rail operations. Both Siemens and Alstom sought domestic facilities for the car body shells through NIST– MEP's supplier scouting program but did not locate any domestic sources." FRA0003.

Displeased with Brightline's decision not to select Alstom as its rolling stock manufacturer for the Project, on July 27, 2024, Alstom filed its Complaint herein challenging FRA's "Buy America" waiver. Dkt. 1. Shortly thereafter, Alstom moved for summary judgment, arguing that FRA exceeded its statutory authority by issuing a waiver permitting Siemens to build two trainsets overseas despite the fact that Alstom purportedly "stands ready" to manufacture all trainsets domestically. Dkt. 12 at 11.

The Federal Defendants moved to dismiss the Complaint and moved for summary judgment on October 8, 2024. Dkt. 35-1. The Court granted Brightline's and Siemens' motions to intervene in this action on October 10, 2024. Dkts. 23, 27.

## ARGUMENT

Brightline incorporates by reference the Federal Defendants' argument that the existing record establishes that Alstom lacks Article III standing to challenge FRA's nonavailability determination. *See* Dkt. 35-1 at 11-13. Specifically, the record does not establish that Alstom's claimed injury is traceable to FRA's nonavailability determination and will be redressed by a merits decision in its favor. It is undisputed there are currently no domestic manufacturers of high-speed trainsets that meet the Project requirements, and the requested relief will not redress Alstom's current inability to manufacture a high-speed trainset that meets the Project's minimum

requirements domestically. Accordingly, Brightline joins the Federal Defendants in requesting that this Court dismiss Alstom's complaint under Fed. R. Civ. P. 12(b)(1).

Alternatively, the Federal Defendants' and Brightline's cross-motions for summary judgment should be granted, and Alstom's motion for summary judgment should be denied. The record demonstrates that FRA's nonavailability waiver was both within the scope of its statutory authority and reasonable based on the agency record. The record contains ample evidence supporting FRA's determination that there are currently no domestic manufacturers of the end products (high-speed trainsets) meeting Project requirements and certain components of the manufactured end products (aluminum car body shells) in the United States. Therefore, FRA's decision to issue a domestic nonavailability waiver was consistent with statutory requirements.

### A. This Action Should Be Dismissed for Lack of Standing

The standing requirement is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A party seeking to invoke the court's jurisdiction is required to "clearly . . . allege facts" demonstrating its standing under Article III. *United States v. Hays*, 515 U.S. 737 (1995).

To establish "the irreducible constitutional minimum of standing," a plaintiff must plausibly allege that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A failure to satisfy any of these elements is fatal to a plaintiff's standing. *American Coalition for Competitive Trade v. Clinton*, 128 F.3d 761, 764 n.2 (D.C. Cir. 1997). As set forth below, because Alstom cannot satisfy the third element required for standing, redressability, the Court must dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1). *See Cubic Transp. Sys., Inc. v. Mineta*, 357 F. Supp. 2d 261, 262 (D.D.C. 2004).

Alstom alleges that if FRA had properly exercised its statutory authority, "Alstom would have been the only bidder that could have performed the lucrative, government-funded contract, in compliance with law[.]" Dkt. 1 ¶ 7. As demonstrated in the Federal Defendants' motion to dismiss, however, Alstom's Complaint is devoid of facts showing that Alstom would become the rolling stock manufacturer for the Project if FRA's nonavailability waiver were to be vacated. Dkt. 35-1 at 12-13. Alstom simply speculates that setting aside **<u>FRA's</u>** waiver somehow would lead to a contract award. The record, however, establishes that Brightline chose not to select Alstom as its rolling stock manufacturer for this Project before FRA made its nonavailability waiver determination, and that **<u>no</u>** manufacturer, including Alstom, currently produces high-speed trainsets with operating speeds in excess of 186 mph domestically. FRA0001, 0003. Alstom conceded that it does not currently manufacture high-speed trainsets capable of meeting Project requirements and would have to attempt to "adapt" its existing Avelia train technology to meet those requirements. FRA0003. It represented that it "could" attempt to build the ten required trainsets in its facility in New York with no guarantee of success. *See* Dkt. 1 ¶¶ 28, 30. Setting aside FRA's waiver decision will not remedy these shortcomings.

In *Cubic Transp. Sys., Inc. v. Mineta*, 357 F. Supp. 2d 261 (D.D.C. 2004), the Court confronted a similar situation in evaluating an unsuccessful bidder's challenge to an FTA determination that a successful bid was compliant with Buy America requirements. Like Alstom, the unsuccessful bidder alleged that it would have been the "only" choice if the FTA had properly interpreted Buy America requirements and disqualified the successful bidder, even though "FTA's involvement … occurred only after the competitive procurement process was complete." *Id.* at 263-264 (emphasis added). The Court, however, concluded that the unsuccessful bidder lacked standing to challenge the FTA's decision and dismissed its

complaint, as the injury it complained of stemmed from the competitive bidding process and was not fairly traceable to the FTA's evaluation of Buy America requirements. *Id.* at 264; *see also Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1174 (D.C. Cir. 1986) (finding that unsuccessful bidder did not have standing to sue Secretary of the Department of the Interior for failure to follow applicable regulations in administering a grant because the causal nexus was too attenuated where a withdrawal of all of the contracts from the current grantees would not result in an award to the plaintiff).

Similarly, in the present case, Alstom's Complaint must be dismissed because Alstom cannot satisfy the required elements for standing. The relief requested by Alstom cannot remedy Alstom's current inability to manufacture a trainset capable of meeting the Project's requirements.

### B. Alternatively, the Defendants are Entitled to Summary Judgment

Alstom's arguments also fail on the merits. As detailed below, and for the reasons set forth in the Federal Defendants' cross-motion for summary judgment, Dkt. 35-1 at 15-27, the record establishes that FRA's nonavailability waiver is consistent with its authority and statutory requirements. It is undisputed that there are currently no domestic manufacturers of high-speed trainsets that meet the Project requirements and certain required components. FRA0003. In addition, the record supports FRA's reasoned determination that a domestic nonavailability waiver was warranted. Accordingly, the Federal Defendants' and Brightline's cross-motions for summary judgment should be granted, and Plaintiff's motion for summary judgment should be denied

A court "shall grant summary judgment if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007), *aff'd*, 408 F. App'x 383 (D.C. Cir. 2010)); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977). When assessing a summary judgment motion in an APA case, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Stuttering*, 498 F. Supp. 2d at 207 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)). In other words, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and citations omitted).

### 1. The Record Supports FRA's Determination That There are no Domestic Manufacturers of High-Speed Trainsets and Components Meeting the Project's Requirements

Alstom argues that FRA erred in issuing the nonavailability waiver because it did not make the required statutory finding that Alstom trainsets were "not produced in a sufficient and reasonably available amount" or were "not of a satisfactory quality." Dkt. 12 at 2. Alstom contends that FRA ignored the statutory requirements and granted the waiver because Siemens could not build the trains required in the United States, thereby improperly focusing on only "one supplier's inability to manufacture its own goods domestically." *See id.* According to Alstom,

FRA should have instead evaluated whether the domestic goods required by the Project (high-speed trainsets meeting the Project's requirements) are available in sufficient quantity and quality domestically. In Alstom's view, "trainsets are so available—from Alstom[.]" *Id.* at 2-3.

Alstom's arguments are directly refuted by the record. As explained above, FRA explicitly determined that "there are currently no domestic manufacturers of high-speed trainsets (i.e., trainsets that are service proven at speeds in excess of 125 mph)."[1] FRA0003. FRA also determined that a rolling stock component (car shells) required by both vendors is also non-available domestically. *See* FRA0003 ("FRA did not identify any domestic location that can produce aluminum car body shells that meet the safety standards required for high-speed passenger rail operations."). In light of the domestic nonavailability of the manufactured end products and certain required components, FRA reasonably determined, consistent with the "Buy America" statute, that "the . . . goods produced in the United States are not produced in a sufficient and reasonably available amount or are not of a satisfactory quality." *See* 49 U.S.C. § 22905(a)(2)(B).

That determination is fatal to Alstom's Complaint. Nevertheless, Alstom attempts to sidestep that critical problem by asserting that it "could" produce the required trainsets domestically, and that FRA did not find that Alstom's Avelia trainsets were "not produced in a sufficient and reasonably available amount or [we]re not of a satisfactory quality," which is the sole basis on which FRA could invoke the statutory nonavailability exception. *See* 49 U.S.C. § 22905(a)(2)(B). In advancing this argument, however, Alstom ignores its own concession that the Avelia trainset requires substantial modification to meet Brightline's speed and performance

[1] The Federal Defendants note that FRA has acknowledged that the final waiver should have stated "at 186 mph or higher" instead of "in excess of 125 mph" to align with Brightline's product specifications. Dkt. 35-1 at 27 n. 8.

requirements. Alstom proposed to adapt the Avelia technology planned for deployment on the NEC for use in the Project by increasing power capacity and traction to achieve the speed and performance capability required by Brightline West. FRA0003. Therefore, FRA reasonably concluded that while "Alstom's facilities in New York are capable of producing domestic rolling stock and trainset components for **conventional rail and transit systems** . . . Alstom does not currently manufacture high-speed rail trainsets at its facilities in New York." FRA0003 (emphasis added).

Alstom attempts to create the impression that it currently has such manufacturing capability by representing that it "stands ready" to manufacture high-speed trainsets domestically, Pl.'s Mot. at 13, but a future potential to meet Brightline's requirements domestically is not a basis for vacating FRA's domestic nonavailability determination. Indeed, FRA's waiver authority would be rendered meaningless if a domestic manufacturer could defeat a waiver request by merely claiming an intent to develop and then manufacture equivalent end products domestically at a future date without the present capability of doing so.

Here, the record is clear that Alstom does not currently produce high-speed trainsets meeting the Project requirements or required components domestically. *See* FRA0003. On this basis, FRA reasonably determined, consistent with the statute, that the "goods produced in the United States are not produced in a sufficient and reasonably available amount or are not of a satisfactory quality." *See* 49 U.S.C. § 22905(a)(2)(B).

### 2. FRA's Waiver Was Fact-Specific and Based on the Project's Minimum Requirements

Alstom also argues that FRA's waiver determination improperly focused on the domestic nonavailability of the Siemens trainsets and should have been based on the generic category of goods required, without consideration of the design and technological distinctions between

suppliers. *See* Pl.'s Mot. at 12-13. Specifically, Alstom asserts that FRA improperly gave "minor differences across suppliers controlling effect," and contends that when "either supplier could provide trainsets useful for the project and meeting its requirement" such an analysis "would swallow the Buy America mandate." *See* Pl.'s Mot. at 13.

To the extent FRA distinguished between Alstom's and Siemens' technologies, it did so solely to determine the proper scope of the nonavailability waiver as required by the "Buy America" statute – after the FRA determined that there are no high-speed trainsets currently manufactured domestically that are capable of meeting the Project's requirements. *See* FRA0003. It simply assessed each vendor's domestic manufacturing capabilities for their proposed trainsets and required components. *See* FRA0004 ("[T]he two proposals from Siemens and Alstom, as described in the proposed waiver, are for two distinct trainset designs and technology."). FRA noted that "Alstom does not currently manufacture high-speed rail trainsets at its facilities in New York" and was proposing to "adapt" its Avelia technology to meet the Project requirements. FRA0003. Likewise, FRA assessed Siemens' domestic manufacturing capabilities, and noted that Siemens planned to manufacture and assemble the first two trainsets in its German headquarters while building its domestic manufacturing capability for the remaining eight trainsets at a new manufacturing facility in the United States. *Id.* FRA's determination that neither Alstom nor Siemens has the current capability to domestically produce its proposed trainsets in accordance with the Project requirements was therefore properly based on consideration of each vendor's respective technologies and domestic manufacturing capability.

Other FRA waivers, including the Amtrak traincar-related waiver approvals from 2014 and 2015 for Alstom referenced in the nonavailability waiver, *see* FRA0004, also acknowledge

that required technologies and project requirements must be considered in waiver decisions. In 2014, for instance, FRA noted that "domestically-produced HSR trainsets **meeting the specific technical, design, and schedule needs of Amtrak and the Authority** are not currently available in the United States" and it would take "HSR trainset manufacturers a minimum of one-and-a-half to two years to establish the required facilities to support a domestic HSR trainset assembly capability." 79 Fed. Reg. 71504 (Dec. 2, 2014) (emphasis added) (explaining that current passenger railcar manufacturing facilities would need to acquire specialized machinery and hire and train additional workforce). FRA then went on to conclude that "a waiver [was] appropriate because the Components are not manufactured in the United States and because domestically-produced Components **meeting the specific safety/service-proven, technical, design, and schedule needs of Amtrak cannot be delivered within a reasonable time**." 80 Fed. Reg. 70074 (Nov. 12, 2015) (emphasis added). Similarly, here, FRA made a specific nonavailability finding with respect to the manufactured goods (high-speed trainsets) as well as the rolling stock component (car shells) required by both vendors and their domestic manufacturing operations. *See* FRA0003. Notably, Alstom did not resist FRA's exercise of its statutory waiver authority with respect to the prior waivers, which were issued for Alstom's benefit, but has objected to the waivers here, where they do not suit Alstom's purposes.

Other waivers issued pursuant to 49 U.S.C. § 22905 also underscore that waiver determinations are fact-specific and based on consideration of whether a current domestic product is capable of meeting a project's minimum specifications and requirements. For example, in 2021, FRA issued a waiver notice for workstation tables for passenger railcars, which explained that while Siemens identified a potential domestic source for the tables, after testing and modeling, the source was not able to configure the tables to meet the required safety

and design standards. *See* 86 Fed. Reg. 28673 (May 27, 2021). Similarly, another FRA waiver request determined the domestic nonavailability of large and wide-span intermodal cranes for ports even though smaller intermodal crates were domestically manufactured. *See* 81 Fed. Reg. 40755 (June 22, 2016); *see also* 81 Fed. Reg. 40395 (June 21, 2016) (approving non-availability waiver for specific natural linoleum, and recognizing that while other linoleum is produced in the United States, the specific linoleum matched the design, color, and texture of the original historic flooring); 80 Fed. Reg. 8131 (Feb. 13, 2015) (approving non-availability waiver for pedestrian swing gate hinges where domestically produced gate hinges did not meet specific safety specifications and the IDOT's schedule and no domestic manufacturer made the "exact" hinge).

FRA's non-availability waiver in this case is consistent with those prior determinations. It appropriately recognized that non-availability assessments must look beyond "a category of goods," Pl.'s Mot. at 12, and evaluate whether there is a domestic source that currently meets the specifications of the project at issue.

**3. FRA's Waiver Decision Complies with OMB's Guidance**

Alstom further asserts that FRA's waiver decision is arbitrary and capricious under the APA because it purportedly failed to comply with "Buy America" guidance issued by the Office of Management and Budget ("OMB"). That assertion is also meritless for the reasons set forth by the Federal Defendants. *See* Dkt. 35-1 at 25-26. FRA's targeted waiver analysis was consistent with OMB's Guidance, which provides that "[t]o the greatest extent practicable, waivers should be issued at the project level and be product-specific." FRA0173; *see also* FRA0173-74 (stating that project-level waivers should be "narrowly targeted" and noting that "[w]aivers that are overly broad will tend to undermine domestic preference policies.").

Contrary to Alstom's allegations, FRA specifically considered whether Alstom could provide a qualifying alternative item domestically. The record is clear that "Alstom does not

currently manufacture high-speed rail trainsets at its facilities in New York" and that Alstom proposed to attempt to "adapt" its Avelia technology to meet the Project requirements. FRA0003-04. Accordingly, contrary to Alstom's arguments, the record shows that FRA properly considered whether Alstom was capable of providing a substitute alternative produced in the U.S.

#### 4. FRA Considered and Addressed Alstom's Comments in the Nonavailability Waiver

Finally, Alstom complains that FRA did not provide a reasoned response to Alstom's comments that "Alstom currently has domestic manufacturing facilities to assemble all the trainsets in the U.S," Pl.'s Mot. at 21, but that argument is belied by the record as well. The record reflects that FRA first determined that "[n]either vendor would be capable of delivering the rolling stock for the FRA-funded project without a waiver based on domestic nonavailability," FRA0003, and then considered each vendor's specific waiver requests. Merely because Alstom was proposing to build all ten trainsets domestically does not necessarily mean that the two trainsets Siemens proposed to manufacture in Germany could also be built domestically. As FRA acknowledged, "these trainsets involve different technologies, [and] the domestic availability of trainset components varies by technology[.]" FRA0004. The record contains evidence that Siemens proposed to build the first two trainsets in Germany to ensure quality control, as well as to provide for training of American workers, testing and commissioning. FRA0003. The fact that Alstom has domestic manufacturing facilities is beside the point because Alstom does not currently manufacture a high-speed trainset meeting Project requirements domestically. FRA reasonably conducted a fact-specific analysis of each vendor's domestic manufacturing capabilities based on their proposed trainsets, consistent with its statutory requirements and OMB Guidance.

### C. Remand Without Vacatur Is the Proper Remedy For any Identified Error

Brightline joins the Federal Defendants in asserting that vacatur of FRA's decision is not warranted in this case. *See* Defs' Mot. at 25-27. However, should this Court identify any error in the FRA's decision making, the proper remedy in these circumstances would be remand without vacatur. Where the consequences of vacating the challenged agency action would be disruptive, courts have found that remanding the agency decision without vacatur is the preferred remedy. *See North Carolina v. EPA*, 531 F.3d 896, 901 (D.C. Cir. 2008) (vacating the Clean Air Interstate Rule ("CAIR") due to "fatal flaws"), modified, 550 F.3d 1176, 1177-78 (D.C. Cir. 2008) (amending judgment to remand the CAIR without vacatur because, notwithstanding the relative flaws of CAIR, allowing it to remain in effect until it is replaced by a rule consistent with the court's opinion would at least temporarily preserve the environmental values covered by CAIR).

Here, vacating FRA's nonavailability waiver would result in significant disruption to the project schedule, jeopardizing timely project delivery. Thus, a remand to FRA would be the least disruptive way to remedy any perceived defects in its decision-making.

## CONCLUSION

For the reasons detailed above, Brightline joins the Federal Defendants in respectfully requesting that the Court dismiss Alstom's Complaint for lack of standing. Alternatively, Brightline and the Federal Defendants are entitled to summary judgment in their favor, and Plaintiff's motion for summary judgment must be denied.

Dated: October 15, 2024

Respectfully Submitted,

/s/ *Paul R. Hurst*
Paul R. Hurst (D.C. Bar No. 454757)
Amba M. Datta (D.C. Bar No. 1000450)
Steptoe LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-8089 (Hurst)
Telephone: (202) 429-8011 (Datta)
Facsimile: (202) 429-3902
Email: phurst@steptoe.com
Email: adatta@steptoe.com

***Counsel for Defendant-Intervenor DesertXpress Enterprises, LLC, d/b/a Brightline West***

Eugene E. Stearns*
Matthew W. Buttrick*
Veronica de Zayas*
Stearns Weaver Miller Weissler Alhadeff & Sitterson
150 West Flagler St., Suite 2200
Miami, FL 33130

***Counsel for Defendant-Intervenor DesertXpress Enterprises, LLC, d/b/a Brightline West***

* *Pending Pro Hac Vice Admission*