IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ALSTOM TRANSPORTATION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 1:24-cv-2098-JMC |
| ) | |
| FEDERAL RAILROAD ADMINISTRATION, ) | |
| ) | |
| AMIT BOSE, Administrator of the ) | |
| Federal Railroad Administration, ) | |
| ) | |
| US DEPARTMENT OF TRANSPORTATION, ) | |
| ) | |
| PETE BUTTIGIEG, Secretary of Transportation, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| DESERTXPRESS ENTERPRISES, LLC d/b/a ) | |
| BRIGHTLINE WEST, et al., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____ ) | |

**DEFENDANT-INTERVENOR DESERTXPRESS ENTERPRISES, LLC d/b/a
BRIGHTLINE WEST'S REPLY IN SUPPORT OF MOTION TO DISMISS OR
CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

I.    Alstom's Complaint Should Be Dismissed Because It Lacks Standing to Challenge
FRA's Waiver Decision............................................................................................3

    A.    The Competitor Standing Doctrine is Inapplicable ...............................5

    B.    Alstom Cannot Demonstrate Standing Based on "Bid Protest" Jurisdiction,
Which Requires a Federal Bidding Process ...........................................7

    C.    Absent Causation, Economic Injury Alone Is Not Sufficient to Support
Standing..................................................................................................10

II.    Alternatively, Defendants Are Entitled to Summary Judgment Because the Record
Directly Supports FRA's Waiver Determination That There Are No Domestic
Manufacturers of High-Speed Trainsets Meeting the Project Requirements ..................11

    A.    The Court Should Reject Alstom's Efforts to Distort the FRA's Reasoning
Because the Nonavailability Waiver Is Clear and Supported by the Record........12

    B.    Defendants Have Not Generated Post-Hoc Rationalizations to Support
the Nonavailability Waiver....................................................................15

III.    Remand Would Be the Appropriate Remedy for any Identified Error............................18

CONCLUSION....................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Air Excursions LLC v. Yellen*,
    66 F.4th 272 (D.C. Cir. 2023) .......................................................................5

*Alfa Int'l Seafood v. Ross*,
    No. 17-0031, 2017 WL 3738397 (D.D.C. June 22, 2017) .......................................18

*Cubic Transp. Sys., Inc. v. Mineta*,
    357 F. Supp. 2d 261 (D.D.C. 2004) ...............................................................4

*High Plains Wireless, L.P. v. FCC*,
    276 F.3d 599 (D.C. Cir. 2002)...................................................................8, 9

*Nat'l Mall Tours of Wash., Inc. v. U.S. Dep't of the Interior*,
    862 F.3d 35 (D.C. Cir. 2017)......................................................................8

*Nat'l Pub. Radio, Inc. v. Fed. Commc'ns Corp.*,
    254 F.3d 226 (D.C. Cir. 2001)...................................................................17

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008)...................................................................18

*PSSI Global Servs., LLC v. Fed. Comm'cns Comm.*,
    983 F.3d 1 (D.C. Cir. 2020).......................................................................6

*Simon v. Eastern Kentucky Welfare Rights Org.*,
    426 U.S. 26 (1976)...............................................................................10

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
    282 F. Supp. 3d 91 (D.D.C. 2017) ...............................................................18

STATUTES

49 U.S.C. § 22905.............................................................................*passim*

OTHER AUTHORITIES

2 C.F.R. § 200.308..............................................................................4

2 C.F.R. § 200.309..............................................................................4

## INTRODUCTION

Plaintiff Alstom Transportation, Inc.'s ("Alstom") Reply in support of its Motion and Opposition to the Defendants and Defendant-Intervenors' Cross Motions ("Reply") repeatedly misstates the law and mischaracterizes the record in an obvious effort to obfuscate the issues before this Court. Contrary to Alstom's suggestion, the Federal Railroad Administration ("FRA") lawfully and rationally exercised its statutory authority to issue a narrow waiver of certain Buy America requirements for the major infrastructure project at issue in this litigation, which will deliver the first high-speed passenger rail system in the United States ("the Project"). Congress authorized the FRA to waive Buy America requirements based on a finding that "the steel, iron, and goods produced in the United States are not produced in a sufficient and reasonably available amount or are not of a satisfactory quality." 49 U.S.C. § 22905(a)(2)(B). Consistent with this statutory authority, the FRA issued a domestic nonavailability waiver based on its finding that there are currently no domestic manufacturers of high-speed trainsets that meet the requirements for the Project.

The record amply supports FRA's determination, including Alstom's own admission that it does not currently produce a high-speed trainset that is capable of meeting the Project's requirements. Although Alstom claims that it could attempt to manufacture the required trainsets at its domestic manufacturing facility at some time in the future, there is no dispute that Alstom does not currently produce end products meeting the Project's specifications domestically. Its hypothetical future trainsets are not produced in the United States "in a sufficient and reasonably available amount" and "are not of a satisfactory quality" to meet the Project's requirements for high-speed trains capable of achieving speeds in excess of 186 mph. The FRA thus properly and reasonably exercised its statutory authority to waive the Buy America requirements as to two complete high-speed trainsets when it awarded federal funding for the Project.

In an effort to get around this, Alstom invites the Court to depart from the plain and straightforward statutory text granting the FRA its waiver authority.  It also argues that FRA's waiver was improper and impacted a competitive procurement conducted by Defendant-Intervenor DesertXpress Enterprises, LLC, doing business as Brightline West ("Brightline") to select the rolling stock manufacturer for the Project.  Specifically, Alstom asserts that FRA provided Defendant-Intervenor Siemens Mobility, Inc. ("Siemens") with a competitive advantage by issuing a waiver for the first two trainsets to be supplied for the Project, despite Alstom's hypothetical assertion that it could produce all ten trainsets required for the Project domestically at some point in the future.  Dkt. 50 at 5.  This argument ignores that **<u>both</u>** Alstom and Siemens required a waiver of the Buy America requirements because neither proposed supplier currently produces the high-speed trainsets required by the Project domestically.  It also underscores that Alstom erroneously equates the existence of its domestic manufacturing facility with actual manufacturing capability for trainsets meeting the Project's specifications.  FRA explicitly determined that Alstom's domestic manufacturing facility does not currently produce high-speed trainsets capable of achieving the Project's speed and performance requirements.  Alstom does not dispute this finding by the FRA, but instead asks the Court to rewrite the statute and find its potential future domestic manufacturing capability sufficient to preclude the waiver issued to Brightline's selected vendor, Siemens.  FRA's nonavailability determination, however, is consistent with the express statutory terms and is supported by the record.

Alstom's Complaint also suffers from a fundamental failure to establish standing.  There is no question that Alstom is displeased with a contract award decision made by Brightline, a private entity that is a subrecipient of a federal grant awarded by FRA to the Nevada Department of Transportation ("NDOT").  Alstom's claimed injury, however, is insufficient to establish

standing because Brightline made its award decision **before** FRA issued its final Buy America waiver and Alstom cannot establish that its claimed injury would be redressed by a merits decision in its favor. Specifically, the relief requested by Alstom cannot remedy its current inability to manufacture a high-speed trainset that meets the Project's minimum requirements or otherwise compel a private entity to issue a contract award to Alstom for the Project.

Accordingly, for the reasons set forth in the Federal Defendants' and Intervenors' pleadings and below, Alstom's Complaint should be dismissed or, alternatively, summary judgment should be entered in favor of the Federal Defendants and Intervenors.

## I. Alstom's Complaint Should Be Dismissed Because It Lacks Standing to Challenge FRA's Waiver Decision

Alstom's Reply (Dkt. 50 at 4-6) fails in its efforts to refute arguments raised by the Federal Defendants and Brightline establishing that Alstom lacks standing to bring this action. *See* Govt. Br., Dkt. 35-1 at 11-15; Brightline Br. Dkt. 46 at 7-9. Its Complaint should therefore be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

Specifically, Alstom cannot satisfy the third element required for standing, redressability. *See* Dkt. 46 at 7-9; *see also Cubic Transp. Sys., Inc. v. Mineta*, 357 F. Supp. 2d 261, 262 (D.D.C. 2004). The injury Alstom alleges, increased competition caused by the agency's action, is not fairly traceable to FRA's evaluation of Buy America requirements and cannot be redressed by this Court. Alstom's Complaint merely speculates that it would become the rolling stock manufacturer for the Project if FRA's nonavailability waiver were to be vacated, Dkt. 1 ¶ 7, but, as demonstrated in the Federal Defendants' motion to dismiss, Alstom has failed to plead facts (and cannot in good faith plead facts) showing that Alstom would become the rolling stock manufacturer for the Project if FRA's nonavailability waiver were to be vacated. *See* Govt. Br. Dkt. 35-1 at 12-13. Indeed, Alstom has conceded that it does not currently manufacture high-

speed trainsets capable of meeting Project requirements and that it would have to attempt an "evolution" of its troubled Avelia Liberty trainset to meet those requirements.  FRA0003; FRA0060; FRA0139.[1]  Accordingly, vacating FRA's waiver decision will not address Alstom's current inability to manufacture a trainset that meets the Project's specifications.

Moreover, Alstom's standing arguments are based on the flawed assumption that, even if the Court grants the relief sought by Alstom, there are only two options – contract award to Alstom for the rolling stock or no federally funded high-speed rail Project.  To the contrary, even if the Court granted the relief sought by Alstom and vacated the portion of the FRA waiver applying to the first two trainsets, this order would not compel Brightline to switch rolling stock vendors so long as Siemens proposed a solution that met the Buy America requirements. Brightline has already begun working with Siemens since being selected as the rolling stock vendor in May 2024 and, as the Government noted, the parties to the grant are entitled to make changes to the grant and project timeline in order for Brightline to continue working with Siemens, as necessary, to minimize adverse impacts on the Project.  *See* Govt. Br. Dkt. 35-1 at 13; 2 C.F.R. §§ 200.308 and 200.309 (authorizing agencies to approve a "[c]hange in the scope or the objective of the project" and performance period).

Alstom also attempts to distinguish *Cubic Transp. Sys., Inc. v. Mineta*, 357 F. Supp. 2d 261 (D.D.C. 2004), but this effort fails.  Alstom argues (Dkt. 50 at 12-13) that because the FTA in *Cubic Transportation* conducted a post-award investigation, the two cases are dissimilar.  As

---

[1] Although Alstom's Avelia Liberty trainset was initially scheduled to enter service by May 2021 on the Northeast Corridor, its deployment has been delayed for years due to defects in the trainsets and a failure to validate the trainset model in accordance with FRA requirements. *See* Amtrak Office of Inspector General, Major Programs: *Company Improved Management of New Acela Program, but Additional Delays and Cost Increases Are Likely*, OIG-A-2023-013, at 3 (Nov. 7, 2023), https://amtrakoig.gov/sites/default/files/reports/OIG-A-2023-013%20%28REDACTED%29%20-%20amended2.pdf.

in *Cubic Transportation*, 357 F. Supp. 2d at 264, however, FRA issued its waiver decision in this matter "only after the competitive procurement process was complete" and Brightline had selected Siemens as its rolling stock manufacturer.  Prior to Brightline's contract award decision, the FRA had issued a proposed waiver that would have benefited either Alstom or Siemens, depending on the ultimate award decision, but Brightline selected Siemens as its supplier before the waiver process was completed.  FRA0003.

Likewise, in *Cubic Transportation*, as here, the injury the plaintiff complained of resulted from a competitive bidding process conducted by a private party and was not fairly traceable to the agency's evaluation of Buy America requirements.  *Id.*  The Court specifically rejected the same meritless allegation made by Alstom here that, without the waiver, there would have been only one "Buy America-compliant offer."  *Id.*  To the contrary, the Court found that because the federal agency did not make the final contract award decision, a finding of non-compliance with Buy America rules "would not have necessarily resulted in awarding the contract to Cubic Transportation."  *Id.* at 263, n.2.  Likewise, Alstom's Complaint should be dismissed for the same reasons.

## A.    The Competitor Standing Doctrine is Inapplicable

Alstom cannot remedy the fatal defects in its Complaint by relying on the competitor-standing doctrine.  *See* Dkt. 50 at 4-6.  This theory of standing applies when a business entity is challenging agency action that affects competition and is inapplicable here where the challenged decision was taken by a private entity.

Under this theory, Alstom cannot establish the first element of standing, injury in fact, because it cannot show that a challenged agency action allowed increased competition against it by lifting regulatory restrictions on an entity's competitors.  *See Air Excursions LLC v. Yellen*, 66 F.4th 272, 280 (D.C. Cir. 2023) (dismissing complaint based on plaintiff's failure to show causal

link between the Treasury Department's allegedly unlawful disbursement of pandemic relief funds to a competitor and the competitor's alleged anticompetitive behavior). It is not enough to show that favorable regulatory treatment created an "'unfair competitive atmosphere'" or a "'skewed playing field.'" *See PSSI Global Servs., LLC v. Fed. Comm'ns Comm.*, 983 F.3d 1, 11 (D.C. Cir. 2020) (citations omitted). Rather, a party asserting competitor standing must "'make a concrete showing that it is in fact likely to suffer financial injury as a result of the challenged action." *Id.* (citations omitted).

Here, there was no agency action that directly increased competition in the market for high-speed trainsets, thereby injuring Alstom. Both Alstom and Siemens required nonavailability waivers because neither currently manufactures the high-speed trainsets required for the Project. *See* FRA0003 ("Neither vendor would be capable of delivering the rolling stock for the FRA-funded project without a waiver based on domestic nonavailability."); *id.* ("[T]here are currently no domestic manufacturers of high-speed trainsets"). Accordingly, FRA's waiver did not confer a competitive advantage on either vendor, nor did it result in economic injury to Alstom.

There is also no causal link between FRA's decision-making and Brightline's selection of Siemens as the rolling stock manufacturer for the project. To the contrary, Brightline's determination not to select Alstom as its rolling stock manufacturer for the Project was made **before** FRA made its nonavailability waiver determination. *See* FRA0001 ("At the time of the proposed waiver, Brightline West had not selected its preferred vender for rolling stock."); FRA0003 ("[T]he final waiver reflects the needs for the project given Brightline West's decision to select Siemens as its preferred rolling stock vendor. The project sponsor notified FRA of this selection and requested to finalize the Buy America waiver for the Siemens trains and

components as included in the previously submitted documentation."). Accordingly, Alstom's alleged competitive injury is not traceable to FRA's subsequent Buy America waiver. *See Air Excursions LLC*, 66 F.4th. at 280 ("[T]he competitor standing doctrine supplies the link between increased competition and tangible injury but does not, by itself, supply the link between the challenged conduct and increased competition.").

Alstom has made only generic assertions about its status as a "'direct competitor' of Siemens in the trainset-manufacturing market," Dkt. No. 50 at 5, but those assertions cannot overcome the timing of Brightline's decision to select Siemens as its preferred rolling stock vendor prior to FRA's issuance of the nonavailability waiver, which completely undermines Alstom's theory of causation. *See* FRA0003; *see also Air Excursions LLC*, 66 F.4th. at 278 (rejecting plaintiff's theory of standing where the causal link between the agency action and allegedly anticompetitive behavior rests entirely on "'general averments'" and "'conclusory allegations'"). As the D.C. Circuit has recognized, to allow the competitor standing doctrine, by itself, to supply the link between the challenged conduct and increased competition would erode Article III's case or controversy requirement and "permit a business to superintend its industry's regulatory scheme, even if the agency action at issue threatens the business with only highly attenuated or wholly speculative consequences." *Air Excursions LLC*, 66 F.4th at 281. Accordingly, Alstom's reliance on the competitor standing doctrine is unavailing.

### B.    Alstom Cannot Demonstrate Standing Based on "Bid Protest" Jurisdiction, Which Requires a Federal Bidding Process

Alstom's Reply next argues that it has an independent basis for standing because it has suffered a second injury-in-fact, the loss of the "right to participate in a legally valid procurement." Dkt. 50 at 6-7. Alstom, however, never once establishes the source of this "right" to "a legally valid procurement" or how this purported "right" is enforceable by this Court. To

the contrary, Alstom's standing allegations rely on a procurement conducted by an indirect recipient of Federal funding (Brightline), not a procurement conducted by a federal agency. Accordingly, Alstom's allegations regarding the conduct of a lawful procurement process are too attenuated to establish standing under the APA.

The cases on which Alstom relies to support its claim of standing under this procurement-process theory are distinguishable because they involve direct procurements or auctions conducted by federal agencies under inapposite federal statutory or regulatory schemes. *Nat'l Mall Tours of Wash., Inc. v. U.S. Dep't of the Interior*, 862 F.3d 35, 44 (D.C. Cir. 2017), for example, involves the award of a concession contract by a federal agency under federal laws not applicable here. *See* 54 U.S.C. § 101931(b). Another case Alstom cites, *High Plains Wireless, L.P. v. FCC*, 276 F.3d 599 (D.C. Cir. 2002), involves the FCC's spectrum auctions and is specifically limited to those circumstances. As the D.C. Circuit recognized in that case, it "tailor[ed] the application of [standing] prerequisites specifically to complaints arising from the Commission's auctions of spectrum" and its conclusion regarding a bidder's right to a legally valid procurement was limited to government auctions. The Court stated: "We have held that '[a] bidder **in a government auction** has a right to a legally valid procurement process; a party allegedly deprived of this right asserts a cognizable injury.'" *High Plains Wireless*, 276 F.3d at 605 (emphasis added). These cases do not stand for the broad proposition that Alstom asserts they do, that it can claim standing based on an assertion that FRA's decision prevented it from competing on an equal basis in a private procurement. Nor do they establish that Alstom has standing to challenge FRA's independent decision to issue a waiver of Buy America requirements based on Brightline's selection of Siemens.

Alstom also asserts, for the first time, that it would have modified its proposal had it known that it could have submitted a proposal relying on its manufacturing capacity abroad, but this assertion has no merit. *See* Dkt. 50 at 7. Alstom has been on notice since March 22, 2023, when FRA published a notice inviting high-speed rail project sponsors to submit domestic sourcing and workforce plans, that project sponsors could seek a waiver for goods, products, and materials used in high-speed rail systems, including rolling stock. *See* FRA0027. FRA's notice specifically requested that potential applicants for high-speed passenger railroad projects provide "[d]etail on the extent to which HSR system goods, products, and materials **are not available in the United States**; . . . and **the justification for imported items**. . . ." *Id.* (emphasis added). The notice further stated that applicants should provide "[a]n explanation of how the recipient anticipates using domestic sources for maintenance and replacement of **initially imported goods and materials** used in the project . . . ." *Id.* (emphasis added). Alstom was therefore on notice that it could use imported products and materials in its proposal if they were not produced domestically, and that FRA expected that potential applicants would use such items in their proposals for high-speed rail systems. *See id.* Alstom had the discretion to structure its proposal using both imported and domestic goods, products, and materials. Its decision to offer a specific technical solution cannot be attributed to FRA.

Finally, Alstom's argument that FRA placed Alstom at a competitive disadvantage, Dkt. 50 at 7, ignores that Alstom's **own** proposed trainsets also required a waiver. FRA did not confer a disadvantage upon Alstom because, without a waiver, Alstom's bid would also have been noncompliant with the Buy America requirements. The waiver, therefore, did not provide an advantage or disadvantage in Brightline's selection decision because both proposed suppliers, not just Siemens, required a waiver from FRA's Buy America requirements.

### C.    Absent Causation, Economic Injury Alone Is Not Sufficient to Support Standing

Alstom's Reply claims that it has standing because FRA's waiver will result in Alstom losing revenue as a result of not being selected to provide trainsets for the Project.  *See* Dkt. 50 at 9-13.  This indirect theory of injury, however, does not establish standing because, as explained above, FRA's Buy America waiver was not issued until after Siemens was selected as the rolling stock vendor.  *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 42 (1976) (stating that the "case or controversy" limitation of Article III requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of a third party).

Similarly, as explained above, Alstom's assertion that vacating FRA's waiver would lead to a contract award is pure conjecture.  *See* Brightline Br., Dkt. 46 at 8.  It is undisputed that no manufacturer, including Alstom, currently produces high-speed trainsets capable of operating speeds in excess of 186 mph domestically.  FRA0003.  Alstom has conceded that it would have to "adapt" a yet-to-be-approved Avelia Liberty trainset to meet the speed and performance required for this Project.  *Id.* Alstom's hypothetical that it "could" attempt to build the ten required trainsets in its domestic manufacturing facility has no guarantee of success.  *See* FRA0003; FRA0060.  Accordingly, Alstom cannot demonstrate a substantial probability that judicial relief addressing FRA's waiver decision would redress the shortcomings of its current trainsets or its failure to be selected as the rolling stock manufacturer by a third party, Brightline.  *See Eastern Kentucky Welfare Rights Org.*, 426 U.S. at 42 ("It is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications.").

Alstom attempts to link Brightline's selection decision to FRA by arguing that there is standing to challenge government activity where the government's action establishes the legality of third-party conduct causing the injury, but that effort also fails.  Dkt. 50 at 10-11.  Contrary to Alstom's assertions, FRA's nonavailability waiver did not uphold or authorize an otherwise illegal action.  Aside from challenging FRA's authority to issue its nonavailability waiver, Alstom's complaint never once alleges (nor can it allege) that Brightline's decision to select Siemens as the rolling stock manufacturer was an illegal action.

Therefore, for the reasons set forth above and in the Federal Defendants and Brightline's Cross Motions (Dkt. 35-1; Dkt. 46), the Court should dismiss Plaintiff's Complaint for lack of standing.

## II.    Alternatively, Defendants Are Entitled to Summary Judgment Because the Record Directly Supports FRA's Waiver Determination That There Are No Domestic Manufacturers of High-Speed Trainsets Meeting the Project Requirements

The Federal Defendants' and Intervenors' cross-motions for summary judgment conclusively show that Defendants are entitled to summary judgment and that Alstom's motion for summary judgment should be denied.  *See* Dkt. 35-1 at 15-27; Dkt. 40 at 14-29; Dkt. 46 at 9-16. Consistent with statutory requirements, FRA's nonavailability waiver was based on a record showing that there are currently no domestic manufacturers in the United States of the end products meeting the Project's requirements (high-speed trainsets capable of achieving speeds in excess of 186 mph) or of certain components of the manufactured end products (aluminum car body shells).  *See* FRA0003; *see also* FRA0008 ("Brightline West was unable to identify a domestic supplier for the rolling stock, signal systems, turnout, and fire alarm components."). Therefore, FRA's decision to issue a domestic nonavailability waiver is supported by the record evidence and was within the scope of its authority under 49 U.S.C. § 22905(a)(2)(B).

**A.    The Court Should Reject Alstom's Efforts to Distort the FRA's Reasoning Because the Nonavailability Waiver Is Clear and Supported by the Record**

In its Reply (Dkt. 50 at 14-15), Alstom erroneously claims that the Defendants and Defendant-Intervenors "do not defend the FRA's reasoning" and attempt to "re-write" the waiver decision. That argument has it backwards. It is in fact Alstom that is attempting to re-write FRA's waiver decision in an effort to manufacture a basis for relief in this case. Alstom's Reply (*id.* at 14-15) repeatedly mischaracterizes the waiver decision by (a) skipping over the portions of FRA's decision which explain the basis for the decision, (b) focusing solely on FRA's discussion of Alstom's public comment regarding Siemens' proposal to manufacture the first two trainsets in Germany, and (c) claiming that "[t]he only reasonable reading of the order is that the FRA granted a waiver for the construction of two trainsets abroad because . . . 'Siemens does not currently have a domestic facility.'"

This is neither a fair nor reasonable reading of the waiver decision because Alstom is completing ignoring FRA's express conclusions regarding domestic nonavailability of the end products (high-speed trainsets) and components (aluminum car body shells) for the Project, which were based on market research. *See* FRA0008; Govt. Br. Dkt. 46 at 5-6 (noting that FRA consulted with the National Institute of Standards and Technology Manufacturing Extension Partnership (NIST–MEP) through its supplier scouting program to research whether any domestic manufacturers produce the identified goods and components).

Alstom's Reply also ignores the context in which the FRA issued this waiver and the contemporaneous record. This $12 billion project will establish the **<u>first</u>** high-speed rail system capable of operating at speeds of 186 mph or higher in the United States. FRA0031, FRA0057. In March 2023, prior to selecting grant recipients for this program, FRA invited sponsors of proposed high-speed rail projects to submit their domestic sourcing and workforce plans to

demonstrate how they would maximize the use of domestic goods, products and materials. FRA0026. In that notice, the FRA recognized that domestic manufacturing for certain high-speed rail equipment was non-existent and that "the domestic manufacturing ecosystem for high-speed rail will require investment." FRA0027. In their domestic sourcing plan, NDOT and Brightline confirmed that, based on their market research, there are no domestic manufacturers of high-speed trainsets capable of meeting the Project's requirements. *See, e.g.*, FRA0002; FRA0059-60; FRA0094-95. In December 2023, the FRA then issued its proposed waivers to benefit both Alstom and Siemens, explaining that Brightline West had conducted market research of available products that could meet its Project requirements, but that it "was **unable to identify a domestic supplier for the rolling stock**, signal systems, turnout, and fire alarm components." FRA0008 (emphasis added). The record therefore supports FRA's determination that a domestic nonavailability waiver was warranted. *See* FRA0003.

Alstom next mischaracterizes FRA's well-reasoned nonavailability analysis by suggesting that the FRA reached a different conclusion as to Alstom and found that "'Alstom's facilities in New York' have manufacturing capacity" for the required trainsets. Reply, Dkt. 50 at 15; *see also id.* at 28 ("Alstom's trainsets must be considered to be 'available' domestically . . . for purposes of 49 U.S.C. § 22905(a)(2)(B)"). In reality, however, the record and FRA's waiver decision both directly refute this assertion. For example, in responding to Alstom's comments on the proposed waiver, the FRA rejected Alstom's claims about its manufacturing capabilities and confirmed that "there are currently no domestic manufacturers of high-speed trainsets (i.e., trainsets that are service proven at speeds in excess of 125 mph)."[2] FRA0003.

---

[2] As noted by the Federal Defendants, FRA acknowledged that the final waiver should have stated "at 186 mph or higher" instead of "in excess of 125 mph" to align with Brightline's

FRA also concluded that Alstom does not currently manufacture high-speed trainsets that meet the Project requirements at its domestic facility.  *See* FRA0003 (noting that "Alstom's facilities in New York are capable of producing domestic rolling stock and trainset components for **conventional rail and transit systems** . . . Alstom does not currently manufacture high-speed rail trainsets at its facilities in New York.") (emphasis added).  Indeed, Alstom represented only that it could attempt to "adapt" its Avelia Liberty trainset by making substantial modifications to "increase[e] power capacity and traction to achieve the required speed and performance capability" necessary for this Project.  FRA0007; *see also* FRA0003; FRA0060.  Therefore, by itself, the existence of Alstom's domestic manufacturing facility—without current production of high-speed trainsets capable of meeting the Project's requirements—does not establish that FRA's domestic nonavailability analysis of the trainset was arbitrary, capricious, or unsupported by the record.

Similarly, to the extent FRA considered the technological differences between Alstom's and Siemens' proposed trainsets, it did so to determine the proper scope of the nonavailability waiver for each vendor.  Having determined that there are currently no high-speed trainsets capable of meeting the Project's requirements being manufactured domestically, FRA assessed each vendor's domestic manufacturing capabilities for their proposed trainsets and required components.  *See* FRA0004.  As explained above, FRA reasonably concluded that "Alstom does not currently manufacture high-speed rail trainsets at its facilities in New York" and was proposing to "adapt" its Avelia technology to meet the Project requirements (FRA0003), which Alstom has not disputed (Dkt. 50 at 18).  FRA also assessed Siemens' domestic manufacturing

product specifications. Dkt. 35-1 at 27 n. 8; *see* FRA0059-60 (describing Brightline's requirements).

capabilities, noting that Siemens planned to manufacture and assemble the first two trainsets in Germany while ramping up its manufacturing capability in the United States. FRA0003. FRA did not provide preferential treatment to Siemens by conducting this analysis. Rather, FRA concluded that neither Alstom nor Siemens manufactures high-speed trainsets that meet the Project requirements domestically. FRA0003.

## B. Defendants Have Not Generated Post-Hoc Rationalizations to Support the Nonavailability Waiver

Alstom's Reply next claims (Dkt 50 at 16-19) that the Defendants and Intervenors are "invent[ing]" *post-hoc* rationales for granting the nonavailability waiver and that the Government and Intervenors do not agree on the basis for the FRA's waiver. Contrary to Alstom's assertion, there is no daylight between the Government's and the Intervenors' positions. The briefing by the Government and Intervenors have unequivocally demonstrated that FRA's waiver is premised on the undisputed fact that there are currently no domestic manufacturers of the high-speed trainsets capable of meeting the Project's requirements. *See, e.g.*, Govt. Br., Dkt. 35-1 at 3 ("FRA properly granted the waiver for the first two Siemens trainsets based on domestic nonavailability and fulfilled all statutory requirements for ascertaining that **no manufacturers of the specialized, high-speed technology exist in the United States that can meet Brightline's requirements for the project**.") (emphasis added); *id.* at 20 (noting that "neither Siemens nor Alstom could provide a trainset that met FRA's Buy America requirements"); Siemens Br., Dkt. 40 at 3 (stating that FRA's waiver "explicitly meets the Buy America statutory test because, as even Alstom admits, the required trainsets 'are not produced' in the United States today.").

Contrary to Alstom's claims, Defendants and Intervenors are each relying on the plain text of the FRA's statutory waiver authority at 49 U.S.C. § 22905(a)(2)(B) and the FRA's

waiver.  This statute authorizes the FRA to waive Buy America requirements for federally-funded projects based on its finding that "goods produced in the United States are not produced in a sufficient and reasonably available amount or are not of a satisfactory quality." 49 U.S.C. § 22905(a)(2)(B).  In exercising this statutory authority, FRA properly and rationally found that neither Alstom nor anyone else manufactures highspeed trains in the United States that meet the Brightline Project requirements.

In contrast to FRA's straightforward application of this waiver authority, the bulk of Alstom's Reply (at pp. 19-30) is devoted to meandering and often contradictory interpretations of Section 22905.  For example, Alstom claims that the "best interpretation" of the statutory nonavailability waiver "is that it applies to components as well as end products," which is the same interpretation applied by the FRA here.  Dkt. 50 at 19. Alstom, however, then contends that the statute can only be applied to components: "if the exception is met, the FRA could deploy it to grant a waiver only for the particular component that is unavailable, and not the . . . end product."  *Id.* at 19-20. This assertion is wholly unsupported by the plain meaning of Section 22905(a)(2)(B).  Alstom even concedes that "end products" "qualify as 'goods' within the meaning of the statute" (Dkt. 50 at 20), but never explains how this non-sensical interpretation is consistent with the statute's plain text granting FRA waiver authority as to any goods (whether end products of components) that are not available in the United States.  This interpretation is also directly inconsistent with the FRA's long-established implementation of this statutory authority, applying nonavailability authority to end products.  *See* Brightline Br., Dkt. 46 at 13-15; Siemens Br., Dkt. 40 at 19 n.5.

Moreover, although the plain text of the statute is focused on whether the goods are currently produced in the United States, Alstom claims (Dkt. 50 at 25-26) that the text must be

interpreted to "focus . . . on a future state of the world" and consider "goods to be produced" at some undefined point in the future. This interpretation is not consistent with the plain text of the statute authorizing waiver on the basis of current and specific information – whether or not the domestically-manufactured goods are produced "in a sufficient and reasonably available amount" or are "of a satisfactory quality." Indeed, Congress would not have used this statutory text to grant a waiver if it intended for FRA to assume the role of fortune teller in order to make predictions about some future state of production quantities or quality to determine if they are capable of meeting a grantee's precise project requirements. Instead, the Court "must presume that Congress meant precisely what it said." *Nat'l Pub. Radio, Inc. v. Fed. Commc'ns Corp.*, 254 F.3d 226, 230 (D.C. Cir. 2001).

The Court should therefore reject Alstom's futile efforts to advance alternative interpretations of the FRA's waiver authority. FRA may waive the Buy America requirements based on its finding that "the steel iron, and goods produced in the United States are not produced in a sufficient and reasonably available amount or are not of a satisfactory quality." 49 U.S.C. § 22905(a)(2)(B). This statute does not impose on FRA any requirement to undertake an analysis of some potential future state or the likelihood of a company's ability to successfully develop a new product that could be capable of meeting a project's requirements. Rather, the analysis is whether the goods are currently "produced" in the United States, not whether they might be manufactured domestically at a future date. *See id.* It is undisputed that Alstom does not currently manufacture trains capable of operating speeds of 186 mph or more at its facility in New York. *See* FRA0003 ("[T]here are currently no domestic manufacturers of high-speed trainsets."); *id.* ("Neither vendor would be capable of delivering the rolling stock for the FRA-funded project without a waiver based on domestic nonavailability."). Accordingly, FRA's

issuance of a nonavailability waiver was entirely rational, supported by the record, and fully consistent with the express statutory authority granted to the FRA under 49 U.S.C. § 22905(a)(2)(B) and fully the record.

Finally, Alstom's Reply also meritlessly asserts that FRA should have issued a waiver only to address unavailability for specific components instead of giving Siemens "complete dispensation" from the Buy America requirements. *See* Dkt. 50 at 19-20. The waiver, however, is a "project-specific waiver" that applied to "the vendor selected to deliver rolling stock and other components for the Brightline West project," i.e., Siemens. FRA0003. It is a targeted waiver. *See* FRA0004. As FRA further noted, the waiver is "narrowly tailored to safety critical, specialized high-speed rail components that are not produced in the United States, as established through Brightline West's market research, FRA's expertise in high-speed rail, supplier scouting through NIST– MEP, and robust public engagement." *See id.* Accordingly, the waiver was not a wholesale "dispensation" to Siemens, but rather a carefully considered determination based on evidence, market research, and FRA's expertise in high-speed rail.

## III. Remand Would Be the Appropriate Remedy for any Identified Error

Finally, this Court should reject Alstom's argument that vacatur is the appropriate remedy in this case. Dkt. 50 at 37. For the reasons that the Federal Defendants and Brightline have argued, vacatur of FRA's decision is not warranted in this case. *See* Dkt. 35-1 at 25-27; Dkt. 46 at 17. To the extent this Court identifies any error in FRA's waiver decision as to the two trainsets at issue, the proper remedy would be remand, as vacatur would be highly disruptive to an important infrastructure project. *See North Carolina v. EPA*, 531 F.3d 896, 901 (D.C. Cir. 2008); *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 282 F. Supp. 3d 91 (D.D.C. 2017); *Alfa Int'l Seafood v. Ross*, No. 17-0031, 2017 WL 3738397, at *2 (D.D.C. June 22, 2017)

(explaining that "remanding to the agency to afford an opportunity to cure the violative act …

where, as here, the disruptive effect of vacatur would be substantial").

Alstom's Reply (at 38) claims that there is no showing of the substantial disruption that

would justify remand without vacatur, but Alstom is once again ignoring the record.  To begin

with, Alstom itself would have required the waiver as to the car shells for all 10 trainsets in order

for it to comply with Buy America requirements and therefore does not challenge this aspect of

the waiver.  The record also reflects that this important infrastructure Project is a massive

undertaking and that, through the date of its application, Brightline had invested hundreds of

millions of dollars to advance the Project for it to be near "shovel-ready."  FRA0031-33.  If the

waiver is vacated, Brightline would lose the benefit of the substantial investment it made to

ensure that the Project was ready to go on schedule.  Alstom also concedes that the FRA made

independent findings of non-availability to waive Buy America requirements for other

components and that those waivers "are not relevant to the analysis" of the rolling stock waiver.

Compl., Dkt. 1 at p. 8, n.3.  Thus, contrary to Alstom's arguments, vacating the waiver would

affect aspects of the Project unrelated to the trainsets and would have far reaching and significant

disruptive impacts that would jeopardize the on-time delivery of the entire Project.

Alstom also advances new argument in its Reply.  It asks the Court to vacate the entire

subsequent grant agreement obligating the disbursement of federal funding for the Project and

enjoin the disbursement of **any** funds for the Project.  The Court should reject this new ask, as

neither Alstom's Complaint nor its Motion for Summary Judgment requested to invalidate the

entire grant agreement.  Instead, those pleadings specifically challenged FRA's waiver decision

only "insofar as and to the extent that it provides a Buy America waiver as to 'The First Two

Complete Trainsets' manufactured by Siemens."  Compl. Dkt. 1, Prayer for Relief; Dkt. 12 at 25.

19

Nor would Alstom be entitled to the drastic remedy it now belatedly seeks, had it pled a request for such relief. The non-domestic manufacturing of the two trainsets accounts for a small percentage of this much larger and important project to build high-speed rail and supporting infrastructure to connect two large metropolitan areas – Southern California and Las Vegas. *See, e.g.*, FRA0031-33; FRA0057-61; Dkt. 40 at 11. Thus, the overall equities weigh against vacating the waiver and the grant agreement, especially where the Court would have much narrower alternatives in crafting a remedy.

To the extent there is any merit to Alstom's arguments and FRA's waiver is found to be in part unlawful, the remedy should be narrowly crafted to minimize any adverse impact to this $12 billion project. As noted above, a ruling in Alstom's favor would not compel the use of Alstom or preclude the use of Siemens, it would simply require FRA's Buy America requirements to be applied to the first two complete trainsets to be manufactured by Siemens and require them to be domestically manufactured if they are to be used in the Project. In that case, any request for payment or "obligation" of federal funds for two trainsets to be constructed by Siemens abroad would be unlawful, nothing more.

Therefore, if the Court finds any error, the Court should reject Alstom's efforts to hold this entire Project hostage and remand to FRA without vacatur. This remedy would be the most appropriate way to remedy any perceived defects in FRA's decision as it pertains to waiver of the Buy America requirements for the two complete trainsets, without substantial disrupting this $12 billion Project.[3]

---

[3] The remaining arguments in Alstom's Reply are meritless and persuasively refuted by the reply briefs filed by Siemens and the Federal Defendants. *See* Dkt. 55 & 57

**CONCLUSION**

For the reasons set forth above and in its Cross-Motion, Brightline respectfully requests that the Court dismiss Alstom's Complaint for lack of standing.  Alternatively, the Federal Defendants and Intervenors are entitled to summary judgment, and Plaintiff's motion for summary judgment must be denied.

Dated: November 20, 2024                     Respectfully Submitted,


                                             /s/ Paul R. Hurst
                                             Paul R. Hurst (D.C. Bar No. 454757)
                                             Amba M. Datta (D.C. Bar No. 1000450)
                                             Steptoe LLP
                                             1330 Connecticut Avenue, N.W.
                                             Washington, D.C.  20036
                                             Telephone: (202) 429-8089 (Hurst)
                                             Telephone: (202) 429-8011 (Datta)
                                             Facsimile: (202) 429-3902
                                             Email: phurst@steptoe.com
                                             Email: adatta@steptoe.com
                                             ***Counsel for Defendant-Intervenor DesertXpress
                                             Enterprises, LLC, d/b/a Brightline West***

                                             Eugene E. Stearns (pro hac vice)
                                             Matthew W. Buttrick (pro hac vice)
                                             Veronica de Zayas (pro hac vice)
                                             Stearns Weaver Miller Weissler Alhadeff &
                                             Sitterson
                                             150 West Flagler St., Suite 2200
                                             Miami, FL 33130
                                             ***Counsel for Defendant-Intervenor DesertXpress
                                             Enterprises, LLC, d/b/a Brightline Wes***