# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ALSTOM TRANSPORTATION INC.,

            Plaintiff,

     vs.

FEDERAL RAILROAD ADMINISTRATION, ET
AL.,

           Defendants.

Civil Action
No. 1:24-cv-02098-JMC

December 13, 2024
10:00 a.m.

Washington D.C.

_____


TRANSCRIPT OF THE MOTIONS HEARING
BEFORE THE HONORABLE JIA M. COBB
UNITED STATES DISTRICT JUDGE


APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Vincent Levy, Esq.<br>HOLWELL SHUSTER & GOLDBERG LLP<br>425 Lexington Avenue<br>14th Floor<br>New York, NY 10017 |
| For Defendant:<br>Federal Railroad<br>Administration | Lisa Ann Olson, Esq.<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division<br>1100 L Street, N.W.<br>Suite 8142<br>Washington, DC 20530 |
| For Defendant:<br>Brightline West | Amba M. Datta, Esq.<br>STEPTOE LLP<br>1330 Connecticut Ave NW<br>Washington, DC 20036 |
| For Defendant:<br>Siemens Mobility, Inc. | Philip Jonathan Perry, Esq.<br>LATHAM & WATKINS LLP<br>555 Eleventh Street, NW<br>Suite 1000<br>Washington, DC 20004-1304 |

```
 1   APPEARANCES CONTINUED:

 2

 3   Court Reporter:    Stacy Johns, RPR, RCR
                         Official Court Reporter
 4
       Proceedings recorded by mechanical stenography, transcript
 5              produced by computer-aided transcription

 6

 7

 8                    P R O C E E D I N G S

 9        DEPUTY CLERK:  Good morning, Your Honor.  We are on

10   the record in civil case 24-2098, Alstom, Incorporated versus

11   Federal Railroad Administration, et al.

12        Starting with plaintiff's counsel, please approach the

13   podium and state your appearance for the record.

14        MR. LEVY:  Good morning, Your Honor.  Vincent Levy

15   from Holwell Shuster & Goldberg for the plaintiff.  And with me

16   are Jack Millman, Jessica Marder-Spiro and Daniel Fahrenthold.

17        THE COURT:  Okay.  Good morning, everyone.

18        MS. OLSON:  Good morning, Your Honor.  This is -- I'm

19   Lisa Olson with the Department of Justice, representing the

20   Department of Transportation, along with Julie Harris, also

21   with the Department of Justice, Emily Kveselis and Matthew

22   Yanez with the Department of Transportation.

23        THE COURT:  Okay.  Good morning.

24        MR. PERRY:  Good morning, Your Honor.  Phil Perry for

25   intervenor Siemens, and with me at the table today are Andrew
```

```
 1    Prins and Nick Schlossman.
 2              THE COURT:  Okay.
 3              MR. PERRY:  Thank you so much.
 4              THE COURT:  Good morning.
 5              MS. DATTA:  Good morning, Your Honor.  My name is Amba
 6    Datta and I'm representing defendant intervenor Brightline
 7    West.  I'm from the law firm of Steptoe, LLP and I'm here with
 8    my colleague Paul Hurst.
 9              THE COURT:  All right.  Good morning.
10              So we are here for argument on the pending motions.  I
11    think what I'd like to do, I want -- in terms of your
12    presentations, I'd like to start with standing.  I'd then like
13    to switch from the merits to just zeroing in on the irreparable
14    harm for the PI, because that's still pending, and then I'd
15    like to get into the merit.  So that's a lot that we have to
16    cover.
17              I don't know if you-all have divided the arguments or
18    if you have one person arguing different aspects.  But I think
19    it's better for me, conceptually, to keep these buckets
20    separately.  I obviously will give you an opportunity to make
21    whatever presentation you want to make, and I may have some
22    questions.
23              Mr. Levy, does that work for you in terms of -- can we
24    start with standing and then --
25              MR. LEVY:  Of course, Your Honor.
```

1          THE COURT:  All right.  Mr. Levy, if you want to come

2    up and then we can start with standing, because I have to deal

3    with that as a threshold matter, and then we can move to the

4    irreparable harm issue and the pending PI, and then we can move

5    to the merits of the summary judgment, which overlaps with the

6    likelihood of success prong.

7          MR. LEVY:  Thank you, Your Honor.  Just by way of

8    preface, of course, we're here on -- Congress passed a statute

9    that required that before federal funds are obligated, that

10   they be obligated for projects that use parts and laborers and

11   goods manufactured in the United States.  That's the

12   buy-American mandate.

13          There are several waiver exceptions to that provision,

14   to that mandate.  And the one that the government relied upon

15   here is for nonavailability.  That's the sole waiver provision

16   that's at issue.

17          There are several waivers that the FRA issued in its

18   decision.  One was for car shells, and both my client and

19   Siemens needed that waiver.  We are not challenging that part

20   of the waiver.  We acknowledge and agree that that part

21   component was not available.

22          The sole waiver that we're challenging is the further

23   waiver for the manufacturing of the two trainsets by Siemens in

24   Germany.

25          So with respect to standing, the D.C. Circuit is, of

1    course, clear that for purposes of standing the Court should

2    assume that we prevail on the merits to evaluate whether

3    there's standing.  So that means that it should assume that the

4    part of the waiver that waives the component for car shells was

5    valid, and that both my client and Siemens would have gotten

6    waivers for that, but that the part of the waiver that

7    addresses the trainsets abroad was invalid and unlawful.

8            And then the question is whether there are the three

9    components of standing:  Injury in fact, traceability and

10   redressability.

11           We have in our papers put forth three theories of

12   standing.  I can go into all three of them.

13           THE COURT:  Yes.

14           MR. LEVY:  But I think, of course, the Court needs to

15   reach only one of them to find standing.  And standing is very

16   clear under the competitor standing doctrine, which is sort of

17   hard to avoid.

18           The D.C. Circuit stated in multiple cases, including

19   the International Brotherhood of Teamsters case from 2013, in a

20   decision by now Justice Kavanaugh, that the competitors

21   standing doctrine recognizes that economic actors suffer an

22   injury in fact when agencies lift regulatory restrictions on

23   their competitors or otherwise allow increased competition

24   against them.

25           In that case, there was a grant program that was being

1   challenged that would allow Mexico domicile trucks to compete

2   in the United States, and the court ruled that a challenge to

3   that grant program could be made by those who were competing in

4   that market in the United States.

5          And hailed that once that is met, the other elements

6   of standing, causation and redressability, are easily

7   satisfied, because the government action that is being

8   challenged, which increased competition and caused the harm, if

9   that action -- agency action is set aside, then automatically

10  causation and redressability are met.  Because without the

11  action, the plaintiff, quote, would not be subject to increased

12  competition.

13         This is at Pages 211 and 212 at 724 F.3d.

14         THE COURT:  Can I just have you really dig into how

15  the FRA's actions impacted your ability to compete for this

16  bid, which was a competition between your client and Siemens

17  with Brightline, who made the selection.  The briefing focuses

18  a lot on the timing.  So the waiver decision was not set forth

19  until after Brightline alleges it had already selected Siemens.

20         So what did the FRA do that impacted your ability to

21  compete as it relates to Brightline's decision?

22         MR. LEVY:  So I think the sequence is a bit more

23  nuanced than that, Your Honor.

24         THE COURT:  Okay.

25         MR. LEVY:  First of all, there are concessions by the

1    government that the waiver here increased competition.  I'm

2    citing, for example, summary judgment brief at 1, where the

3    government says that plaintiff now seeks to disqualify the

4    chosen competitor.  So it's clear that there is a competitive

5    dynamic here between, as Your Honor said, two bidders.

6    Brightline received two bids, one from my client, one from

7    Siemens.

8            For the FRA, both bidders, both suppliers, could

9    provide the high-speed train rail components that meet

10   Brightline West's specifications and the FRA's safety

11   requirements.  That's at FRA 7, at the end, as part of the

12   record.

13           So we have two bidders, both could meet the

14   specification.

15           There were then best and final offers given by both

16   Alstom and Siemens.  That's in a declaration that Brightline

17   submitted on the PI, docket 63-1.  The waiver was initially

18   requested for both Alstom and Siemens.  During this process,

19   Siemens was identified as, quote, the preferred vendor.

20           Now, have the fact that there was a preference for

21   Siemens does not mean that there was a selection to the

22   exclusion of Alstom or that Alstom would not have been selected

23   as the path forward should the waiver for Siemens have been

24   denied.  It was just an expression of a preference.

25           Then the waiver was given for Siemens and the

```
1    government, in the notice -- in the decision, said that,

2    although there was a preference for Siemens, it would have also

3    given the waiver for the car shells for my client, Alstom.

4          And then after that -- and this seems undisputed.

5    After that there was a contract that was signed between Siemens

6    and Brightline for the supply of the trainset.  So the waiver

7    came in the middle of this process.

8          THE COURT:  So let me make sure I understand you.

9    You're saying that before the waiver was provided, that

10   Brightline expressed a preference, but until the contract is

11   executed, your client was still, you know, in running, for lack

12   of a better word, for the bid and could have received it

13   despite the preference?

14         MR. LEVY:  Well, I think what we know is what's in the

15   record, which is a letter, which is at FRA 0138, where the word

16   that's chosen is "preferred."

17         So it doesn't say that Alstom is disqualified or that

18   it was going forward with Siemens.  It says that Siemens is a

19   preferred vendor.

20         THE COURT:  What I'm trying to understand is that just

21   language that this is our selection pending, you know,

22   execution of a formal contract, in which case they had made a

23   decision and were just wrapping up the paperwork, or does that

24   have some other significance?  You're seeming to suggest that,

25   you know, competition was still live between the two until the
```

1    contract was executed and that, therefore, the waiver pre-dated

2    the selection of Siemens.  Is that what your argument?

3         MR. LEVY:  Well, I read the word "preferred" according

4    to the plain language, which is to express a preference rather

5    than a selection.  In terms of the chain of causation, that

6    expression of preference came before the contract.

7         I will add -- the arguments -- our three standing

8    arguments dovetail with each other to some degree.  And the

9    case law on causation and redressability for economic harm

10   makes clear that the causation requirement is not that rigid

11   and that what's required is a -- is that the challenge conduct

12   be a substantial factor in the chain of causation, even when

13   the harm is caused by a third party, which goes to Your Honor's

14   question about the selection being conducted here by a third

15   party.

16        And in the telephone and data systems case from the

17   D.C. Circuit, the Court made clear that indirectness of harm,

18   with the fact that the harm was caused by a third party, so it

19   was a government action, it was a challenge to an FCC decision

20   and the harm was alleged to have been caused by a third party,

21   which acted based on the FCC's decision.

22        The Court said that the indirectness of the harm was

23   no barrier to standing.  The Court said that -- and this is a

24   quote from Page 47 -- one narrow proposition at least is clear.

25   Injurious private conduct is fairly traceable to the

```
 1   administrative action contested in the suit if that action

 2   authorized the conduct or established its legality.

 3        And it also said that if the injury is redressable, a

 4   favorable decision setting aside the government action would

 5   constitute a necessary first step on a path that could

 6   ultimately lead to relief fully redressing the injury.

 7        There's no necessity there.  It's a necessary first

 8   step.  And the Court made clear that a decision in the favor of

 9   the plaintiff or the petitioner would not -- it wasn't

10   convinced that that would necessarily redress the injury but it

11   was clear that without the setting aside of the government

12   action, there could be no redressability and that was adequate.

13        So much the same analysis here applies both to the

14   competitive injury analysis and to the third theory, which is

15   about economic harm in the face of lost revenue.

16        THE COURT:  Can I ask you another question just about

17   the competitive injury?  So let's assume that, you know,

18   instead of "preferred selection" or whatever the language was,

19   that it was undisputed that Siemens selected -- sorry,

20   Brightline selected Siemens as its vendor, pending execution of

21   the contract, before the waiver decision.  Does that change

22   your position with respect to competitor standing at all?

23        MR. LEVY:  I don't think it would because the ability

24   to proceed with federal funding would still turn on a waiver

25   being granted.  And if there's no waiver being granted, the
```

```
1   fact that Brightline would have said we want to go with Siemens
2   but we want this waiver, if the waiver is not granted, then
3   they couldn't have proceeded with Siemens on the bid offered
4   and federal funding.  Because, again, the waiver was necessary
5   to establish the legality of that conduct.
6           So going to Your Honor's question, I don't think it
7   turns on whether it's a preference or more than that.
8           THE COURT:  That leads me to another question.  If
9   Siemens had not received the waiver for the two trainsets,
10  you're saying and suggesting that that means that, by default,
11  Alstom would have likely received the contract as the only
12  other vendor who was ready to complete this project.
13          And there's a lot in the briefing about, you know, all
14  of these other things that could have happened.  Maybe they
15  would have extended the timeline of the project to work with
16  Siemens.  Maybe Siemens would have put forth another proposal.
17  It's in the record in terms of all the various what ifs.
18          So what is your response to that and what am I
19  supposed to do with that in terms of a threshold standing
20  inquiry?  In making a decision about whether or not harm to you
21  is speculative, whether or not there is a remedy that could
22  adequately redress your injuries, what am I to do with all of
23  that?
24          MR. LEVY:  I think the analysis is slightly different
25  depending on which injury the Court focuses on.  So with
```

```
 1    respect to the competitive injury, the fact that things may
 2    have played out differently, that doesn't really matter.
 3    Because the issue is that the government action lifted
 4    regulatory restriction on a competitor.  And that's what the
 5    injury is.  It's harm to competition by an active participant.
 6          And so we have the example in our brief in the
 7    Washington Alliance case, where there were participants in the
 8    stem labor market who were challenging a DHS regulation on
 9    visas that allow more people to come to the United States and
10    compete in that market.
11          And there were allegations about, well, we don't know
12    if the people who are petitioners here are actually going to
13    compete again.  And the Court said it doesn't matter because
14    they are participants in the market, they competed before, and
15    so their harm, which is harm -- which is a competitive injury,
16    is concrete.
17          THE COURT:  That's where I'm a little bit -- how were
18    you not able to compete in terms of putting forth your bid in
19    front of Brightline?  What did the FRA do at the bidding level?
20    Because a lot of these procurement cases that you rely on, it's
21    the government who is putting forth the bids.  We have a
22    unique -- not a unique situation but just a different situation
23    here.
24          I'm not really understanding how you were injured in
25    terms of your ability to compete fairly for this contract.
```

 1          MR. LEVY:  I think the bidding cases are somewhat

 2   distinct from the competitive harm cases.  The cases that Your

 3   Honor was asking about really go to the competitive procurement

 4   contact.

 5          THE COURT:  Right.

 6          MR. LEVY:  And most of those cases do involve the

 7   government as the counterparty in a procurement process.  We

 8   think those cases are analogous and the injury is the same,

 9   even though there was an intervening third party, given the

10   standard that applies in the circuit and causation being only

11   required to be a substantial cause.

12          With respect to competition, the competitive injury, I

13   don't think those issues much matter.  Again, the point is that

14   the injury is established when an agency lifts a regulatory

15   restriction.  And here, that happened.  Because without the

16   waiver, Siemens could not have built the -- offered to build

17   the two trainsets overseas.  The bid that it did offer would

18   have been disqualified.  Perhaps they would have put in another

19   bid, perhaps they wouldn't have.

20          Brightline did ask for best and final.  So if it had

21   stuck to the process, we should have gotten the contract.  But

22   the point is none of that matters with respect to the

23   competitive injury line of cases because there was lifting of a

24   regulatory restriction on a competitor and we are a participant

25   in the market.

1          If the Court focuses -- I think that's the competitive

2     injury piece.

3          Your Honor asked questions about what if the injury is

4     the loss of the contract.  And I touched on this a little bit.

5     Again, if a government decision lifts -- establishes the

6     legality of conduct, that is something that can be addressed

7     and all that is required for causation and redressability is

8     that it be a step.

9          And there are other cases that speak to the government

10    action being a substantial factor motivating third parties.  So

11    that, for example, is Judge Mehta's decision in the Ciox Health

12    case, which involves a third party, where a government action

13    was deemed to be subject to challenge because it was a

14    substantial factor motivating third parties.  That's 435

15    F.Supp. 3d at 48 to 49.

16         And whether there are other factors along the way that

17    may have led to the contract ultimately going back, going to

18    Siemens or not, on this third theory of injury about loss of

19    the contract, the government action here remains a substantial

20    motivating factor.  And that's all that's required for

21    causation and redressability.  On that, of course, I think the

22    injury would be really settled because it's a loss of revenues,

23    which is a classic injury in fact.

24         THE COURT:  I think I interrupted you when I was

25    asking you to deal with everything that's been set forth in the

1  briefing about other things that may have happened or are

2  likely to happen if the waiver is invalidated in whole or in

3  part.

4          Can you just speak to kind of how I am to assess that

5  at this stage?

6          MR. LEVY:  There's a lot in the briefing, Judge.

7          THE COURT:  Yeah.  I mean, you know, for example,

8  there's, you know, that they could have extended the project

9  timeline for Siemens.  Siemens could have put forth another

10 proposal.  They could reopen the bidding process, which I guess

11 you would welcome.

12         MR. LEVY:  Right.

13         THE COURT:  I'm just curious in terms of some of the

14 other examples of what could or is likely to happen if the

15 waiver is invalidated, if you could speak to how that factors

16 into my analysis.

17         MR. LEVY:  Right.  So I think I tried to touch on

18 this.  So with respect to competitors standing, I don't

19 think --

20         THE COURT:  Right.

21         MR. LEVY:  With respect to the third theory, which is

22 about the economic harm, I think whether there are other things

23 that may have happened, the fact remains that the action is --

24 was a substantial motivating factor.  So that is establishing

25 causation.

```
1              And with respect to redressability, again, I think the

2     Telephone and Data Systems case makes clear that if

3     redressing -- setting aside the government action is a

4     necessary first step toward getting ultimate relief, that's

5     enough.  And it doesn't matter that there may be other

6     intervening causes along the way that ultimately are ultimate

7     relief.

8              THE COURT:  Okay.

9              MR. LEVY:  And I think those two cases establish

10    effectively the same point, which is that it's a substantial

11    factor.

12             And just taking a step back, I think that if our

13    client, who put in this bid and one of two bidders that went

14    through this process, is unable to challenge a waiver granted

15    to a competitor, I don't know who could challenge this sort of

16    decision.

17             There are multiple injuries, economic harm to

18    competition, participating in a process that was tainted by

19    legal violations.  And all of those could be redressed by a

20    favorable decision vacating the decision granting the waiver.

21             I don't know if I should touch briefly on the Cubic

22    Transportations System case --

23             THE COURT:  Please.

24             MR. LEVY:  -- which is, I think, the case that is most

25    relied upon I think by Brightline.
```

```
 1              First, I don't think the analysis there is consistent

 2    with circuit law as we read the cases.  But it's also just

 3    factually inapposite.  There was no waiver in that case.  There

 4    was no decision establishing the legality of the challenged

 5    decision.  There was no -- there just wasn't.

 6              And instead, what happened is that there was a

 7    challenge to an investigation that came along after the fact,

 8    and the Court said that a challenge to that investigation after

 9    the injury is complete, which the grant was already obligated,

10    isn't redressable.

11              Here we have a situation, again, where Siemens was

12    selected as the preferred vendor.  There was a waiver, which

13    established the legality of Siemens's bid.  And then there was

14    a contract setting forth the bid.

15              And we filed a lawsuit challenging the action

16    establishing the legality of the only other bid, and did so

17    before the preference was so-called ratified and turned into a

18    contract between Brightline and Siemens, and before the funds

19    were obligated, which happened after the summary judgment

20    brief -- our summary judgment brief was even filed.  So unless

21    the Court has a question, I'm mindful of the time and the

22    number of issues.

23              THE COURT:  This is more for my curiosity in terms of

24    learning how this process works.  Is your understanding that

25    it's typical that the contract would be finalized after the
```

1    waiver decision?  Otherwise, if it was before, I'm assuming the

2    contract would have to be contingent on receiving the waiver.

3    Or do you not know?  I don't know if it's in the record or if

4    it even matters.  But I'm just curious as to --

5                MR. LEVY:  DOT may be a better --

6                THE COURT:  Okay.

7                MR. LEVY:  But I would think that this would be

8    standard that if you were to enter a contract, it would be

9    contingent on a waiver being granted because, otherwise, you

10   know, you couldn't proceed without the waiver if, as here,

11   federal funding is required, where the project has taken a

12   position that that waiver is required and wants $3 billion of

13   federal funding toward a $12 billion project.

14               Again, I don't think it matters because even if the

15   contract had been signed before, taking money would have been

16   illegal without the waiver.

17               THE COURT:  All right.  Thank you.  I'll hear from DOJ

18   about standing first.

19               MS. OLSON:  Excuse me.  Thank you, Your Honor.

20               If I may, first, I would like to address the claim of

21   harm.  And I think we need to be clear about what harm the

22   plaintiff is alleging.  They're alleging that they're suffering

23   harm from the unlawful Siemens waiver.  Specifically, they're

24   asserting harm on grounds that the Siemens waiver is unlawful

25   because of plaintiff's claim that it can produce the trainsets

19

domestically.  And there are four flawed assumptions underlying this claim of harm.

First of all, the plaintiff is doing exactly what it accuses the defendants of doing, conflating standing with the merits, because the question the Court must decide is whether plaintiff's claim that it can produce trainsets domestically renders FRA's waiver decision unlawful.

Secondly, plaintiff repeatedly asserts that it can produce trainsets domestically when that assumption is manifestly inaccurate.  Plaintiff needs a waiver for car shells.  So, by definition, it cannot manufacture the trainsets domestically.

The fact that Siemens also needs a waiver for car shells doesn't magically cancel out plaintiff's need for the waiver and convert plaintiff's project into a domestic one. And the fact that the plaintiff would need to adapt its existing conventional technology to the project's needs suggests the possibility that it would need further waivers in the future.  So the possibility that it could actually manufacture trainsets domestically is even more remote.

Thirdly, plaintiff's assertion that the Siemens waiver is unlawful because plaintiff can produce the trainsets domestically mistakenly assumes that, to be lawful, FRA's waiver decision must depend on the comparative waiver needs of competitors or the speculative manufacturing potential of

1    competitors.

2            In fact, however, FRA's waiver decisions must be based

3    on the needs of the supplier, Siemens, that is chosen by the

4    project's sponsor, Brightline, and must be based on

5    nonavailability, as the statute requires.  The statute does not

6    authorize FRA to deny a waiver for Siemens based on plaintiff's

7    speculative claim that one day it may be able to build

8    trainsets domestically.

9            And fourth, plaintiff's assertion that it's harmed by

10   the allegedly unlawful Siemens waiver rests on the highly

11   speculative assumption that Brightline would choose plaintiff

12   to be its supplier if the Siemens waiver is vacated.  But, in

13   fact, the plaintiff has failed to show this and Brightline, as

14   the Court pointed out, has several alternatives to selecting

15   plaintiff as its supplier.

16          THE COURT:  Can you speak to -- I mean, you're not

17   suggesting that, in terms of my threshold standing decision,

18   that they have to show that they would be selected.  Can you

19   respond to Mr. Levy's point about the first step -- that

20   redressability is the first step in a chain that could lead to

21   relief.

22          Meaning, plaintiff would be happy, happier than they

23   are now, if the waiver was invalidated and Brightline had to go

24   back to the table and decide among options, which could include

25   reopening the bidding process.  I'm assuming, from plaintiff's

1    perspective, that would be a substantial win for them, just to

2    have this process revisited.

3         Do they have to show now that they would be the

4    default winner, particularly given the competitive injury

5    standing theory that they're asserting?

6         MS. OLSON:  They have to show causality.  And I think

7    the question here is whether in the absence of the waiver -- or

8    the proper question isn't whether in the absence of a waiver --

9    it's not whether the Siemens waiver caused the alleged harm --

10   the proper question, sorry, for purposes of assessing whether

11   the Siemens waiver caused alleged harm to plaintiff, which is

12   what they alleged, is not whether Brightline would have signed

13   the contract with Siemens in the absence of the waiver, but the

14   proper question is whether, in the absence of the waiver,

15   Brightline would have chosen plaintiffs to be its supplier.

16   Because that's the source of the harm.

17        THE COURT:  What I understand the plaintiff to be

18   saying with respect to standing is until -- unless and until

19   this waiver is invalidated, they're stuck.  They can't -- their

20   proposal can't be considered.  There's absolutely no chance

21   that they could be selected.

22        Maybe, ultimately, after -- if the waiver was

23   invalidated and Brightline went back to the drawing board and

24   revisited how it wanted to proceed, maybe there's a chance that

25   they still wouldn't select plaintiff.  But there's certainly no

1    chance that plaintiff could be selected while the waiver

2    stands.

3         So they're saying that in order to get the remedy that

4    they're seeking, a chance to be considered for their bid, and

5    they're saying they're the only ones that can -- if the waiver

6    is invalidated for these two trainsets, that they're the only

7    ones standing, so that there's something there.

8         But I really want you to address the kind of first

9    step or first -- that Mr. Levy was talking about in his

10    presentation.  Because, you know, there's a lot that could

11    happen, but none of that can happen until -- if this waiver is

12    allowed to stand.

13         MS. OLSON:  Right.  The question -- the chain of

14    causation here is too attenuated to show -- the question is

15    whether the plaintiff can demonstrate injury.  And here the

16    chain of causation is too attenuated, because if Brightline

17    were -- if Siemens were not to get the waiver, Brightline has

18    all these other options, and there are other manufacturers that

19    produce the high-speed trains.  So the question isn't -- you

20    know, the proper question is how close is the causation in

21    order to show injury?

22         THE COURT:  But when you're alleging, in part, an

23    injury of fair competition, that doesn't really rest on you

24    winning the contract.  It's more about being able to compete

25    for it on a fair and lawful playing field.

```
1                MS. OLSON:  Right.

2                THE COURT:  So what about that point?

3                MS. OLSON:  Both of them were on equal footing with

4      respect to waivers.  So it can't really reasonably be concluded

5      that the Siemens waiver actually caused Brightline not to

6      select plaintiff for Brightline's contract.  Nor would the

7      plaintiff's failure to win the Brightline contract be redressed

8      by the cater of the waiver.

9                THE COURT:  Why is that?  You're making reference to

10     the fact that both Siemens and Alstom needed waivers.  Alstom

11     started its presentation saying they're not contesting the car

12     shell aspect of the waiver.  They're contesting the trainset

13     piece of the waiver.  So why does it matter that they needed a

14     waiver for car shells for standing purposes?

15               MS. OLSON:  Because neither of them can produce

16     trainsets domestically.  And the two -- just because they each

17     needed waivers for car shells doesn't mean that they cancel

18     each other out and that Siemens is suddenly the only one that

19     can only produce trainsets overseas.  It doesn't mean that

20     Alstom can produce trainsets domestically.

21               So the problem here is that the plaintiff doesn't have

22     any grounds for challenging Brightline's choice directly, so

23     it's going around to the back door and attacking the waiver

24     decision.

25               THE COURT:  Who other than an entity who did not get a
```

1   waiver that they sought would have standing under the APA to

2   challenge the FRA's decision to grant a waiver?

3          So I understand clearly a person maybe who -- or

4   entity who sought a waiver and didn't get it might be adversely

5   affected under the statute.  But is it limited to that?  Can

6   you envision -- if not the only other competitor, what other

7   entity or party could have standing to challenge an FRA

8   decision of this nature?

9          MS. OLSON:  I don't -- I mean, the problem is that you

10  have Brightline as an -- making an independent business

11  decision to choose its supplier.  And FRA is not in a position

12  to make that decision.  And, in effect, what the plaintiff is

13  asking here is for the Court and FRA to get involved in making

14  that decision.

15         Challenging the waiver on the basis of

16  nonavailability, I mean, it's speculative.  I'm trying to think

17  of who could challenge --

18         THE COURT:  I mean, maybe your answer is no one.  I'm

19  just curious as to if not a competitor involved in the process,

20  is there any other entity you can think of that would have

21  standing to challenge?

22         MS. OLSON:  Well, I mean, I can't because FRA has to

23  make its decision based on nonavailability.  And there's very

24  little wiggle room with that.  I mean, the parties who are

25  proposing to get a waiver have to submit a domestic sourcing

```
 1   plan.  And FRA engages with Brightline to ensure that due

 2   diligence has been carried out and there's been marketing

 3   research that there's a substantial justification for the

 4   waiver.

 5          So I think it's FRA's responsibility for enforcing the

 6   by merit -- the requirements, which it does strictly.  The

 7   problem here is we have two competitors vying for a contract.

 8   But because the plaintiff has no grounds for going after

 9   Brightline in its choice of a contract, again, it's trying to

10   do it indirectly, and therein lies the problem with standing

11   for the plaintiff.

12          THE COURT:  And maybe this is a better question for

13   Brightline, but don't you think the waiver decision factors

14   heavily in an entity's decision about what vendors to select?

15   I mean, if Brightline knew or suspected that Siemens's proposal

16   would not get a waiver, don't you think that would have

17   affected whether they would have selected them?

18          MS. OLSON:  Well, I think the outcome would have been

19   different.  But the plaintiff has failed to show that it would

20   be different in a way that would have resulted in its getting

21   the contract.  Also, the fact is that normally FRA is only

22   presented with one supplier and one request for a waiver.

23          THE COURT:  Right.

24          MS. OLSON:  Here there was a little bit of a deviation

25   from that because Brightline hadn't yet made the decision and
```

1    wanted its waiver to align with the timing of its project.  But

2    normally, FRA's only presented with one waiver request.  So

3    it's -- it's not intended to make a choice between competing

4    suppliers, nor is it equipped or qualified to do so.

5         THE COURT:  And you keep saying that they can't show

6    that they would have awarded -- been awarded the contract.  So

7    that's the government's position, that for standing purposes,

8    despite the three buckets that they put their standing

9    arguments in, your position is unless they can show that they

10   would have won this contract absent FRA's decision, that

11   they're out of court?

12        MS. OLSON:  They have to show that not winning -- that

13   the waiver was a substantial factor in their not winning the

14   contract, yes, in order to show causality.

15        THE COURT:  But what about the competitor standing

16   injury?  Just the idea of being able to compete on an equal

17   footing absent any, you know, unlawful regulations or

18   government action.

19        MS. OLSON:  Well, they were able to compete on equal

20   footing.

21        THE COURT:  Okay.  Can you speak to that?

22        MS. OLSON:  Sure.  There is nothing that prevented

23   them from submitting their proposal to FRA and -- first of all,

24   this doesn't involve a government procurement.  Otherwise, we'd

25   probably be in the court of federal claims, and this was,

1    instead, an independent business decision by Brightline to

2    select a supplier, which didn't involve FRA.

3        But then nothing prevented the plaintiff from

4    competing with -- in Brightline's procurement process, which

5    they did by submitting a proposal.  And Brightline consulted

6    with both the plaintiff and Siemens during that process.

7        And the signing of the contract with Siemens after the

8    waiver was finalized couldn't have affected the bidding

9    process, as plaintiff claims, because, again, both plaintiff

10   and Siemens engaged in the bidding process and qualified for

11   waivers.  And I think it's irrelevant whether -- I don't know,

12   I haven't looked at the language the plaintiff was referring to

13   about FRA's expression of preference.  I didn't see that in any

14   of the briefs.

15       THE COURT:  Well, they're saying it affected the

16   process to the extent that, had the government -- had the FRA

17   not granted the waiver, there's a chance that contract between

18   Brightline and Siemens would have wouldn't have been executed

19   because their proposal was contingent on receiving the waiver

20   for the two trainsets.

21       I think what Alstom is saying is that until the

22   contract is signed, you know, they're not the selected vendor,

23   and absent your waiver, there's a good chance that that

24   contract wouldn't have been signed because they wouldn't have

25   been able to complete the project that they proposed.

1          Now, we can talk about what other things could have

2     happened, but I think Alstom wants to go back to the part

3     before the contract was signed, the waiver is out of the

4     picture and now Brightline is making a decision without the

5     waiver, which would benefit them in some way, even if they're

6     not ultimately selected.  That's what I think they're saying.

7          MS. OLSON:  Yeah, well, Brightline has invested

8     $9 billion in this project.  So if Siemens hadn't gotten the

9     waiver, again, Brightline would have had a lot of alternatives.

10          THE COURT:  Including considering plaintiff's

11     proposal, right?

12          MS. OLSON:  Well, they rejected it once and I think

13     the critical fact here is that there are radically different

14     technologies being offered by Siemens and Alstom.  And these

15     are -- the entire project is interdependent.  The parts of this

16     project, the components, are not interchangeable, Alstom does

17     not have the technology that Siemens has.  I think it has some

18     high-speed trains in Europe but it would have to adapt its

19     conventional technology here in this country to meet the

20     project specifications.

21          And there's every reason to believe and it can be

22     reasonably concluded that Brightline based its decision on

23     these differences in technology.  And high-speed technology is

24     highly specialized.  These are bespoke trains.  And you can't

25     interchange parts without compromising safety.  Obviously,

```
1    these are very dangerous vehicles.  And Brightline, it appears,

2    chose Siemens because of the specific high-speed technology it

3    offered, which Alstom cannot offer.

4         THE COURT:  Okay.  Anything more on standing?  I want

5    to hear from Brightline and Siemens on any standing issues

6    before I turn to the merits and irreparable harm.

7         MS. OLSON:  I think I've covered most of it.

8    Plaintiff raised the competitive injury point.  And again, I

9    think the timeline here shows that all the competition for the

10   contract and Brightline's selection of Siemens actually took

11   place before FRA granted the waiver.

12        Because they both obtained a waiver, the waiver being

13   given to Siemens didn't alter their competitive status.  And

14   they talk about -- the plaintiffs have talked about the lifting

15   of regulatory restrictions.  I don't know what regulatory

16   restrictions they're talking about.  Everyone was on equal

17   footing to apply for a waiver.  So granting the waiver didn't

18   lift regulatory restrictions on Alstom's competitor.

19        And I think we've pointed out in our briefs that what

20   the plaintiff actually wants to do here is eliminate

21   competition.

22        And finally, I think the plaintiff has said that

23   these -- in their reply brief they mentioned the technical

24   differences are immaterial.  But Brightline apparently

25   disagreed and it's Brightline's decision to make as to which
```

1    technology to choose.  Because FRA doesn't want to be

2    interjected into the process of a project sponsor choosing a

3    supplier, and that would also put the Court in the position of

4    second guessing Brightline's choice of supplier.

5              THE COURT:  Okay.

6              MS. OLSON:  Thank you.

7              THE COURT:  Thank you.  Who's up next?

8              Remind me, are you with Brightline?

9              MS. DATTA:  Yes, Your Honor.  I'm representing

10   Brightline West.

11             THE COURT:  You're in a unique position to say what

12   might have happened absent the waiver.

13             MS. DATTA:  Yes.  So I wanted to address a few points,

14   Your Honor, that came up in the colloquy with plaintiff's

15   counsel and with DOJ.

16             The first is that the waiver decision was not a

17   substantial factor in Brightline's procurement decision.

18   Brightline conducted a competitive procurement.  It reviewed

19   the proposals that were submitted by both Alstom and Siemens

20   and it made a selection decision accordingly.  The timing of

21   the waiver decision does not support plaintiff's argument at

22   all.

23             THE COURT:  But let me just ask a question.

24   Certainly, if a vendor is putting forth a proposal that depends

25   on receiving this waiver, I'm not sure how you can say that

1    that doesn't factor into your decision, right?  Because that's

2    how you get federal funding for the project.

3            So when you say that the waiver decision doesn't

4    factor into your decision, if you knew -- if your client knew

5    that a proposal wouldn't be able to go forward because it's

6    unlikely that the vendor would receive this waiver, are you

7    saying that would be immaterial to your client's decision?

8            MS. DATTA:  So, Your Honor, to clarify, both vendors

9    here required a waiver.

10           THE COURT:  Sure.

11           MS. DATTA:  So it wasn't a distinguishing factor

12   between Alstom's and Siemens's proposals.  If one vendor had

13   required a waiver and one had not, that might have been a

14   different case but that's not what we're presented with here

15   today.

16           THE COURT:  But aren't they requiring waivers for

17   different components?  Both for the car shells, but isn't

18   there -- there's an additional component here.

19           MS. DATTA:  Right.  What FRA does when it issues these

20   waivers is it looks at the state of domestic production.  It's

21   undisputed, even Alstom agrees here that there are no domestic

22   manufacturers of high-speed trainsets that meet the project

23   requirements.

24           So when -- and FRA acknowledges this.  It's in the

25   waiver and it also was part of the reason why FRA sought

1    domestic sourcing plans from offerors for this project.  And in

2    those domestic sourcing plans the project sponsors, you know,

3    set forth proposals from both vendors regarding the nondomestic

4    components and foreign suppliers that they would have to seek

5    components from.

6          So FRA reviews that documentation, and based upon that

7    documentation and the conclusion that there are no domestic

8    manufacturers of high-speed trainsets meeting the project

9    requirements, it makes its waiver decision accordingly and

10   documents that finding.  Which is what FRA did here.

11         So here, since both vendors required waivers, there

12   really was no basis to distinguish between either vendor on

13   that basis.  And the timing of the waiver decision and

14   Brightline's selection simply doesn't support what plaintiff is

15   arguing.

16         So the selection decision, which was memorialized in

17   the later executed contract, was made May 1st and the waiver

18   decision was not issued until May 24th.  So the waiver

19   decision was simply not a substantial factor in Brightline's

20   decision making, and that's crucial for the standing analysis.

21         THE COURT:  The language of preferred vendor, that's

22   the same as a selection from your client's perspective?

23         MS. DATTA:  Right.  I mean, the selection decision had

24   already been made on May 1st.  I mean, the executed contract

25   memorializes that decision but it had already been made and it

```
 1   was announced by Brightline.

 2            THE COURT:  Okay.  And then, can you just speak to the

 3   standing issues?  I don't know if you want to respond to

 4   something that you heard.  I'm most interested in the

 5   competitor standing piece and interested in the discussion

 6   we've been having about a plaintiff having to show that -- kind

 7   of the first step of a chain of events that could lead to

 8   relief, and kind of take you to the point of, you know, if this

 9   waiver were invalidated, then what happens next or what's

10   likely to happen from your client's perspective.

11            MS. DATTA:  Absolutely.  So the competitor standing

12   cases, Your Honor, that the plaintiff cites are just

13   inapplicable here.  They concern government procurements,

14   auctions.  The decision here that is at issue is Brightline's

15   selection decision.  Brightline is not an executive agency.

16   This was a competitive procurement that was conducted by

17   Brightline.  It made an independent business decision.  And FRA

18   had no role in that business decision.

19            So the injury that plaintiff is complaining of really

20   stems from a private party's selection decision.

21            As we've discussed in our papers, the competitor

22   injury cases that the plaintiff is citing really don't apply

23   here; they're inapplicable.  I think the case that is most

24   helpful, if I may suggest, Your Honor, is the Cubic

25   Transportation Case because, you know, that case involved -- it
```

```
1    was issued by the District Court for D.C. and it involved a
2    similar instance in which an unsuccessful bidder was
3    challenging the FTA's application of buy America requirements.
4            In that case, the Court determined that it was really
5    a competitive -- a private competitive selection decision that
6    was at issue.  So it determined, you know, that was the injury
7    that plaintiff was complaining of.  So therefore, it didn't
8    have standing to challenge the FTA's interpretation of its buy
9    America requirements.  I think that case is on all fours here,
10   Your Honor, and is the best one to guide the outcome here.
11           THE COURT:  Any other points you want to make about
12   standing?
13           MS. DATTA:  Your Honor, I also want to address this
14   dichotomy that Alstom has presented, which is the issue that
15   there's really just, you know, a choice here between Alstom
16   proceeding with federal funding and proceeding with Siemens
17   without federal funding.  And that's just that's not the case,
18   you know, Your Honor.
19           At this point, you know, there is zero chance that
20   Brightline is going to proceed with Alstom.  I mean, since May
21   of 2024, Brightline has invested millions of dollars in working
22   with Siemens after its selection as the rolling stock
23   manufacturer, and we can't go back at this point.
24           There's a carefully calibrated project schedule.
25   Preliminary design and engineering work has been done that
```

1    incorporates Siemens's trainsets.  So at this point, that

2    dichotomy is just a false one.  It's not going to predict the

3    outcome of this case.

4                THE COURT:  So for purposes of this standing inquiry,

5    I can just take that representation or what in the record --

6                MS. DATTA:  I think so.  So the declaration of

7    Brightline's CEO that's in the record, Your Honor, discusses

8    the investment that Brightline has made in this project,

9    including $140 million since Brightline was selected and for

10    the FRA grant.

11                That really amply illustrates the amount of money that

12    Brightline has invested since the receipt of the grant in the

13    project as it is, you know, envisioned now with Siemens's

14    trainsets.

15                THE COURT:  Okay.  Thank you.

16                Does anyone from Siemens want to speak to standing?

17                MR. PERRY:  Yes, Your Honor.  But very briefly, if I

18    might.  And it's just to supply some record cites --

19                THE COURT:  Yes, that would be very helpful.

20                MR. PERRY:  -- that support this discussion.

21                First, FRA 3 in the record, it's part of the final

22    notice, is the place where the agency describes that the

23    selection actually occurred.  That's in the first column on

24    that page.

25                So -- and I would say, Your Honor, that to the

1    incredibly speculative notion that Alstom would ever win this

2    contract, I think Brightline just made that absolutely clear.

3    But here is where in the record you can see that the speed of

4    the train is incredibly material.

5         FRA 31 through 34, those are submissions by Brightline

6    that explain the heart of this project.  This is the first

7    truly high-speed project in the United States and it is

8    competitively viable because of the speeds of the trains, 186

9    to 220.  The rail used and the infrastructure product is

10   specialized rail, contemplating that you can go up to 220.  All

11   of that is covered in the record, including submissions from

12   Nevada, which, of course, is participating in this project and

13   has engaged Brightline at 55, 57 and 59 in the record.

14        And then just by very sharp contrast, Your Honor,

15   there is no question -- in fact, Alstom has admitted that it

16   does not have from this domestic facility a train that can

17   achieve those speeds at this time.  You can find that

18   throughout the record but including at footnote 19 of Page 12

19   of their final brief, that's their PI reply, where they write:

20   "Alstom has never disputed the FRA's conclusion that no

21   manufacturer in the United States was yet producing trains at

22   over 186 miles an hour."

23        There are other record cites for that same

24   proposition, including FR -- and including in the

25   administrative record at 139, and, of course, that's exactly

1    what the agency described in its final waiver decision at

2    Page 3.  Thank you, Your Honor.

3              THE COURT:  Okay.  Mr. Levy, I'll let you rebut

4    anything that you've heard about standing.  And then let's

5    move -- I'll combine the discussion of the merits and

6    irreparable harm, just for sake of time, so that you don't have

7    to keep standing up and down, but I'll let you get the final

8    word on standing.

9              MR. LEVY:  Thank you, Your Honor.  A few points on

10   standing.  I think a few of my friends -- I'm losing track of

11   all the arguments -- have said that the fact that we required a

12   waiver somehow affected the analysis.

13             I think I touched on that at the outset.  We're

14   challenging only one of the waivers for trainsets and the Court

15   should assume that we prevail on that for the standing analysis

16   and that therefore, Siemens's bid was unlawful while ours was

17   lawful.

18             Number two, I think the government is ignoring the

19   current law on competitive injury with respect to a few points

20   that were made, including stating that somehow the acts of

21   third parties affected the analysis.

22             The stem case that I mentioned, the Washington

23   Alliance case from 2022 from the D.C. Circuit, explicitly

24   rejected the government's contention that the injury is not

25   traceable to the rule because the -- employment decisions

1    involve the independent hiring or firing actions of third

2    parties.  That's at 177.

3         And then the cases on the third theory of standing

4    about economic injury, the cases I mentioned also involve third

5    parties.  The Telephone and Data Systems case was against the

6    FCC, where the FCC had granted a permit and the permit was

7    alleged to have allowed conduct said by the plaintiff to have

8    caused economic injury by a third party, and the Circuit found

9    standing.  So I think those cases, the third-party point is

10   just a red herring.  We cite cases where there are third

11   parties.

12        I think the government also has the wrong standard for

13   causation.  The Court had it right.  It is a substantial

14   factor.  And again, I would point to the Telephone and Data

15   Systems case, where the D.C. Circuit was very clear that,

16   although a favorable action may not necessarily result in the

17   plaintiff ultimately having their injury redressed, it's clear

18   that without a favorable decision there was no chance, and that

19   was enough for redressability purposes.

20        There were a number of points that were made about how

21   these are bespoke trains and somehow we are to assume that

22   Alstom would have never been selected.  There's no record

23   cite -- evidence saying that Alstom would not be selected.

24   That's just not there.

25        The affidavit from the CEO doesn't say that.  It

1    speaks about money that was expended and it's significant that

2    it does not say that from our perspective.  What remains is

3    that Brightline did ask for the two bids, did ask for best and

4    finals for both, and then asked the government for a waiver,

5    either before or after, for Alstom.

6          If Alstom were really out of the running, then why

7    would it have done all of that?  It doesn't make any sense.

8    Siemens says that Alstom has not yet manufactured high-speed

9    trainsets in the United States.  That's disputed.  But the fact

10   remains that they haven't either and they were two competing

11   bidders who were proposing to build them in different ways.

12   We're challenging a waiver that made it possible for them to do

13   so.

14         I think there were -- in terms of the timeline, just

15   briefly, the waiver decision happened May 24th, 2024.  The

16   contract was signed May 31st, 2024.  So after the waiver.

17         Again, I think if the contract for that bid would not

18   have been appropriate but for the waiver, then it doesn't --

19   the sequence doesn't really matter because it still would have

20   rendered -- it was still necessary to make the conduct legal.

21         So I'll pause there unless the Court has questions

22   based on the presentations of my friends.

23         THE COURT:  No further questions on standing.

24         MR. LEVY:  So I think on -- I'll probably address the

25   merits first because they're a bit more complicated.  On the

1    irreparable harm, it's in our briefing.  I think the Court

2    doesn't have to reach it if it just decides the merits or if my

3    friends give the Court a bit more time to do so before the

4    disbursement happens.

5           On the merits, there are, of course, statutory

6    arguments and there are arbitrary and capricious arguments.

7    I'll start with the statute.

8           There seems to be some disagreement as to what the

9    rationale here was that the FRA gave here for the part of the

10   waiver that we're challenging.  We think that the record is

11   clear that there is one piece of the decision that -- where the

12   FRA is responding to comments that say that there should be no

13   waiver at all for anybody.

14          And that's at Page 3, where the FRA makes clear that

15   Alstom needs a waiver for the car shells, which is the waiver

16   that, again, we're not challenging.

17          There is a separate discussion on Page 4, where the

18   FRA addresses the scope of the waiver, and my client's comment,

19   that because my client can manufacture the trainsets here and

20   Siemens cannot, that the further waiver for the trainsets is

21   inappropriate and unlawful.  And that's on Page 4.

22          And the response that is given as to why that's

23   appropriate, the FRA says that the Siemens and the Alstom

24   trainsets are different technologies and designs.  That's in

25   one of the paragraphs.  And then it says, also, that granting

1    the waiver would maximize the use of domestic content by

2    building out future capacity.

3            So those are the points that are made in the decision.

4    We explained in our opening brief why those simply did not

5    work, and that if you were to accept those at face value, then

6    the buy America mandate would be a dead letter.  Because,

7    effectively, the government could just give a waiver on a

8    supplier-by-supplier basis and project bidders would not have

9    to look for alternative suppliers who could supply goods

10   domestically.  And this just doesn't make any sense.

11           Now, in their opening brief on summary judgment, the

12   government conceded that the FRA lacks authority to consider

13   differences in design or technology.  That's at Page 4, and

14   they're quoting us and they're agreeing to that.

15           They say, again on Page 4, that the statute does not

16   authorize the FRA to base waiver decisions on anything but

17   physical nonavailability.

18           So the relevant question is whether the goods used in

19   the project are available domestically.  Here there were

20   trainsets that were by Alstom and Siemens as part of the

21   proposals that met the project specification.  The mandate

22   commands, therefore, that if there is one bidder, one supplier,

23   that proposes to use American labor or parts, that that bidder

24   has to be chosen.  That is a preference that Congress --

25           THE COURT:  Can you point me to -- I'm sorry to cut

1    you off.  Where are you getting that both train proposals met

2    the project specifications?  I'm just -- I mean, it was in the

3    briefs but are you saying just by virtue of that they wouldn't

4    have submitted Alstom for a waiver if it didn't?  Or is there

5    some declaration that --

6         MR. LEVY:  Well -- I'm sorry, Your Honor.

7         THE COURT:  I'm just trying to make sure I understand

8    where everything is in the record.  I mean, I get the point

9    that if your client's proposal didn't meet the project's

10   specifications, why would they have even gone through this

11   process.  I get that.  But in terms of any declaration that

12   these are, essentially, even though different brands, the same

13   trains that can do the same thing and that both meet the

14   specifications, where are you getting that?

15        MR. LEVY:  I think there are several references but

16   the main point is just the fact that they were being asked --

17   waivers were being asked for both.  And it's on --

18        THE COURT:  I get that point.

19        MR. LEVY:  I'll come back to it on rebuttal, if I may.

20        THE COURT:  Yes, yes.  I get that point.

21        MR. LEVY:  So the mandate, from our perspective,

22   commanded that it use the domestic supplier.  The FRA assumed

23   for purposes of the discussion, because Brightline had

24   represented, that Alstom's facilities in New York have the

25   capacity to manufacture the Avelia Liberty trainsets in the

1    United States, in contrast to Siemens.  That's at Page 4,

2    FRA 4.

3         The statute permits a waiver when goods are not

4    produced in a sufficient and reasonably available amount or not

5    of a satisfactory quality.  Those are the statutory words.

6    There was no finding that that occurred.  And so the waiver

7    decision, to the extent it was based on design and technology,

8    is simply not allowed.

9         The part of the waiver that speaks to building at

10   capacity is also not allowed.  I will add that my friends on

11   the other side do not even defend that part of the waiver or

12   that part of the rationale.  And it doesn't make any sense.

13   Because the point is there has to be unavailability now.  And

14   building at future capacity is not a statutory factor that

15   would permit a waiver and the FRA cannot add one.

16        Now, I think the government, as we read the brief,

17   says that they have a different argument in their opening

18   summary judgment brief, which is if there's one component and

19   one supplier -- and I'll turn to that.  In the reply they seem

20   to come back more to the FRA 4 rationale and to say that it

21   does vary on a supplier-by-supplier basis and to say, well,

22   Brightline selected Siemens and, therefore, you have to look at

23   what Siemens can do and it doesn't really matter what Alstom

24   can do.

25        There's no -- there's no support for that.  And if it

1    were true, the mandate would really be a dead letter because

2    all you'd have to do is say, well, what can the supplier do,

3    when the whole point of the mandate is to favor American parts

4    and labor and you are meant to look at difference suppliers.

5    And that's, in fact, what the FRA usually does.

6          And here, although it could defer to Brightline to

7    some degree, Brightline told it that Alstom could manufacture

8    all ten trainsets here.  So that's, I think, the FRA 4

9    rationale, which is the vendor-by-vendor rationale.

10          The government in its summary judgment brief, as we

11   read it, takes a second rationale, which is to say that -- it

12   says that unavailability is determined on the project level,

13   not the component level, and that if a bidder's product require

14   any component, however small, be produced overseas, then that

15   product does not meet the buy America requirements and that a

16   waiver would, therefore, be required and that bidder could,

17   therefore, not be deemed to eliminate unavailability.  That's

18   19 and 20 of the government's summary judgment brief.

19          So as we understand the government, because Alstom

20   needed a waiver for the car shells, therefore, that permitted a

21   waiver for everything else because Alstom cannot manufacture

22   the trainsets with fully U.S. parts.

23          THE COURT:  I'm sure I'm oversimplifying this but I

24   want to drill down the kind of vendor-by-vendor issue.  So as I

25   read the government's argument, it's almost as if they're

1    suggesting that these are two kind of distinct products.

2          Maybe they both fall under the category of high-speed

3    trains but that Siemens has a very specific type of train that

4    it is proposing be used in this project that it is representing

5    is not available in the United States.  And your client has a

6    specific train that is also not currently being manufactured

7    but that it proposes it will adapt to meet the requirements of

8    this project.

9          And so what I hear you saying is that that's just a

10   brand issue and the question is, in general, whether the

11   high-speed trainsets can be produced here.  It doesn't matter

12   that Siemens is proposing a specific type of brand of

13   high-speed train that's not available here, because you're not

14   contesting that whatever specific technology or type -- what is

15   this?  The Velaro train is not manufactured here.

16         So can you just drill that down?  I think I might be

17   getting tripped up over whether these are different products or

18   the same product and you're just saying different brand names,

19   is what I understand you to be saying, as opposed to different

20   products, different technologies and, thus, it matters for

21   Siemens's proposal that what they're proposing they use is not

22   something that can be manufactured here.

23         MR. LEVY:  I don't think it's just a question of

24   branding.  They're obviously different trains.  They're

25   different suppliers.

1              THE COURT:  Right.

2              MR. LEVY:  I think the point, though, is the statute

3    looks at that category of goods -- here, rolling stock -- that

4    meet the project's requirements.  And I think the way also

5    Siemens and Brightline discuss it in their brief is high-speed

6    trains that meet a certain speed.

7              Based on the submission of the waiver requests and

8    what was in the record, both Alstom and Siemens trains meet

9    those requirements of the project.  There was no explanation,

10   either in the submissions or in the FRA's decision, as to why

11   any design or technological differences might matter.

12             This dovetails a bit with our arbitrary and capricious

13   argument, which is that to the extent there were design and

14   technology differences that were significant for purposes of

15   the waiver of the project, there's no explanation as to what

16   those are or why they matter.

17             So I'll leave it at that unless --

18             THE COURT:  Okay.

19             MR. LEVY:  So the government in its brief suggests

20   that -- as we read it, that the -- again, 19 to 20, that one

21   should look at the project level, not the component level.  And

22   that if one of the suppliers needs a waiver for a part, that

23   means that it's unavailable for purposes of the waiver

24   exception.

25             But that's both counterfactual and contrary to the

1    text of the statute.  The text speaks of goods and goods, it's

2    clear, may include components.  And that's, in fact, how the

3    FRA looked at it here.  FRA at 5 gave waivers for components,

4    including car shells.

5            And this aligns with the practice at the time the

6    statute was enacted.  So there were FTA regs in effect when the

7    statute was interacted.  We cite them in our brief, 49 CFR

8    661.7 F and G, which made clear that with respect to the FTA

9    regs, which govern a similar statute that used the same

10   operative language, that a waiver could be granted for a

11   component or a subcomponent or for a specific item or material

12   that is used, and that once a waiver is granted for a component

13   or a subcomponent, then that is considered of domestic origin

14   for purposes of the waiver.

15           So if in other words, if the component, which is car

16   shells for train A and car shells for train B, there's a waiver

17   for both of them, then you do have a situation where we have a

18   domestic supplier, Alstom, and a foreign supplier for purposes

19   of conducting the two trainsets.

20           The FRA doesn't respond to these points.  It says in

21   their reply brief that this assertion is legally unsupportable.

22   And the only thing it says is it cites a waiver that Alstom got

23   in 2014 at the time when there were no other suppliers who were

24   prepared to supply trains, meaning all Amtrak's specifications,

25   when here we have two.  So it's completely inapposite.

1          So again, on a component-by-component approach the

2     waiver must fail.  Alstom and Siemens both met the criteria for

3     a waiver for the car shells at FRA 5.  The FRA accepted that

4     the construction could occur here.  That's both in the summary

5     judgment brief of the government, where they said they accepted

6     this, and at FRA 4.  So this argument, I think, falls apart.

7          THE COURT:  Sorry to jump around but can you speak to

8     some of the counterarguments in the other side's briefs that

9     all the parties agree that there, at least at the time the FRA

10    is making this waiver decision, was not a domestic -- there was

11    no domestic capability to manufacture these trains.  And that

12    that's all that -- that admission is fatal to your position and

13    it doesn't matter what your future representations about your

14    future capability might be.  That for purposes of the waiver,

15    if the FRA satisfies itself that there's no domestic

16    capability, then it's perfectly appropriate for them to make a

17    finding that a waiver is appropriate.

18         MR. LEVY:  I was going to turn to that.

19         THE COURT:  Okay, perfect.

20         MR. LEVY:  I think that's the argument that we think

21    the intervenors make, Siemens and Brightline.  It's clearly

22    post hoc.  It doesn't appear in the waiver decision.  So it

23    can't be considered.  The government all but concedes as much.

24    The government in its brief, we don't read them as making that

25    argument.

1          In fact, in their reply at 14, on summary judgment

2     they say the plaintiff argues that FRA's waiver decision failed

3     to state that a waiver should be granted for the two trains

4     because Alstom needed to adopt the available technology for

5     this project.

6          Then it goes on:  But FRA would have had no reason to

7     make this statement about Alstom because its waiver decision

8     with respect to Siemens was based on the nonavailability of

9     components required by Siemens.  FRA did not grant the Siemens

10    waiver because of Alstom need to adapt its facilities.

11         So there's -- you know, I don't think the government

12    adopts the intervenor's approach.  That's, again, at Page 14 of

13    the summary judgment reply.

14         The argument also -- not only does it -- is it

15    improper but it falls apart.  I think it relies, ultimately, on

16    the use of the present tense "are" in "are produced."  All the

17    other arguments about the text, I think, are contingent on what

18    that means.  But number one, it's significant that the statute

19    uses the present tense and not the past tense.

20         I think what Siemens and Brightline are saying in

21    arguing that it must have happened in the past, they're really

22    requiring that there be a past production, and if that's what

23    the statute would have required it would have said "were

24    produced before,"  "were previously produced" in the reply.  In

25    Siemens's reply at Page 3, they change the word "are produced"

1    to "have produced."  Of course, the word "to be" and the word
2    "to have" are different.  Having produced something means
3    you've done it before.  Are producing means you're doing it
4    now.  So the focus is on present capability of production, not
5    whether you've done it before.
6            The argument that you have to have done it before
7    isn't just inconsistent with the text and grammar, but it's
8    also inconsistent with the mandate.  So the mandate says that
9    before there's an obligation or the time of obligation, the
10   project must use goods that are produced in the United States.
11   I'm paraphrasing, but the same "are produced" verb applies
12   there.  Same tense.  That needs to be read in harmony with the
13   use of the "are produced" in the waiver.
14           And focusing on the same period, obligations occur, as
15   happened here, before the work starts, before the funding
16   occurs.  It's for a project which is a prospective enterprise.
17   And the question is whether there is present capability.  And
18   there is capability.
19           Again, FRA 4 says Alstom's facilities in New York have
20   capacity to manufacture Avelia Liberty trainsets in the United
21   States, in contrast to Siemens.  And what they needed was the
22   waiver for the car shells.  That's it.
23           And I will add, I think we cited instances in our
24   brief where the FRA can and does consider present capability,
25   even when the manufacture hasn't done it before.  Including --

1    we had a decision on gate hinges.

2          And that also makes sense as a matter of constructing

3    the statute.  There's a broad mandate where Congress stated

4    that American parts and laborers have to be used.  It was a

5    bipartisan bill.  And there are exceptions to that.  Those have

6    to be read narrowly, so as not to swallow the rule.

7          As the Court is aware, as Siemens has said a number of

8    times, trains in the United States are not at the same level as

9    they are overseas.  It couldn't be that Congress intended to

10   permit waivers whenever the FRA planned to deploy funds toward

11   a new sort of project.  That would completely swallow the rule.

12   The whole point was to, as a matter of policy preference --

13   Congress's preference not, not the project manager's

14   preference -- advantage U.S. labor and parts.

15         On the statute, I think I'll pause there.  We also

16   have arguments on how the decision was arbitrary and

17   capricious.  I've touched on the first one a bit.  There were

18   three basic arguments.  The first is that to the extent design

19   and technological differences mattered, there's no explanation

20   in the record as to what those were and why they mattered for

21   the purpose of a decision.  And so that renders the decision

22   arbitrary and capricious.

23         My friend's response to that is that the FRA didn't

24   really rely on design and technological differences, but that

25   begs the question of what did it rely upon.

1          So that's the first point and the arguments I think

2     are in the brief.  Unless the Court has questions.

3          The second argument is that the FRA failed to maximize

4     the use of domestic -- even if there were statutory discretion

5     to grant a waiver here, it is discretionary.  It says may

6     waive.  And the notice in the government today said, again, in

7     its brief that the FRA strictly enforces compliance to maximize

8     the use of materials produced in the United States.  That's at

9     FRA 6.

10          The OMB guidance says the same thing.  It's quoted in

11     the government's brief.  It's at FRA 173, which speaks of

12     minimizing the use of waivers.  It says that -- again, 173 --

13     "To the greatest extent practicable, waivers should be issued

14     at the project level and be project specific.  As appropriate,

15     a project level waiver may be further narrowed to apply only to

16     a single product or product type."

17          So it's as narrow as possible.  The waiver here does

18     not seek to maximize the use of domestic labor because once the

19     waiver for -- a waiver could have been granted only for the car

20     shells, and once that occurred for each vendor, we have one

21     vendor who could produce all the goods here and all the trains

22     here and the other, in its bid, could not.

23          So -- and there's no explanation as to how the

24     current -- the proposal maximizes the use of current domestic

25     labor.  Instead, it says that it would build out future

1    capacity.  That is not a permissible factor under the statute

2    or the guidance.

3        THE COURT:  Can I ask a question?  One thing I

4    understood the government to be saying is that you're kind of

5    setting this up as a comparison between two vendors.  And in

6    the normal course, what I think I heard Ms. Olson say, is they

7    only get one vendor proposal and that this was somewhat unique

8    in that there were two.

9        So you're sending this up as a comparison of this

10   person is saying they can do it and this entity is saying they

11   can't.  I mean, how does this work in a vacuum from the

12   agency's perspective?

13       MR. LEVY:  I think two points.  One, this may be

14   unique but it is the fact pattern before the Court, where there

15   are, in fact, two bidders and one could do it and the other one

16   could not.

17       Number two, if the situation had been different, where

18   only Siemens had been set forth and Brightline disclosed that

19   it previously had engaged with Alstom but decided to go with

20   Siemens because it was a preferred vendor, for whatever reason,

21   that would still be part of the record and there would still be

22   another supplier domestically who could satisfy the mandate of

23   buy America.

24       Congress was clear, the mandate is clear, that federal

25   funds, to be obligated they have to be deployed in preference

1    of the American supplier when one is available.  And that is

2    the situation here.

3         THE COURT:  Okay.

4         MR. LEVY:  Unless the Court has a question, I'm

5    mindful of the time.

6         THE COURT:  Sure.  I don't have any more questions

7    about this but if there's anything else you want to hit on,

8    and, obviously, I'll give you an opportunity to have the last

9    work.

10        MR. LEVY:  Okay.  I touched briefly on the preliminary

11   injunction, which I think is only necessary to the extent the

12   Court needs more time.  That argument dovetails a bit with the

13   standing arguments, where there's case law saying that

14   competitive harm is irreparable.  And with respect to the

15   economic loss, we cited in our brief there's case law saying

16   that the loss of revenues is irreparable in situations where

17   there's sovereign immunity and the economic harm is

18   significant.

19        And then with respect to the balance of the equities,

20   the analysis there is if we're likely to prevail on the merits,

21   which we are, as I've just explained, then the public interest

22   does favor an injunction because the -- because there's a

23   compelling interest in enforcing Congress's policy decisions.

24   And we cite cases to that degree too.

25        There are also some questions on the remedy.  I don't

1    know if the Court would like me to touch on those.

2            THE COURT:  Sure.  Let me ask you a question.  Can you

3    just remind me of the timing situation about when you're saying

4    irreparable harm is triggered in terms of the request or

5    invoice that might issue?

6            MR. LEVY:  So the date of payment that I was told by

7    my friends -- and I think the Court should ask them, but --

8            THE COURT:  Okay.

9            MR. LEVY:  Was December 18th.  And they'll confirm.

10   And I don't know the extent of the payment or what it covers.

11   We haven't been told.  We have been told that it covers some

12   disbursement for some trainsets.

13           And they've taken the position that that would affect,

14   potentially, the available remedies.  So in light of that, we

15   think the harm is irreparable to the extent it impacts our

16   ability to obtain relief here.

17           And then in terms of the final remedy, I think the

18   vacatur is the standard remedy under circuit law.  To avoid

19   that, it is the other side's burden to show two factors:  One,

20   that the ability to fix on remand would be clear, and, second,

21   that there would be disruption.  Both factors need to be made.

22           I think the government concedes in its PI brief at 13

23   that the status quo ante can only be restored by granting the

24   ultimate relief sought, which is a vacatur of the waiver for

25   Siemens.  That's at Page 13 of their brief.

1          It's clear that setting aside unlawful government

2     action, which is what an AP action seeks to do always, almost

3     always results in this disruption.  There are multiple cases

4     that say this.  With respect to the first factor, which is the

5     ability to fix the problems on remand, I think that dovetails

6     with the merits.  So I don't want to repeat them too much.

7          But what's clear from circuit law is that if it's not

8     at all clear, if it's not clear what would happen on remand,

9     then there should be a vacatur.  And that's the Environmental

10    Defense Fund case versus FERC, 2 F.4th at 976.

11         Here, we think it's not clear.

12         The second factor, which is whether there would be

13    disruption, again, that same case, F.4th at 976, says that that

14    factor is weighty only insofar as an agency may be able to

15    rehabilitate its rationale.  So they have to meet both.  So the

16    Court doesn't even have to go there.

17         The case also makes clear that a remand without a

18    vacatur would set horrible incentives for the government

19    because it could just grant relief and push illegal action

20    forward and effectively avoid review.

21         We also think that with respect to some of the

22    arguments that are made about how this is a complex

23    infrastructure project, the decision of the District Court in

24    Friends of the Capital Crescent Trail versus FTA, which is 218

25    F.3d -- or F.Supp.3d at 53 is instructive.

1          And at Page 60, the case there involved, quote, "a

2     major infrastructure project involving complex contractual

3     relationships and intricate construction schedules."  And there

4     was a vacatur that was ordered because a NEPA analysis had not

5     been adequately conducted.

6          And the Court said that remanding without a vacatur

7     would be far more disruptive or risk being far more disruptive

8     because it would allow the project to proceed at a pace without

9     completing all the analysis required under NEPA, and it could

10    very well be that the agency would determine as a result of the

11    required analysis that some other alternative is now

12    preferable, and everything would have to be unbound.

13         So it it's sought, actually, that the disruption

14    factor in the context of a complex infrastructure analysis of a

15    case of the sort at issue here would require a vacatur and that

16    not vacating would be far worse.

17         THE COURT:  And I'm going back.  Can you just -- I

18    know this is in your brief, so I just want to understand.  The

19    connection between the payment of this invoice, if it is for

20    the two trainsets for which the waiver was granted, why does

21    your irreparable harm hinge on the payment of that invoice?

22    Specifically, given your citations to the competitive standing

23    cases and how competitive injuries are irreparable.  That's not

24    tied to any kind of monetary considerations.  I'm just -- I

25    want you to walk me through the connection.

```
1              MR. LEVY:  So I'm not -- my friends on the other side
2     have taken the position that those payments would affect the
3     analysis somehow.
4              THE COURT:  Okay.
5              MR. LEVY:  Our position is that if the waiver is
6     unlawful, then no payment at all, whether for the trainset or
7     for anything else, can occur to the extent that they're
8     proposing to go ahead with Siemens trainsets built abroad in
9     the project, whether those trainsets are paid for using private
10    funds or government funds.  That's what the mandate says.
11             So my friends, I think, have taken the position that
12    this payment does affect the analysis.  There's not enough of a
13    factual record to show why that is.  So we felt that we had to
14    move for preliminary injunctive relief for that reason.
15             THE COURT:  I see.  So absent that representation you
16    might not have moved for a preliminary injunction?
17             MR. LEVY:  That's right.
18             THE COURT:  Okay.  Thank you.
19             MR. LEVY:  Thank you.
20             THE COURT:  Ms. Olson, I'll hear from you.
21             Can I just ask you to expound on where we just left
22    off?  Because I want to understand timelines and the pending
23    PI.  So first, what is the December 18th date and what is the
24    significance of that date for my purposes?
25             MS. OLSON:  That's the date that the second
```

```
 1    disbursement would go out.  And I believe the first

 2    disbursement pertained only to items not related to the Siemens

 3    trainsets.

 4              THE COURT:  Okay.

 5              MS. OLSON:  The second disbursement might involve the

 6    Siemens payments being disbursed -- or disbursing Brightline

 7    for payments it made for the Siemens trainsets.

 8              THE COURT:  On December 18$^{th}$?

 9              MS. OLSON:  Yes.

10              THE COURT:  So on December 18$^{th}$, Brightline will

11    receive money that includes --

12              MS. OLSON:  Reimbursement for payments that Brightline

13    made for Siemens services.

14              THE COURT:  Why does that impact the Court's remedy in

15    this case?  Or why does that matter in terms of --

16              MS. OLSON:  Well, we don't think it impacts the

17    remedy, for several reasons.  I mean, first of all, what the

18    plaintiff is asking for is the vacatur of the FRA waiver.

19    That's the source of its harm.  And they allege in their brief

20    that if these disbursements go out, it will prevent them from

21    being switched over to become the supplier.

22              But that wouldn't be a proper remedy that this Court

23    could conceivably order.  If you -- if the Court vacates the

24    FRA's waiver, it can't then order that Brightline choose Alstom

25    as its supplier.
```

1          THE COURT:  I understand that.  But what I understand

2     from plaintiff is that the reason they moved for this PI is

3     that they were under an impression based on some representation

4     from the government that there was some argument that you would

5     make once these disbursements were made that would either --

6     were too far down the field, the Court can't do anything or

7     something of that nature.  Is that not what you're --

8          MS. OLSON:  Well, I think the plaintiff wanted us to

9     agree that we would never make that argument.  I said, at this

10    point, that's so far down the road if it ever did happen that

11    we couldn't find ourselves not to make the argument.

12         THE COURT:  I understand lawyers never want to bind

13    themselves.  Here's what I'm trying to say.  There are a lot of

14    moving pieces in this case.  It's complicated.  I would prefer

15    not to be scrambling on a PI for a situation that's not going

16    to come up.  Meaning if the real question is not whether these

17    disbursements affect the ultimate judgment in this case, I

18    would prefer, and I would move expeditiously while this is

19    fresh in my head, to issue to resolve the summary judgment

20    motions and not deal with the PI that plaintiffs are filing out

21    of an abundance of caution, if that makes sense.

22         I mean, do you see a need for me to resolve this PI,

23    not on the merits, but just is there, from your perspective, if

24    these disbursements go out does that impact anything in the

25    case?

1          MS. OLSON:  No.  Because there's no possibility --

2     first of all, it depends on an assumption that the plaintiff

3     will ultimately get the contract and be entitled to payments

4     somehow.  Those payments would never come directly from FRA.

5     They would be Brightline's obligation to make if Alstom were to

6     get a contract with Brightline.  There are no circumstances

7     ever under which FRA's disbursements would go directly to the

8     plaintiff.

9          So if plaintiff got the contract with Brightline, it

10    would be in a position to contend that Brightline owes it

11    money.  And if Brightline had exhausted all of FRA's

12    disbursements at that point, Brightline would presumably still

13    be under an obligation to pay the plaintiff for performance of

14    the hypothetical contract through nonfederal funding.  Because

15    federal funds are only about a quarter of this project,

16    3 billion out of 12 billion.  Brightline has $9 billion from

17    non-federal sources.  So its obligation to pay plaintiff exists

18    whether or not FRA now disburses this money.

19          THE COURT:  Okay.  Just to be clear, the

20    December 18th disbursement, in terms of any issue

21    plaintiff -- let's assume plaintiff prevails on everything

22    they've asked for.  Your position is those disbursements would

23    not impact any argument that you would make or any ruling that

24    I would make?

25          MS. OLSON:  That's correct.

 1          THE COURT:  Are you satisfied with that?  I would much

 2    rather decide this case, and I know -- I mean, I know there's a

 3    lot at stake here and I want to make sure I get the right

 4    answer, at least right to me.  I would prefer not to be, you

 5    know, ruling on a PI that's just filed out of an abundance of

 6    caution if it's really not going to impact.

 7          MR. LEVY:  I think I agree with Your Honor.  We -- I

 8    agree with Your Honor.  I don't know if my friends at

 9    Brightline and Siemens take a different position.  But assuming

10    they do not, then that concession is enough.

11          THE COURT:  Okay.  Thank you.

12          All right.  Now let's focus on the merits.

13          MS. OLSON:  Okay.  I think the most prevalent claim

14    that plaintiffs make about why this FRA waiver was improper is

15    based on its assertions that FRA did not base its decision on

16    nonavailability.  It based its decision on technical

17    differences and a future increase in manufacturing capacity.

18    And that's based on a misinterpretation of FRA's response to

19    some comments.

20          I mean, the basic facts here are pretty simple.  The

21    sponsor of this rail line, Brightline, chose the supplier,

22    Siemens.  And Siemens needed a waiver for car shells and two

23    trainsets.

24          And at the outset, I just want to point out that there

25    are separate waivers for these projects but the fact that the

1    two contenders for the supplier contract both needed a waiver

2    for car shells, they don't cancel each other out.  Those

3    requests for waivers don't cancel each other out and render

4    Alstom a domestic supplier.  There's no magical conversion by

5    which -- because two suppliers need waivers for car shells,

6    Alstom is suddenly a domestic supplier because it doesn't need

7    a waiver from trainsets.

8         But aside from that, FRA granted waivers for Siemens

9    and Alstom based on the physical nonavailability of the

10   components that these suppliers said they needed to meet the

11   specifications for the project.  And that is the extent of

12   FRA's involvement --

13        THE COURT:  Let me ask you this.  And again, I may be

14   oversimplifying this.  Plaintiff's basic position is the two

15   trainsets are not physically unavailable because they have the

16   capacity to manufacture them.  I mean, at bottom, that's what

17   they're saying.  So a waiver was granted for -- they're not

18   challenging the car shells.  For the two trainsets, they're

19   saying that that decision is wrong.  So what is your response

20   to that?

21        MS. OLSON:  Because it is wrong because they do not

22   have the capacity to manufacture the trainsets domestically

23   because they needed a waiver for the car shells.  They do not

24   have a capacity to manufacture the components needed for

25   Brightline's project domestically because they also need a

1   waiver.

2           And the fact that the waiver is for car shells and

3   they're claiming, which is purely a matter of speculation, that

4   they can manufacture waivers for trainsets domestically, they

5   can't.  They can't produce the components needed for this

6   project.

7           THE COURT:  So you're saying -- and I thought I

8   understood this from your brief but I'm confused by this.

9   You're saying that because they requested a waiver -- or Alstom

10  requested a waiver for a component of this overall project,

11  that that means that at a project level --

12          MS. OLSON:  Yes.

13          THE COURT:  -- trainsets, rolling stock, whatever

14  cannot be manufactured domestically and, therefore, you could

15  give a waiver for any component of a high-speed trainset, even

16  if there is a domestic producer that -- let's say a light

17  switch, right, that you -- because they needed a waiver for car

18  shells, if another proposal was in front of you that said, you

19  know, we can't manufacture the light switches domestically,

20  even if there were other producers that could do that and did

21  do that, you would say, well, because you needed a waiver for a

22  component then any piece of this that someone needs a waiver

23  for we would grant?

24          MS. OLSON:  Well, here, again, as I've said before,

25  these components are not interchangeable.  So the -- FRA views

1    this as one waiver request, even though the waivers are for

2    separate components.  The fact that Alstom needs a waiver

3    disqualifies it from being a domestic supplier.

4         THE COURT:  When you say it's one waiver request,

5    meaning that you don't look at each component for which a

6    waiver was requested and make an independent determination?

7         MS. OLSON:  They look at each component but what makes

8    a supplier a domestic producer is the ability to manufacture

9    the overall product domestically.  And Alstom cannot

10   manufacture trainsets domestically.  They can't manufacture the

11   rolling stock domestically.  It's proposing to adapt its

12   technology to meet the project specifications, but --

13        THE COURT:  And your position is because it needs a

14   waiver for the car shells, that means that it can't -- so it's

15   not able to -- so therefore, you could grant a waiver to

16   Siemens, even if other components that Siemens is proposing to

17   obtain or manufacture overseas could be manufactured and

18   produced in the United States?

19        MS. OLSON:  Well, FRA isn't authorized to grant a

20   waiver -- it isn't authorized to grant a waiver -- it cannot --

21   Alstom cannot base its assertion that it is able to produce

22   trainsets domestically on the speculative assumption that it

23   will some day be able to adapt its product.

24        THE COURT:  Right.  But you're not looking -- I mean,

25   the FRA is not deciding whether or not Alstom's representations

```
1    are accurate if -- or looking into the specifics of its
2    project, right?  You're just deciding whether or not the waiver
3    is appropriate based on the information that's presented to
4    you.
5              MS. OLSON:  That's right.
6              THE COURT:  There's nothing here in which you would or
7    did suggest that Alstom, in fact, doesn't have the capability
8    in the future to do this?
9              MS. OLSON:  That's correct.  But the proper basis for
10   a waiver is nonavailability.  And I mean, I don't know how to
11   get the point across but that Alstom is not a domestic -- it's
12   not capable of producing products domestically in a way that
13   would bring it within the meaning of the statute, because it,
14   too, needs a waiver.
15             THE COURT:  Maybe I'm just not understanding this.  So
16   there are a number of components outlined for which the FRA
17   concluded that these components were not available in the
18   United States.  My understanding, or at least what I thought,
19   is that you're looking at each of these components individually
20   in making that determination, right?
21             And so even if Alstom needed a waiver for car shells,
22   when you go to brake control units and other components, if
23   Alstom could produce domestically brake control units, you're
24   saying that you would nonetheless find that Siemens could get a
25   waiver for this component --
```

```
1              MS. OLSON:  Yes.

2              THE COURT:  -- because Alstom can't produce the entire

3    project domestically.

4              MS. OLSON:  Well, in this case we're talking about

5    rolling stock.

6              THE COURT:  Okay.

7              MS. OLSON:  And rolling stock is considered a

8    component.

9              THE COURT:  Okay.

10             MS. OLSON:  FRA considers the waiver request as a

11   whole, but I'm -- I don't know if I can clarify this for the

12   Court but --

13             THE COURT:  I knew nothing about trains before this.

14   So if I'm oversimplifying this, I just like to drill it down.

15   I now know what rolling stock is.  But I thought that you look

16   at each component request so that you could say I give you a

17   waiver for X, Y, Z but not this piece.  Is that not right?

18             MS. OLSON:  That is right.

19             THE COURT:  Okay.

20             MS. OLSON:  But for purposes of determining

21   nonavailability, it looks at the overall waiver request.  I

22   think that's the difference.  It has to look at each component

23   and determine whether it's available.  In this case, the

24   component was the rolling stock.

25             By the same token, Alstom needed a waiver for car
```

1    shells.  So it can't be considered a supplier that has the

2    needs for this project available domestically.

3         THE COURT:  Even if it has components that another

4    supplier doesn't?  Even if it can produce domestically

5    components of a project that another supplier can't?

6         MS. OLSON:  The problem here is that the parts aren't

7    interchangeable.  So even if Alstom might be able to produce

8    light switches on a train domestically, it's not necessarily

9    the case --

10        THE COURT:  Oh, I see what you're saying.

11        MS. OLSON:  -- that Brightline --

12        THE COURT:  Would use their light switches.

13        MS. OLSON:  Yeah.

14        THE COURT:  But one could argue that if enough

15   components weren't granted a waiver, then they might not go

16   with the vendor that can't get the waiver for certain

17   components.  I know they're not interchangeable but --

18        MS. OLSON:  FRA, there's the domestic sourcing plan

19   that these suppliers have to submit.  And I think the way the

20   process works is that -- you know, in this case, for example,

21   Siemens asked for a waiver for two trainsets.

22        THE COURT:  I see.

23        MS. OLSON:  If it had asked for a waiver for ten

24   trainsets, FRA might have gone to Brightline and said, let's

25   see if we can improve -- have you done your marketing research?

```
 1              THE COURT:  Got it.  I think I understand now.

 2              Can you talk about the -- since we're on the topic of

 3    interchangeability, can you clarify the government's position

 4    with respect to the references to technology and the

 5    differences between the proposals and the trains proposed being

 6    used in the project and how that factored or didn't factor into

 7    your decision.

 8         MS. OLSON:  Yeah.  It definitely did not factor into

 9    the decision.  The decision was based on the physical

10    nonavailability of the components.  And that is what the

11    statute requires.  And what the plaintiff has done is take

12    language from FRA's response to certain comments and

13    mischaracterized it.

14              For example, when the plaintiff alleges that FRA based

15    its decision on different technologies, it is referring to

16    language in response to plaintiff's comment that -- for the

17    proposed rule -- that it had domestic -- quote, domestic

18    manufacturing capability for high-speed trainsets.

19         FRA, in response to this, explained why different

20    technologies might be unavailable domestically to varying

21    degrees and why the plaintiff might not, in fact, be capable of

22    manufacturing trains with the specific technology offered by

23    Siemens and chosen by Brightline.

24              But FRA was not basing its decision on those

25    differences in technology.
```

1          And the same goes for plaintiff's assertion that FRA

2   based its decision on domestic manufacturing capacity.  That

3   was -- that language that the plaintiff refers to was just the

4   response to a comment that issuance of a waiver would undermine

5   domestic investment.  And that's at FRA 0004.

6          And in response to that assertion, FRA just noted that

7   Siemens would be building domestic manufacturing capacity for

8   future demand.

9          And FRA also noted in response to that comment that,

10  just as the plaintiff had developed domestic manufacturing

11  capacity in the northeast corridor, FRA expected capacity to

12  ramp up to meet demand for high-speed technology.  And that's

13  all at FRA 0004.

14         But, perversely, really, the plaintiff is asking FRA

15  to base waiver decisions on its technology by denying the

16  Siemens waiver because Siemens needs to build two trainsets

17  overseas while the plaintiff can allegedly adapt its technology

18  to project requirements.

19         And the plaintiff is also arguing that encouraging the

20  future manufacture of trainsets in the U.S. isn't a proper

21  basis for a waiver.  But again, that's exactly what the

22  plaintiff's proposing to do, to build high-speed trainsets in

23  the future once it adapts its current technology to the

24  project's requirements.

25         Again, the FRA is basing its waiver decision on

    1    Brightline's choice of a supplier.  And it can't be emphasized
    2    enough that that is Brightline's independent business decision
    3    to make because FRA isn't authorized to make judgments about
    4    respective technologies, nor is it qualified to do so.
    5         And, again, the plaintiff says that, because it had
    6    this waiver for the components -- for the car shells, that its
    7    waiver for that component and the Siemens waiver for car shells
    8    somehow cancel each other out and convert plaintiff's request
    9    into -- convert plaintiff into a supplier that's able to
   10    produce things domestically, and there's no basis for that
   11    assumption.
   12         The plaintiff says that the FRA doesn't explain why
   13    differences in design matter, and, as I think we've said in our
   14    brief, they don't matter.  What matters is Brightline's choice
   15    of a supplier and FRA bases its decision on nonavailability and
   16    nothing else.
   17         THE COURT:  Okay.  So let's drill that down.  So I
   18    think the plaintiff argues that the government's kind of
   19    articulation of the basis of its decision is somewhat of a
   20    moving target and a shift and includes some post hoc
   21    justifications.
   22         When you say that the FRA based its decision on
   23    Brightline's choice of a supplier, what do you mean by that?
   24    Because you presented with Alstom and --
   25         MS. OLSON:  FRA bases its nonavailability

1  determination on whether the supplier chosen by the project

2  sponsor needs a waiver.

3          THE COURT:  Okay.

4          MS. OLSON:  It doesn't base its waiver decision on

5  FRA's judgment of the competing technologies of two proposals.

6  It isn't authorized to do that and it would be overriding or

7  supplanting Brightline's business decision about which

8  technology was best suited to its project.

9          THE COURT:  So if you had to kind of articulate and

10 put a finer point on the basis for FRA's determination of

11 nonavailability with respect to the two trainsets, what would

12 your -- what would you point me to or what would your kind of

13 summary of it be?

14         MS. OLSON:  It based its determination of

15 nonavailability for the two trainsets based on the fact that

16 Brightline had chosen Siemens to be its supplier and Brightline

17 asked FRA to grant a waiver for trainsets for the first two

18 trainsets that Siemens proposed to build overseas.

19         THE COURT:  Right.  And so they asked you to grant the

20 waiver.

21         MS. OLSON:  Right.

22         THE COURT:  And FRA granted the waiver for the first

23 two trainsets based on nonavailability because?

24         MS. OLSON:  Because those two trainsets are not

25 available in the United States.  No high-speed train is

1    available in the United States.  And Siemens proposed to build

2    the first two trainsets overseas to test its technology,

3    although these are service proven, but it has the facilities

4    there to ensure that these trainsets will work.  It is

5    proposing to build the first two trainsets overseas while it

6    develops the capacity to do the same thing here, to build the

7    trainsets and then be able to test them.

8            THE COURT:  Okay.  So then Alstom's response, as

9    presented by Mr. Levy, was the determination that the trainsets

10   are not available in the United States is wrong because we

11   produce trainsets.

12           MS. OLSON:  Right.

13           THE COURT:  And then the response to that is?

14           MS. OLSON:  They cannot currently, and they are basing

15   that assertion on the assumption that they will in the future

16   be able to adapt their conventional technology in this country

17   to suit the project's needs.

18           THE COURT:  Okay.  So let's start with the currently

19   piece.  So are you agreeing with -- I can't remember which or

20   if both intervenors said that question of availability is based

21   on current capacity, not future capacity at the time of the

22   project?

23           MS. OLSON:  That's right because the statue says are

24   produced.  So currently physically unavailable.

25           THE COURT:  And then your next point about the

1    assumption that it will be able to do so in the future, that's

2    not -- you didn't doubt that assumption -- there's nothing in

3    the record in which the FRA indicates that Alstom would not be

4    able to do that, right?  Like that's not --

5              MS. OLSON:  The statue doesn't authorize FRA to deny a

6    waiver to Siemens based on the future speculative hypothetical

7    capacity of a competitor to build trains.

8              THE COURT:  Okay.  What if it wasn't speculative?

9    What if they currently were building trainsets?  I'm sorry,

10   what if they were currently adapting their trainsets to go at

11   these speeds?

12             MS. OLSON:  Great.  But Brightline chose Siemens to be

13   its supplier.

14             THE COURT:  I understand that.  I'm just talking about

15   from your perspective of granting a waiver, take the future

16   capacity out of it and let's say --

17             MS. OLSON:  Oh.

18             THE COURT:  -- it's the -- I can't remember the names

19   of these trains.  It's the Siemens train, whatever brand that

20   is, and the train that --

21             MS. OLSON:  The Vela and whatever.  I know what you

22   mean.

23             THE COURT:  Yes.  That they want to adapt.  Let's take

24   the hypothetical out.  Let's say they were currently in

25   production adapting those trains.  What happens then?

1          MS. OLSON:  If Alstom were -- what happens to what,

2     though, is the question.

3          THE COURT:  I want to take out of the hypothetical the

4     current versus future versus, whatever, speculative piece.  I

5     want to remove that from the equation and just deal with what

6     happens if Siemens has the exact same proposal, they need a

7     waiver because these two trainsets, whatever make, model,

8     technology they are, are not something that they currently

9     produce domestically and they have a longterm plan to produce

10    them domestically but they're going to need a waiver for the

11    first two trainsets.  So same thing.

12         But I'm changing the Alstom hypothetical to instead of

13    making representations about a future capacity, they're

14    indicating that they currently -- or have successfully adapted

15    existing conventional trains to reach high speeds.

16         MS. OLSON:  Right.  But FRA still isn't authorized to

17    deny Siemens a waiver based on Alstom's capacity.  Because the

18    Siemens waiver depends on the Siemens capacity to build --

19         THE COURT:  That's what I'm trying to drill down on.

20    In terms of the nonavailability decision, then, what does that

21    look like?  You're saying -- because you're the one that said

22    the two reasons were they're not currently producing them and

23    then at some assumption about what they may have the capacity

24    to do in the future.  So I'm trying to remove that to see

25    whether or not that is material.

1        And now I hear you saying that it's not material, that

2   you could still grant the waiver to Siemens even despite that.

3   And I want you to expound on that.

4        MS. OLSON:  Yes.  Because the Siemens technology is

5   radically different from the Alstom technology.  And the

6   Siemens technology is the technology chosen by the project --

7        THE COURT:  Where in the record do I know that the

8   technology is radically different?

9        MS. OLSON:  In explaining the waiver, FRA does mention

10  that Siemens is -- I can't remember which one has the Avelia

11  and -- I think Alstom has the Avelia and Siemens -- it might be

12  on FRA 0004.

13       THE COURT:  I knew this.  Siemens is the Valero,

14  correct?  The Valero?

15       MS. OLSON:  Okay.  Siemens is the Valero.  Alstom is

16  the -- thank you.  Let's see if I can find it.

17       THE COURT:  And what I'm trying to understand is --

18  I'm trying to follow up on your argument that your finding of

19  nonavailability, despite Alstom's -- the information before you

20  about Alstom's representation, was based on, you know, they're

21  not currently available.  And I'm just trying to figure out, in

22  the event, if Alstom was currently manufacturing or had

23  successfully adapted its trains --

24       MS. OLSON:  It would still need a waiver, though, for

25  the car shells.

1          THE COURT:  It would need a waiver for the car shells.

2     But in terms of -- walk me through how the FRA would then

3     analyze Siemens's request for a waiver and they say, we don't

4     currently produce these trainsets in the United States.  We

5     plan to do so in the future.  Of the ten, we're going to

6     manufacture two overseas.

7          Would the FRA be able to make the determination that

8     the trainsets are not available if you had information in the

9     record before you that another competitor was making high-speed

10    trainsets?

11         MS. OLSON:  If there were -- if FRA were presented by

12    a proposal from Brightline, we need a waiver for Siemens, and

13    it was readily apparent that there were another domestic

14    manufacturer that could produce trainsets or meet the

15    specifications of this project in exactly the way that

16    Brightline preferred, then probably FRA would go to Brightline

17    and say, hey, it looks like there might be another domestic

18    manufacturer here.

19         THE COURT:  Okay.

20         MS. OLSON:  But what happens is these proposed

21    suppliers present domestic sourcing plans and they have to

22    justify their need for a waiver.

23         THE COURT:  Right.

24         MS. OLSON:  Very exhaustively.  And show that they've

25    conducted marketing research and that there was due diligence

1    in attempting to find another domestic supplier.

2          So the fact that -- if Alstom could definitely produce

3    trainsets that exactly matched what Brightline felt it needed,

4    and it's Brightline's decision to make that choice, then maybe

5    there would be some discussion.  But it's -- again, it's

6    Brightline's decision.  These are dangerous vehicles and you're

7    talking about safety considerations --

8          THE COURT:  Sure.

9          MS. OLSON:  -- and what Brightline thinks is best for

10   its project.  And it's the sponsor.  Nevada is the grant

11   recipient.  So it's up to them to ensure that they have a

12   successful project.  And they have every incentive to choose a

13   domestic supplier.  Presumably, it would be a lot cheaper, if

14   there is one.  But in this case there wasn't one that met

15   Brightline's project specifications.

16         THE COURT:  Okay.  Any other points you want to make

17   before I hear from intervenors?

18         MS. OLSON:  I think I've made -- oh, the plaintiff

19   talked about the fact that the OMB guidance confers some kind

20   of discretion on FRA to weigh proposals based on their domestic

21   content, or relative domestic content, or who produces a

22   greater percentage of things domestically.  And it doesn't

23   confer discretion in that way and it just says the agency's

24   efforts have to be, quote, consistent with applicable law.

25         So OMB guidance can't override statutory requirements,

1    and the applicable law indicates that a waiver has to be based

2    on physical nonavailability.

3         We've pointed out in our brief about the fact that FRA

4    has addressed the comments that the plaintiff made, although

5    the plaintiff may not agree with those responses.  But there

6    were three comments and I don't want to repeat them here unless

7    the Court has questions.

8         THE COURT:  No.

9         MS. OLSON:  And then as far as remedies are concerned

10   and irreparable harm, the -- again, the only remedy here is

11   they cater.  That is what the plaintiff asks for and any remedy

12   beyond that would be beyond the scope of this case.

13        So preventing the disbursements won't prevent the

14   plaintiff from getting the remedy that it wants.  And as I've

15   explained earlier, there's no way that plaintiff would ever be

16   entitled to disbursements directly from FRA, simply because of

17   the way the disbursements go first to the grant recipient and

18   then to the sub recipient, which then pays the supplier.  And

19   under no circumstances would switching to Alstom for this

20   contract be a proper remedy.

21        And finally, again, we've discussed in our brief the

22   relative equities of this case and the fact that the balance of

23   equities and public interests strongly favored the government.

24   I don't want to repeat what we've said.  But I would like to

25   repeat that any disbursements that -- if the Court goes in that

1   direction, any disbursements that it enjoins should be limited
2   to those associated with a supplier contract between Brightline
3   and Siemens.

4           I think that's all I had to say, Your Honor.

5           THE COURT:  Okay.  Thank you.  I appreciate that.

6           MS. OLSON:  And I think the plaintiff referred to the
7   status quo ante, but I'd like to point out the status quo right
8   now is that FRA granted the waiver, Siemens has the supplier
9   contract, the project is moving forward, as plaintiff must have
10  known it would.  It's a massive project.

11          The grant for this project was obligated in December
12  of 2023 and Siemens made its choice of a supplier well -- or
13  Brightline made its choice of a supplier well before the
14  contract was signed.  So the plaintiff should have known that
15  this project was going to move forward and it should have
16  sought a remedy sooner if it felt it was suffering any kind of
17  irreparable harm.

18          THE COURT:  Okay.  Thank you.

19          MS. OLSON:  Thank you.

20          THE COURT:  Okay.  Where do you want to start?

21          MS. DATTA:  Your Honor, I wanted to make a few points
22  quickly.  I wanted to return to the hypothetical that you were
23  addressing with Ms. Olson.  I think the issue there is that FRA
24  would have to look at whether Alstom's proposed trainsets meet
25  Brightline's needs.  So I just want to reiterate, that's an

1    integral part of the analysis here.  You know, what are the

2    project specifications and do the proposed products meet the

3    project --

4            THE COURT:  That's what -- that's part of their

5    determination?

6            MS. DATTA:  Right.  Because it's -- right, exactly.

7    Because each project, you know, has its distinct

8    specifications, and in this case the two trainsets offered by

9    Alstom and Siemens are distinct.  They're not interchangeable.

10            I would also add that, I mean, this is not a situation

11    where, you know, the on switch needs to be sort of flipped on

12    in a factory.  I mean, the Avelia trainset that Alstom is

13    proposing to use has had a troubled history.  It has had

14    numerous issues with it.  The record has citations to an OIG

15    report that was issued by Alstom's own government customer

16    about the fact that the trains were supposed to be fielded or

17    put in service in 2021 and it's now three years later and

18    they're not ready.

19            THE COURT:  In terms of my ruling on the summary

20    judgment motions, what is the relevance of that in terms of my

21    determination about the propriety of the waiver in the case?  I

22    know it's atmospherics and I understand why it was included,

23    but is it really relevant to -- there's nothing about that that

24    the FRA considered, right?

25            MS. DATTA:  Well, I mean, I think -- actually, there

1    is.  I mean, so the record includes a citation at FRA 3 about

2    the present capability of Alstom's domestic facility in New

3    York.  And that facility, FRA concluded, manufactures

4    conventional trainsets only.  It does not manufacture the

5    high-speed trainsets capable of operational speeds at 186 miles

6    per hour or higher that are required by this project.

7        So, I mean, what is the significance for FRA?  It's

8    really what is the present capability of the -- of the

9    manufacturer at issue.  And so, when Alstom -- I mean, Counsel

10   has conceded that this is about present availability and

11   present capability.  That facility in New York is not capable

12   currently of manufacturing a trainset that meets this project's

13   specifications.

14       THE COURT:  So future capability, so capability at the

15   time of the project is not relevant?

16       MS. DATTA:  Well, future capability is speculative,

17   right?  I think the purpose of the nonavailability waiver would

18   be completely defeated if a domestic manufacturer could just

19   raise its hand and say, well, we don't make this product now

20   but we swear we will in the future.  That's, you know, not

21   sufficient for the FRA to conclude that there is a present

22   domestic capability.

23       THE COURT:  Okay.

24       MS. DATTA:  Your Honor, I just wanted to return really

25   quickly to one point about the PI motion.  I mean, I think

1    that's -- the PI is really -- the emergency created by the PI

2    motion is really one that plaintiff has created.

3          But I do want to emphasize that if this Court were to

4    entry a preliminary injunction, that would seriously jeopardize

5    this project.  I mentioned before, you know, this is one of the

6    largest infrastructure projects in the nation.

7          THE COURT:  I've satisfied myself that -- based on the

8    government's representation that I don't need to rule on the

9    PI.  My intent was to deny it without prejudice, and if

10   something changes all plaintiff needs to do is tell me, can you

11   reopen it, and I'll rule on it.  I'm not going to make the

12   parties rebrief it.

13         But I'm satisfied, based on the communication between

14   Ms. Olson and Mr. Levy in front of me, that this disbursement

15   issue doesn't affect my overall ruling in the case, and,

16   therefore, I can just move quickly to the merits and resolve

17   the summary judgment motions.

18         MS. DATTA:  I think a ruling on the merits would be --

19         THE COURT:  Again, from the plaintiff's perspective,

20   if you leave and you determine that, actually, you're not

21   satisfied or you need me to take it up, all you need to do is

22   just tell me, and I'm not going to make the parties rebrief it;

23   I'll just reopen it.  But for purposes of where we are now, I'm

24   going to just deny it without prejudice, with granting leave of

25   plaintiff to reopen if circumstances change.

1          MR. LEVY:  That's my understanding based on the

2     representation of counsel, which I would assume would be

3     updated in the event the situation changes, yes.

4          THE COURT:  I meant change your mind -- if you need to

5     update it, you can.  I'm saying if the only change in

6     circumstance is you learn that some party has a different

7     representation than we're all under the understanding of, you

8     can just tell me to reopen it.  If you need to supplement it,

9     you can.

10          MR. LEVY:  Thank you.

11          THE COURT:  Let's just focus on the merits then.

12          MS. DATTA:  I think the issue in this case is actually

13     fairly straightforward, despite the smoke screens or

14     atmospherics that have been put up.

15          I think the core issue in this case is really about

16     whether there is currently a domestic manufacturer of

17     high-speed trainsets that meet the project requirements, and

18     the answer to that question is no.

19          That is the basis upon which FRA issued its waiver and

20     that's well documented in the record.

21          THE COURT:  Okay.  And you're basing the currently

22     available on the text of the statute?

23          MS. DATTA:  Yes, exactly, on the text of the statute.

24          THE COURT:  Do you have anything else that you want

25     to --

```
 1              MS. DATTA:  We are -- Your Honor, I would add, though,
 2    that we understand that you would like to defer on the PI
 3    motion, but just in terms of the merits, Brightline is anxious
 4    to receive a decision --
 5              THE COURT:  I understand that.
 6              MS. DATTA:  -- at your earliest --
 7              THE COURT:  I understand that.  And this is fresh in
 8    my head.  So I understand that.  I just wanted to -- you know,
 9    there's a difference between you telling me that someone needs
10    a ruling in five days versus, you know, me ruling on the merits
11    in short order.  So --
12              MS. DATTA:  Yeah.  All I would say there is that, you
13    know, although this is a very large project, the schedule in
14    this project is just so tightly planned.
15              THE COURT:  Sure.
16              MS. DATTA:  That even, you know, a delay of a few days
17    or weeks would have significant repercussions for Brightline.
18    I mean, it's carrying significant costs right now that it is
19    relying on FRA to reimburse.  There are many stakeholders here.
20              THE COURT:  I understand.
21              MS. DATTA:  That's all I'll say.
22              THE COURT:  Thank you.
23              MS. DATTA:  Thank you.
24              MR. PERRY:  Your Honor, there are two related reasons
25    why the government wins this case.  They're both explicitly in
```

1    the record on Page FRA 3.  That's the final waiver decision.

2    But in order to get to that, Your Honor, I'd like to actually

3    return to the very specific language in the statutory text.

4              THE COURT:  Sure.

5              MR. PERRY:  There's two provisions that are relevant

6    here, and I'm going to refer to the record pretty extensively

7    as I go through this.  The first, of course, is A1, which has a

8    very specific requirement on the secretary before the secretary

9    can obligate funds.

10             So obligation of funds, I think everybody recognizes

11   that's an appropriation-related term.  It happens at a moment

12   in time.  In order to obligate funds, the agency has to either

13   determine that there are all steel, iron and manufactured goods

14   in the project, which is the railroad, not the trainsets but

15   the railroad, are produced in the United States and if that

16   requirement is not met then they have to go to the waiver

17   provision.

18             So project, railroad, trainsets, component.  And

19   indeed, there are components of the trainsets.  And that's why

20   it's a little confusing because there's components of the

21   component.

22             THE COURT:  Yes.

23             MR. PERRY:  So completely understand why this doesn't

24   make sense without thinking about the project as a whole.  And

25   that's, of course, what FRA explained.

1          Now, here's the reason why.  The car shells, they're

2     material to the speed of the trains.  That's on Page FRA 3.

3     And, in fact, on Page FRA 8, which is the proposed waiver.  The

4     car shells are -- in fact, I can probably read it.

5          THE COURT:  Great.

6          MR. PERRY:  High-speed rolling stock aluminum car

7     shells are critical to the achievement of high speeds, and high

8     speeds are critical to the viability of this project.  Okay.

9     So A1, A1 says secretary can only obligate funds -- secretary

10    did that already -- if the manufactured goods used in the

11    project are produced in the United States.  You can find this

12    at Pages 61 and 62 of the record and 71 to 74 of the record.

13         Even in the Alstom proposal there are no manufactured

14    goods produced in the United States.  And that's because they

15    need foreign car shells.  That's reason one.

16         Now, why is that relevant to the waiver?  Because the

17    waiver requires the agency to have a snapshot in time before

18    the obligation of money to look at the steel, iron and goods

19    produced in the United States.  That is, it's a different

20    question than what this project is.

21         It's a survey of the entire United States, all the

22    suppliers.  They use what's called NIST map, which is part of

23    the Department of Commerce, to look at that.  It's a public

24    private partnership.  It's something that is sort of an example

25    of good government.  You go out and survey this.

1          But you have to make sure that there are goods

2    produced in the United States or not produced in the United

3    States that correspond to the foreign-sourced goods that the

4    project is going to use.  So you have to use U.S. goods if

5    they're available.  There's nothing about capacity.  It doesn't

6    say capacity here.  It's all present tense or past tense, not

7    future capacity.  Not in here.  So the steel, iron and goods

8    produced in the United States.

9          Now, again, Alstom doesn't do that.  Sixty-one to 62,

10   they don't produce this in the United States.  So the

11   government's first argument is correct.  When I go out and do

12   this survey of the United States, Alstom doesn't count.

13        THE COURT:  Right.

14        MR. PERRY:  They don't have goods produced in the

15   United States.

16        Now, here's the second reason the government wins.

17   Even if Alstom was making the car shells in the United States,

18   it doesn't produce trains that go fast enough.  It's a

19   different class of train.  They're not capable of operating on

20   Brightline's system.

21        Brightline's system is, as Brightline's counsel

22   described, an intricately designed system using, as I said

23   before, class 8 and 9 track for trains that can go 220 miles

24   per hour.  You have to get passengers from Los Angeles to Las

25   Vegas in two and a little bit -- two-plus hours.  To make it

1  competitive, they need those quick trains.  Alstom can't make

2  them.  So that's reason two.

3       Now, maybe some day in the future they might make

4  them.  And Your Honor asked my friend from Brightline a request

5  about the IG report.  The IG report is important for this

6  reason.  It shows that Alstom has not successfully made a

7  lower-speed train for Amtrak.  It's a year ago that that report

8  came out and they're still having horrific problems getting a

9  lower-speed train actually in revenue service.

10       THE COURT:  The reason I was asking the relevance of

11  that is just in terms of the FRA's waiver decision, how does

12  that factor in?

13       MR. PERRY:  Because the FRA's waiver decision not only

14  says -- it says two things on Page 3.  One, it says Alstom

15  needs a waiver because it doesn't produce anything in the

16  United States that, you know, we can survey the United States

17  and find that they produce it.  It also says they make

18  conventional-speed trains; they don't make fast trains.

19       Now, this is true high-speed trains like are used in

20  Europe.  Like if you go from London to Paris, you go through

21  the Chunnel, you're likely to be on one of these trains.

22  Right?

23       The major importance of what's going on here is that

24  there's a product that's being deployed in this unique project,

25  the only project of its kind in the United States at this

1    point -- maybe there'll be another project up and down the

2    state of California, going from Bakersfield to Merced, but this

3    project is the first one.  It's the pioneer project to bring

4    these types of high-speed trains to the United States.

5           Now, it's important that Siemens has agreed as part of

6    this process to train people in the safety -- train American

7    workers on the safety of these trains in Europe and then

8    successfully export those trains to a U.S. facility that

9    Siemens builds in New York.  And that's because the capacity to

10   build those trains is something the U.S. needs.

11          So you sometimes hear, and you can see this in the

12   briefs that Alstom writes, they say, well, there's these OMB

13   guidelines, right?  The OMB guidelines cannot contradict the

14   statute, right?  I was at OMB.  I wish I could have done that.

15   I can't do that.  Congress lays out what the requirements are.

16          So the real point here is that these products, these

17   policy issues that FRA looks at, they're not part of the

18   statute.  But the decision not only addresses what is part of

19   the statute, it also explains -- and you can find this in

20   FRA 27 and FRA 3 and 4 and even in the proposed notice at FRA 7

21   and 8 -- that the agency went through and worked with

22   Brightline and Siemens to get this manufacturing capacity for

23   these high-speed trains into the United States.  That's what

24   this OMB guidance is about.  It's about expanding the

25   capability in the United States to get this.  Guidance, not

1    statute.  Guidance.

2           So if the Court thought that this OMB guidance was

3    relevant, FRA addressed it.  And it addressed it well.  And so

4    sometimes my friend from Alstom counts that as something

5    negative in this instance.  It is absolutely not negative.

6    It's a positive.  It shows that the current administration was

7    working hard to try to achieve the ends set forth in the

8    guidance.

9           Not only is it statutorily appropriate but it complies

10   with the very specific guidance.

11          My friend from Alstom also made a reference to the FTA

12   regulations, the Federal Transit Authority, I think.  Those

13   aren't appropriate here.  He tried to say that Alstom's product

14   would some day be deemed a domestic product under those.  Only

15   if they had a waiver.  They don't have a waiver.  It hasn't

16   happened; it won't happen.

17          Now, there's been a little bit of discussion about

18   remedies here and people use the term "vacatur," of course.

19   You know, we're not talking about a vacatur.  We're talking

20   about a partial vacatur.  We don't think there's any remedy

21   necessary.  Of course, we don't.  Everything I just said

22   suggests that there's absolutely no reason for the Court to

23   consider this.

24          But if the Court started to think about remedies, it

25   would be a partial vacatur.  There are seven items on that list

1    on Page, I think, FRA 4.  And what they're trying to do is halt

2    one of them.

3        Now, as we discussed already, and Your Honor started

4    with standing, there's no reason to think that even if there

5    were some type of partial vacatur here as to that, that Alstom

6    would get this project.  That, again, is the relevance of the

7    IG study.  Why in the world would you hire somebody to build

8    your trains that couldn't build a train for Acela,

9    appropriately?  So it's relevant for that purpose.

10        But the point here is that the government ought to win

11    on the merits on both of these two theories, and even if there

12    were some type of a vacatur, it would be a very limited

13    vacatur, and odds are Alstom has, in fact -- it would be highly

14    speculative for Alstom to suggest here that it would have some

15    right to come back in and compete in a way where they'd win the

16    project.

17        Unless the Court has questions.

18    THE COURT:  I'm just curious on the FRA's point that I

19    was trying to drill down earlier about the fact that Alstom

20    needed a waiver means that they're not a domestic producer.  Do

21    you have anything to add to that discussion beyond what you've

22    already said?

23    MR. PERRY:  It's, again, from A1 in the statute,

24    right, and the question is is steel, iron and manufactured

25    goods used in the project produced in the United States, right?

1    Because if that's not the case, you need a waiver.  And Alstom

2    needed a waiver if it were selected.  And that's because the

3    manufactured goods that it was proposing to produce are not

4    produced in the United States because it needs car shells.  So

5    that was reason one why the government wins.

6         Reason two, of course, is that they don't make

7    sufficiently high-speed trains, even if they satisfied that

8    requirement.  Even if they could manufacture car shells in

9    Kentucky or somewhere, they still wouldn't win.  They would

10   still lose this case.

11        THE COURT:  Thank you.

12        MR. PERRY:  Thank you.

13        THE COURT:  All right.  I said I would give you the

14   last word.

15        MR. LEVY:  Thank you, Your Honor.  I'll try to be

16   brief.  I'll start with a citation to what Your Honor asked

17   where the FRA accepted that Alstom could meet project

18   specifications.

19        THE COURT:  Yes.

20        MR. LEVY:  That's at FRA 7, where it said that the

21   representation was that it could provide high-speed rail

22   components that meet Brightline West's specification and

23   applicable FRA safety requirements.

24        And then the government, in its summary judgment reply

25   at 10, says Alstom representation that it met Brightline's

1  specification and safety requirements was undisputed only for

2  the purposes of the waiver but it acknowledges that it was

3  taken as true for purposes of the waiver.  That's also, I

4  think, at Page 25 of the opening brief.

5          So again, two bids.  Both represented to Brightline

6  they could meet the specification.  Both were then submitted

7  onto the government for waivers.  And the only waiver my client

8  wanted was for the car shells.

9          I'll start, then, I think responding to some of the

10  points on the component argument that the government made.

11          THE COURT:  Yes.

12          MR. LEVY:  So I'll start back with the FTA regs.  Of

13  course, those are relevant because when the Supreme Court has

14  made clear that when Congress adopts a statute that borrows

15  language from the prior regulatory regime and there have been

16  regulations interpreting it that is brought in along with it,

17  carries the soil with the language.

18          49 CFR 6617(f), which I cited, I think, in my opening

19  presentation, when it speaks to waivers being granted for

20  components or subcomponents it specifically addresses that's

21  for the -- for purposes of procurement of rolling stock in

22  particular.  And it says that those -- that a waiver can be

23  granted for a component or subcomponent for rolling stock.  And

24  once that is granted, the particular component or subcomponent

25  would be considered of domestic origin for purposes of the

1  waiver regulations.

2        And so the point is, again, that the Court should --

3  FRA should have looked at it on a component-by-component basis.

4  And there may be situations where different manufacturers

5  propose to use different components manufactured overseas.

6  Here we have two manufacturers, both asked for the same

7  component, car shells, to be manufactured overseas and only one

8  of them needed an additional component.

9        And this is also how the FRA treated -- I believe the

10  page that I was referred to earlier by my friend from Siemens,

11  the waiver is given for both -- it's at FRA 5, "the following

12  components."  Bullet 1 is "first to complete trainsets."

13  That's only for Siemens.  And then Bullet 2 says "car shells

14  for all 10 trainsets."  That would be for either of them.

15        So again, the statute speaks to component by

16  component.  And I think if the government's approach to one

17  foreign component allowing dispensation for any other component

18  by another manufacturer, you just look at the supplier, the

19  mandate really becomes a dead letter because any minor

20  difference, no matter how irrelevant, could be a basis for a

21  waiver.  There's no explanation in the FRA's decision as to why

22  there are any technological differences that matter.

23        The second argument that I think the government is

24  making is that this was really Brightline's decision and the

25  government sort of went along with it and couldn't do anything.

 1    It's not Brightline's decision.  The government -- because the
 2    government -- because it was seeking federal funding, and
 3    Congress set forth in the mandate that it would have to use
 4    domestic suppliers if they were available.  And so it's not
 5    Brightline's decision because of that.
 6        And with respect to what was articulated, I think the
 7    Court has heard arguments from my friends about how there's an
 8    OIG guidance about Alstom, how the train's tech is different.
 9    That's not part of the record at all.
10        The only reference in the record to Brightline's
11    decision is FRA 138.  It's the letter, May 17th, 2024, that
12    identifies Siemens as the preferred vendor bidder after having
13    identified both of them as meeting the project's qualification.
14        And it says, and I quote it in full:  "The letter
15    serves to advise the Federal Railroad Administration that on
16    May 1st, 2024, Brightline West (BLW) announced its selection of
17    Siemens Mobility, Inc. as its preferred bidder for the supply
18    of rolling stock for the project.  As such, BLW hereby requests
19    that FRA proceed with finalizing the buy America waiver request
20    for the Siemens's trains and other components as included in a
21    previously submitted documentation."
22        There's no reference in the letter to the technologies
23    being different.  There's no reference in the letter to safety
24    concerns with Alstom's trains.  There's no reference in the
25    letter to OIG reports or to Alstom's specific issues or to

1    Alstom suddenly not meeting qualifications for the project

2    after having said earlier that they did, nothing like that.

3         It's just a preference announced by Brightline.  And

4    as between Brightline's preference and Congress's preference

5    for buy America, Congress's preference prevails.

6         So that's, I think the -- Brightline gets the select

7    argument.

8         The next argument was about present, past, future

9    capabilities and the words "are produced."  I don't want to

10   repeat too much of what I said but, again, it was assumed by

11   the government, by the FRA, that Alstom could construct the

12   trainsets here.  FRA 3, the discussion that was referenced by

13   my friend, speaks to the car shells as the only part of

14   Alstom's proposal not being available in the United States.

15   Again, that concept should be on Page 4, where Siemens's

16   present lack of capability to construct is contrasted to

17   Alstom's.

18        And so that was taken as true and I think we made this

19   point in the brief.  I don't know if I made it in my opening

20   presentation but at the time of the obligation, the government

21   clearly accepted that trains three to ten for Siemens, which

22   should have never have been manufactured in the United States,

23   they've never manufactured a single train in the United States

24   either.  They didn't get a waiver for those.

25        So clearly the relevant time frame for the mandate is

1    specification for the project and it's got to be the same as

2    for the waiver because, otherwise, to obligate the funds they

3    would have had to obtain a waiver.

4          And I don't think the Court could or should, under

5    Supreme Court precedent in governing the interpretation of the

6    statutes, read the waiver and the mandate to have different

7    scopes and points in view and time.  It's just not only

8    contrary to interpretation but, frankly, a bit nonsensical.

9          On the remedy, we did ask for a permanent injunction.

10   Contrary to what is being said, it's in our complaint, a prayer

11   for relief.  The government's view that if there is an

12   injunction it should be limited to trainset payments is,

13   frankly, concerning because the whole point of buy America is

14   there could be no federal funding if the project uses foreign

15   trainsets, and a project cannot get around those requirements

16   simply by limiting the use of money to non-offending products,

17   given the fungibility of money in the plain text of the

18   statute.

19         THE COURT:  Can you go back to what you were saying

20   about the FRA or the government accepting that Siemens's trains

21   three through ten could be manufactured here and somehow that

22   sheds light on how to interpret it?  Because I just assumed,

23   you know, the request for a waiver was only for the first two

24   trainsets.  That the agency is just taking that at face value

25   is not making any kind of determination about whether or not

1    three through ten could actually be manufactured here or not.

2    Could you repeat what you said about the relevance of that to

3    the question of statutory interpretation?

4              MR. LEVY:  Right.  I think the words "are produced"

5    appears -- "whether the goods are produced" appears in the same

6    tense, same phraseology in the mandate and in the waiver.

7              THE COURT:  Right.

8              MR. LEVY:  And the waiver is effectively an exception

9    that permits the government to give a waiver of the mandate

10   before obligation.

11             So the scope -- the operative scope is the same.

12   There was here a waiver for Siemens for trains one and two.

13             THE COURT:  Right.

14             MR. LEVY:  And there was an obligation of funds -- to

15   use funds for trains one through ten, where one and two would

16   be produced abroad and three to ten were promised to be

17   produced in the future here.

18             THE COURT:  Right.

19             MR. LEVY:  And that was accepted as efficient for

20   purposes of the mandate.  And I think the statute ought to be

21   read in harmony.  If trainsets three through ten for Siemens

22   meet the statutory definition off being produced in the United

23   States, even though they never have been, and surely Alstom's

24   does as well for trainsets one through ten, given that it

25   presently has capability that was assumed to be adequate by the

1    government and the FRA, subject to the waiver for the car

2    shells.

3              THE COURT:  Okay.  All right.  Thank you.

4              MR. LEVY:  Thank you, Your Honor.

5              MS. OLSON:  Your Honor, may I?

6              THE COURT:  Sure.

7              MS. OLSON:  I'll be brief.  First of all, just to

8    clarify earlier, it is correct to say that these requests for a

9    waiver are viewed as one waiver, even though FRA looks at the

10   components separately in granting the waiver.

11             THE COURT:  Okay.

12             MS. OLSON:  If a party needs a waiver for one

13   component, then it is not considered to be a domestic supplier.

14   The point, though, is that FRA can't base its waiver decisions

15   on a comparison of the different domestic manufacturing

16   capabilities of two competitors.  That choice is Brightline's

17   of what supplier to select.

18             FRA accepted the plaintiff's representation that it

19   could produce trainsets domestically but only for purposes of

20   assessing the waiver.  It was not making a judgment that the

21   plaintiff met the specifications for Brightline's project.

22             Third, the plaintiff has raised this but-for argument

23   several times.  But for the need for car shells, the plaintiff

24   would be a domestic manufacturer.  Well, the same applies to

25   Siemens.  But for the need for car shells and two trainsets,

1    Siemens could be considered a domestic manufacturer.  That's
2    not the way the statute works and that argument makes no sense.
3          The penultimate point is that the FRA didn't have to
4    reference technical differences in letters or in its decision
5    because it made the decision based on nonavailability.
6    Brightline made the choice and plaintiff now -- you know, based
7    on technical differences, perhaps, presumably, and the
8    plaintiff accusing FRA of not responding to comments.  But as I
9    said earlier, it's misconstruing comments and then holding it
10   against FRA for responding, basically.
11         And then, finally, the project is already funded.
12   These funds were obligated in September of 2023.  Right now
13   what's being done is FRA is making disbursements to reimburse
14   payments already made.  It is not funding a foreign
15   manufacturer.
16         FRA doesn't take anything at face value.  It has
17   domestic sourcing plans that it examines in determining whether
18   to grant waivers.  And these domestic sourcing plans are
19   exhaustive and thorough in their justification of, in this
20   case, the project sponsor's need for a waiver.
21         Thank you, Your Honor.  Unless the Court has other
22   questions.
23         THE COURT:  Nope, thank you.
24         Anything else?
25         MR. LEVY:  Just one correction, which is -- I'm sorry,

1    Your Honor.

2            THE COURT:  That's okay.

3            MR. LEVY:  I believe the obligation was

4    September 2024, not September 2023.  But I don't have anything

5    to add.  Thank you, Your Honor.

6            THE COURT:  All right.  Thank you, all.  I appreciate

7    the time that you took.  And this matter is under advisement.

8    Thank you.

9        (Proceedings concluded at 12:40 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Stacy Johns, certify that the foregoing is an
accurate transcription of the proceedings in the
above-entitled matter.


/s/ Stacy Johns                Date: December 17, 2024

Stacy Johns, RPR, RCR
Official Court Reporter