**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALSTOM TRANSPORTATION, INC., | |
| Plaintiff, | Case No. 24-cv-2098 (JMC) |
| v. | |
| FEDERAL RAILROAD ADMINISTRATION, *et al.*, | |
| Defendants, | |
| and | |
| SIEMENS MOBILITY, INC. & DESERTXPRESS ENTERPRISES, LLC d/b/a BRIGHTLINE WEST, | |
| Intervenor-Defendants. | |

<u>**MEMORANDUM OPINION**</u>

The Nevada Department of Transportation, together with private rail operator Brightline West, plans to build a passenger railroad that will connect Las Vegas and Southern California in about two hours.[1] With trains travelling over 180 miles per hour, this project will be the first of its kind in the United States. To fund a portion of the project, the state agency and Brightline applied for a federal grant. To be eligible, the project had to comply with Buy America requirements, which mandate that the steel, iron, and goods used in the project be manufactured in the United States. *See* Notice of Proposed Nonavailability Waiver of Buy America Requirements for the Nevada Department of Transportation to Purchase Certain High-Speed Rail Components, 88 Fed.

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

1

Reg. 89015, 89015 (Dec. 26, 2023); *see also* 49 U.S.C. § 22905. Those requirements can be waived, however, in certain circumstances, including if the "goods produced in the United States are not produced in a sufficient and reasonably available amount." 49 U.S.C. § 22905(a)(2)(B).

Brightline conducted a private procurement process to select a vendor to supply the trains for the project. Alstom Transportation, a train manufacturer based in New York, submitted a bid in which it proposed to adapt its existing lower-speed train to meet the Brightline project specifications. Alstom proposed manufacturing the trains in its New York facility but using aluminum car shells sourced abroad. Siemens Mobility also bid for the contract. Siemens proposed its high-speed Velaro NOVO trains, which are already in service in Europe. Siemens would build the first two of the ten trains needed for the project at its German headquarters, with American workers in attendance for training, and then build the remaining eight trains at a manufacturing facility to be constructed in Nevada. Because both Alstom and Siemens required foreign manufacturing for some aspect of their proposal, Brightline submitted a request for a waiver from the Buy America requirements. The Federal Railroad Administration conducted a notice of proposed rulemaking where it solicited comments and evaluated the waiver requests.

Brightline ultimately selected Siemens as the "preferred rolling stock vendor" for its project. Notice of Nonavailability Waiver of Buy America Requirements for the Nevada Department of Transportation to Purchase Certain High-Speed Rail Components, 89 Fed. Reg. 45934, 45936 (May 24, 2024). After Brightline's selection of Siemens, the Federal Railroad Administration announced that it was issuing a "final waiver [that] reflects the needs for the project given Brightline West's decision to select Siemens as its preferred . . . vendor." *Id.* After considering Brightline's domestic sourcing plans and the public comments, the Administration waived the Buy America requirements on nonavailability grounds. Explaining that "there are

currently no domestic manufacturers of high-speed trainsets (i.e., trainsets that are service proven at speeds in excess of 125 mph)," the waiver allowed Siemens to construct the first two trains in Germany. *Id.*

Having lost out on the project, Alstom brought suit under the Administrative Procedure Act against the Federal Railroad Administration, its Administrator, the U.S. Department of Transportation, and its Secretary, challenging the propriety of the Buy America waiver. ECF 1. Siemens and Brightline intervened in the case to defend the waiver. Because Alstom lacks standing to challenge the waiver decision, the Court **GRANTS** the defendants' and intervenors' motions to dismiss for lack of subject matter jurisdiction.

## I.    BACKGROUND

### A.  The Federal-State Partnership for Intercity Passenger Rail Grant Program

In 2021, Congress passed the Infrastructure Investment and Jobs Act as an effort to increase funding for federal highways, infrastructure, and transportation initiatives. Pub. L. 117–58, 135 Stat. 429 (2021) (codified, in relevant part, at 49 U.S.C. § 24911). Among other things, the statute authorizes the Secretary of Transportation to develop and implement a competitive grant program to fund intercity passenger rail service projects, known as the Federal-State Partnership for Intercity Passenger Rail Grant Program. *Id.* § 24911(b). One goal of this program is to establish new intercity passenger rail service. *Id.* Eligible applicants for funding under the program include states, interstate compacts, public agencies, state political subdivisions, Amtrak, and federally recognized Indian tribes. *Id.* § 24911(a)(1). Private rail operators are also permitted to partner with an eligible entity to receive funding. *Id.* § 24911(b). The Federal Railroad Administration (FRA) is responsible for administering the program. *See* 49 C.F.R. § 1.89(a).

Projects that receive funding under the program are subject to statutory "Buy America" requirements. *See* 49 U.S.C. § 22905; 88 Fed. Reg. at 89015; ECF 66 at 187. As its title suggests, the statute provides that projects are eligible for funding "only if the steel, iron, and manufactured goods used in the project are produced in the United States." 49 U.S.C. § 22905(a)(1). That said, the FRA (exercising the Secretary's delegated authority) can "waive" those requirements if it "finds that" one of a delineated list of conditions is met. *Id.* § 22905(a)(2); *see* 49 C.F.R. § 1.89(a) (delegating this authority). Those conditions are satisfied, for instance, where "the steel, iron, and goods produced in the United States are not produced in a sufficient and reasonably available amount or are not of a satisfactory quality," or where "rolling stock or power train equipment cannot be bought and delivered in the United States within a reasonable time." 49 U.S.C. § 22905(a)(2)(B)–(C). Prior to granting a waiver, the FRA must "publish in the Federal Register a detailed written justification as to why the waiver is needed" and "provide notice of such finding and an opportunity for public comment." *Id.* § 22905(a)(4).

### B. Brightline West Project

In late 2022, the FRA issued a Notice of Funding Opportunity under the grant program inviting applications for rail service projects located outside the Northeast corridor. Notice of Funding Opportunity for the Federal-State Partnership for Intercity Passenger Rail Program, 87 Fed. Reg. 75119 (Dec. 7, 2022). In response, the Nevada Department of Transportation (NVDOT) applied for funding in partnership with Brightline West, a privately owned railroad. The NVDOT-Brightline project proposed to establish a first-of-its-kind passenger rail system between Las Vegas, Nevada, and Rancho Cucamonga, California. 88 Fed. Reg. at 89015. Under the supervision of NDOT, Brightline would construct the project, consisting of a 218-mile rail service with trains moving at least 186 miles per hour to take passengers from Las Vegas to Southern

California in 2 hours and 10 minutes. ECF 66 at 32–33. The project was projected to break ground in 2023 and begin operations ahead of the 2028 Los Angeles Olympics. *Id.*

Brightline conducted a private procurement process to identify a domestic supplier for the rolling stock—the trainsets, as the parties call them, or, in lay terms, the trains—and signal system components of the project.[2] Two companies, Alstom and Siemens, responded to Brightline, "represent[ing] [that] they could provide high-speed rail components that me[t]" its "specifications and applicable FRA safety requirements." 88 Fed. Reg. at 89016. Alstom is part of a global conglomerate that manufactures trains and other rail industry technology. ECF 1 ¶ 8. Its principal place of business is in New York, and it has manufacturing facilities there and in Pennsylvania. *Id.* Siemens, a global train manufacturer, has 45,000 employees across the United States and manufacturing facilities in several states. ECF 66 at 143.

Both Alstom and Siemens, however, said in their proposals that certain non-domestic components would be required due to the unavailability of high-speed rail equipment in the United States. 88 Fed. Reg. at 89016. As Brightline later explained in its request for a waiver from the Buy America requirements, "[t]here are currently no trainsets or infrastructure in production or use within the US capable of supporting speeds in excess of 160 mph in revenue service." ECF 66 at 95. At the time of submitting the proposal, Brightline had not yet decided if it would use Siemens or Alstom trains, so it requested waivers for both companies' proposals. *See* 88 Fed. Reg. at 89016.

As for the trains the two companies planned to use, Siemens proposed its Velaro NOVO Electric-Multiple-Unit. *See* ECF 66 at 61. That high-speed train was already in service in Europe and was "capable of meeting the performance requirements" of Brightline's project. *Id.* Siemens planned to manufacture and assemble the first two trains in Germany with American workers

---

[2] The Buy America regulations define rolling stock as "transit vehicles such as buses, vans, cars, railcars, locomotives, trolley cars and buses, and ferry boats, as well as vehicles used for support services." 49 C.F.R. § 661.3.

present to observe the process, and then manufacture the remaining eight trains—Brightline needed ten total—at a new factory to be constructed in Nevada. *See id.* In addition to manufacturing the first two trains in Germany, Siemens said that the car shells for all ten trains would need to be sourced abroad. *See* 88 Fed. Reg. at 89016.

Alstom, for its part, proposed to adapt its Avelia train for the project. *See id.* While the Avelia train could not yet meet Brightline's requirements, Alstom said it would increase the "power capacity and traction" of the Avelia trains "to achieve the required speed" and "performance capability" for the Brightline project. ECF 66 at 61–62. Alstom's ten trains would be manufactured at one of its facilities in New York. *See* 88 Fed. Reg. at 89016. But Alstom, like Siemens, said that the car shells needed for its proposal were domestically unavailable. *See id.* It said the same of the brake control units it planned to use. *See id.*

### C.  The FRA Waiver Decision

In early December 2023, the FRA awarded the NVDOT-Brightline Project a grant of up to three billion dollars. *See* 89 Fed. Reg. at 45935. Later that month, the FRA issued a Notice of Proposed Nonavailability Waiver of Buy America Requirements for the NVDOT-Brightline project and invited public comment. *See* 88 Fed. Reg. at 89015. The notice explained that NVDOT and Brightline "conducted due diligence and performed thorough market research to adequately consider qualifying alternate items, products, or materials," and, having done so, believed that "a waiver [was] justified because no manufacturers exist in the United States that can produce the components described above, and that the use of these non-domestic components is necessary to ensure the safety and reliability of the high-speed rail system." 88 Fed. Reg. at 89016–17. NVDOT and Brightline also explained that the waiver would only represent less than 5 percent of the total expenditures for the project, with over 95 percent being spent on domestically sourced products

and labor. *Id*. at 89017. The FRA opened a 30-day public comment period on the proposed Siemens

and Alstom waivers.

On May 1, 2024, Brightline publicly announced its selection of Siemens as the preferred

vendor to supply the trains for the project. ECF 66 at 139; *see also Brightline West Selects Siemens

to Manufacture High Speed Rail Train Sets*, Brightline (May 1, 2024), https://perma.cc/GP7F-

5NHU. Later that month, on May 24, 2024, the FRA published its final notice granting a waiver

to Brightline's selected vendor, Siemens. 89 Fed. Reg. at 45934. The notice explained that the

FRA did not make any significant changes from the proposed waiver, but that "the final waiver

reflects the needs for the project given Brightline West's decision to select Siemens as its preferred

rolling stock vendor." *Id.* at 45936. The FRA noted, however, that "the Alstom proposal also meets

the statutory criteria for a waiver based on domestic nonavailability," as "[n]either vendor would

be capable of delivering the rolling stock for the FRA-funded project without a waiver based on

domestic nonavailability." *Id.*

The final waiver also responded to the public comments—including comments from

Alstom—that the FRA received. *See* 89 Fed. Reg. at 45936–38. Some of those commenters

"specifically" pointed to what the commenters said were Alstom's "domestic production

capabilities." *Id.* at 45936. Responding, the FRA acknowledged that "Alstom represented that it

would be able to manufacture and deliver the trainsets within Brightline West's project schedule."

*Id.* The FRA concluded, however, that although "Alstom's facilities in New York are capable of

producing domestic rolling stock and trainset components for conventional rail and transit

systems[,] . . . there are currently no domestic manufacturers of high-speed trainsets (i.e., trainsets

that are service proven at speeds in excess of 125 mph)" and that "Alstom does not currently

manufacture high-speed rail trainsets at its facilities in New York." *Id.* And in explaining why

Siemens could build the first two trains abroad, despite Alstom's plan to build all ten domestically, the FRA clarified that "the two proposals from Siemens and Alstom . . . are for two distinct trainset designs and technology": for Siemens, the Velaro high-speed train, and for Alstom, an adapted version of the Avelia train. *Id.* at 45937. Because "these trainsets involve different technologies," the FRA concluded, it was satisfied that there was "currently" no domestic capacity to build the Velaro high-speed train. *Id.* The waiver went into effect on May 29, 2024.

### D.  This Lawsuit

Around two months later, Alstom filed this suit against the FRA, Michael Lestingi in his capacity as the FRA's acting Administrator, the U.S. Department of Transportation, and Sean Duffy in his capacity as Secretary of Transportation.[3] ECF 1. Alstom asserted two claims under the Administrative Procedure Act. First, Alstom alleges, the FRA exceeded its statutory authority and contravened the Buy America statute when granting the May 2024 waiver. ECF 1 ¶ 51–52. Second, the FRA's decision was allegedly arbitrary and capricious for failing to explain the relevance of the Alstom-Siemens design and technology differences, failing to address some of Alstom's comments from the public comment period, and issuing a waiver decision inconsistent with relevant Office of Management and Budget guidance. *Id.* ¶ 58. Alstom seeks vacatur of the FRA's rolling stock waiver to Siemens for the foreign manufacture of its first two trainsets, a declaratory judgment that the waiver violates the Administrative Procedure Act, and permanent injunctive relief enjoining the FRA from disbursing funds to NVDOT and Brightline to the extent those funds apply to trains manufactured by Siemens abroad. *Id.* at 15.

---

[3] At the time the complaint was filed, Amit Bose served as FRA Administrator and Pete Buttigieg served as Secretary of Transportation. Pursuant to Fed. R. Civ. P. 25(d), however, when a public officer sued in his official capacity ceases to hold office while an action is pending, "[t]he officer's successor is automatically substituted as a party."

In August 2024, Alstom moved for summary judgment. ECF 12. Brightline and Siemens then moved to intervene in this case, which the Court allowed without opposition. Oct. 10, 2024 Min. Order. Around that same time, the Government moved to dismiss and cross-moved for summary judgment, contending that Alstom lacks standing to bring suit and that its claims otherwise fail on the merits. ECF 35. Siemens and Brightline promptly filed their own motions to dismiss for lack of subject matter jurisdiction, or in the alternative for summary judgment. ECF 39; ECF 44.

While briefing was underway on those motions, Alstom moved for a preliminary injunction. ECF 51. At a hearing on that motion, the Government made a representation that satisfied Alstom that it no longer needed an immediate ruling on the preliminary injunction motion, but instead would be satisfied if the Court simply resolved the pending cross motions for summary judgment and to dismiss. *See* H'rg Tr. 62:1–10; *see also* ECF 75 at 2–3. The Court therefore denied the motion for a preliminary injunction without prejudice, leaving it to Alstom to raise it again if it had concerns about irreparable harm. *See* H'rg Tr. 83:19–25. Alstom eventually did so, and its renewed motion for a preliminary injunction is now pending, as well. *See* ECF 75. Because the cross motions for summary judgment and motion to dismiss are ripe, and because the Court ultimately concludes that it must dismiss the case for lack of jurisdiction, it does not address Alstom's renewed motion for a preliminary injunction.

## II.    LEGAL STANDARD

When assessing a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), "[i]t is to be presumed that a cause lies outside [the federal courts'] limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "Under settled law, the District Court may in appropriate cases dispose of a motion to dismiss for lack of subject matter

jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint standing alone," or "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## III.    ANALYSIS

As the party invoking federal jurisdiction, Alstom bears the burden of establishing standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). To do so, Alstom "must show (i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant[s]; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Because Alstom is seeking declaratory and injunctive relief, "past injuries alone are insufficient to establish standing." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). Rather, the company must show either that it "is suffering an ongoing injury or faces an immediate threat of injury." *Id.*

Alstom argues it has three separate cognizable injuries. The company only need establish one of those injuries to have standing. *See Nucor Steel-Ark. v. Pruitt*, 246 F. Supp. 3d 288, 292 n.3 (D.D.C. 2017) ("In order to demonstrate that it has standing to sue, a plaintiff needs to identify only one type of cognizable injury-in-fact."). First, Alstom asserts it suffered a "loss of revenue from not being selected to provide trainsets for the Project." ECF 50 at 16. Alstom claims that absent the waiver, Alstom would have been selected for the Brightline project and as a result financially benefitted. Second, Alstom asserts that it has competitor standing because the FRA waiver caused increased competition by "permit[ing] Siemens to compete against Alstom with a proposal Alstom otherwise would not have been required to compete with." *Id.* at 12. Third, Alstom contends it suffered an injury because the FRA waiver impacted Alstom's ability to

participate in a lawful bidding process. *Id.* at 13. The Court addresses each theory in turn and concludes that none offers Alstom a viable path to bring this suit.

### A. Lost Revenue

Alstom's first theory turns on the company having lost out on the contract that Siemens won. Alstom alleges that, had the FRA denied the Siemens waiver, "Alstom would have been the only bidder that could have performed the lucrative, government-funded contract . . . and its hundreds of employees in New York would have been the ones to handle the work." ECF 1 ¶ 7; *see id.* ¶ 48 ("If the FRA had followed the law, then [Alstom] would be the only bidder who could legally supply rolling stock for the Project."). As a result of not being selected for the contract, Alstom "stands to lose out on millions of dollars of income under the Project." *Id.* Alstom argues that these "monetary losses, in the form of lost sales," are "economic harm that clearly constitutes an injury-in-fact." ECF 50 at 16. And Alstom is of course correct that its lost revenue qualifies as "an injury-in-fact for standing purposes." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.) ("A dollar of economic harm is [] an injury-in-fact for standing purposes."). But this theory of standing falters when it comes to causation and redressability.

That result is unsurprising, given the chain of events that connects Alstom's pocketbook injury to the challenged agency action. It was Brightline that decided not to award Alstom the contract. In this lawsuit, however, Alstom is challenging a decision made by the FRA, not Brightline. Because Alstom is "challeng[ing] government action"—the FRA's grant of the waiver—"in order to remedy an injury caused by a third party"—Brightline's decision—it is "substantially more difficult" for Alstom to establish that the "challenged government action" caused its economic injury. *Johnson v. Becerra*, 111 F.4th 1237, 1244 (D.C. Cir. 2024). In these circumstances, Alstom must show that the FRA's grant of the waiver was "at least a substantial

factor motivating" Brightline's decision not to use Alstom, and that there is "little doubt" that a favorable decision from this Court can redress Alstom's economic injury. *Id.* These are "significant barrier[s]" that "routinely" lead courts to "reject[] suits for injunctive relief that are directed against executive agencies but that seek to change the behavior of third parties." *Id.* Alstom cannot clear either barrier here.

As for causation, Alstom's story goes like this. "[G]iven the relative amount of federal funding at stake," Alstom begins, "a denial of Siemens's waiver request would have altered Brightline's calculus." ECF 50 at 18. Brightline therefore "would not have proceeded with Siemens on the same terms if the waiver had been denied," Alstom reasons. *Id.* at 17. And finally, because "Brightline obtained technical bids from both Siemens and Alstom, and then requested waivers for both," Alstom was a serious contender for the project. *Id.* at 18 (emphasis omitted). It therefore "does not require speculation," Alstom concludes, to assume that had Siemens been denied the waiver, "Alstom had a better chance of receiving the contract." *Id.* at 17.

This theory is doubly flawed. For one, Alstom has not offered any evidence that it could in fact meet Brightline's requirements for the project. As the FRA noted in ruling on the waiver, "Alstom [did] not [at that time] manufacture high-speed rail trainsets" in New York capable of meeting Brightline's needs and would have to "adapt" an existing train model "for high speed." 89 Fed. Reg. at 45936. Siemens's proposal, by contrast, proposed to use high-speed trains that it already produced. *See* 89 Fed. Reg. at 45937 (discussing the "Velaro NOVO EMU"). The lack of evidence suggesting Alstom could supply Brightline with the trains it needed strongly suggests that, even if Siemens had not received the waiver, Brightline would not have contracted with Alstom. In other words, as the Government puts it, it is "a matter for pure speculation to assume that Brightline would have chosen Alstom for the contract, rather than re-scoping the contract,

extending the project schedule to accommodate Siemens, or reopening the procurement process to invite additional proposals" ECF 55 at 5.

For another, the timing of Brightline's decision to use Siemens rather than Alstom undermines the plausibility of the causal chain Alstom has laid out. Recall that the FRA issued the waiver *after* Brightline announced that it decided to use Siemens's trains. *See supra* 7; ECF 66 at 139 (Brightline's letter advising the FRA of its May 1, 2024, announcement of its selection of Siemens); 88 Fed. Reg. at 45934 (FRA's final waiver became effective on May 29, 2024). In other words, Alstom decided to use Siemens before it knew that the company would receive the waiver. Viewed most favorably to Alstom, that sequence suggests Brightline assumed that the FRA could grant Brightline the waiver it applied for—meaning *both* Alstom and Siemens would receive a waiver. But even on that view, the timing reinforces the conclusion that Brightline's decision was motivated by other factors that distinguished Siemens from Alstom. *See Cubic Transp. Sys.*, *Inc. v. Mineta*, 357 F. Supp. 2d 261, 264 (D.D.C. 2004) (concluding that plaintiff's alleged injury was not "fairly traceable" to government action where Buy America decision was made "after the competitive procurement process was complete").

Resisting this conclusion, Alstom notes that although Brightline announced its selection of Siemens on May 1, 2024— prior to the May 29, 2024 waiver decision—the final agreement was not consummated until after the waiver. *See* ECF 50 at 15 & n.4 (citing Limited Remarketing Memorandum, Brightline West Passenger Rail Project Revenue Bonds Series 2020A-4, at 13 (July 25, 2024), *available at* bit.ly/40jiBg8 ("On May 31, 2024, the Company entered into a rolling stock purchase agreement with Siemens to supply trainsets for the Project, after a multi-year global qualification process.")). At most, that fact is consistent with a speculative possibility that Brightline wanted to retain some flexibility if Siemens did not get a waiver. But Alstom presents

no evidence that Brightline would have awarded the grant to Alstom had the FRA not granted the waiver. Without any such evidence, it is "entirely conjectural" whether denial of the waiver would have led Brightline to select Alstom. *Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004). Alstom has therefore failed to put forward the requisite "substantial evidence of a causal relationship between the government" action and Brightline's decision not to contract with Alstom. *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.* 366 F.3d 930, 941 (D.C. Cir. 2004), *abrogated on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017).

That conclusion about causation leads inevitably to the conclusion that Alstom has failed to establish redressability for this theory of injury, either. *See Carpenters Indus. Council*, 854 F.3d at 6 n.1 ("Causation and redressability typically overlap as two sides of a causation coin. . . . After all, if a government action causes an injury, enjoining the action usually will redress that injury."). For the same reasons that the Court cannot conclude that the grant of the waiver to Siemens was a "substantial factor" in Alstom not being selected, the Court has far more than a "little doubt" that vacating the waiver would lead to Brightline choosing to use Alstom's trains now. *Johnson*, 111 F.4th at 1244. Most fundamentally, Alstom's proposal involved a "distinct trainset design[] and technology" from the Siemens trains that Brightline chose, and nothing this Court can do would change the fact that "Alstom does not currently manufacture high-speed rail trainsets at its facilities in New York" that meet Brightline's requirements. 89 Fed. Reg. at 45936–37. That conundrum leaves the Court with plenty of reason to think that, should it vacate the waiver, Brightline would not choose to use Alstom's trains, but instead opt for "one of the[] alternative[]" paths available to it. ECF 55 at 11; *see* ECF 35-1 at 2–3 (describing these alternatives).

What's more, because of the particular facts of this case, Alstom would likely have failed to establish redressability even if it could have established causation. That is because much water

has flowed under the bridge since the FRA's waiver decision. After Brightline selected Siemens, Siemens "beg[a]n working towards the ultimate delivery of the rolling stock," and Brightline has, unsurprisingly, "been paying Siemens for its work." ECF 63-1 ¶ 17. More generally, Brightline has been incurring expenses on the project—$140 million as of November 2024—since it was selected for the FRA grant. *Id.* ¶ 11. And Brightline has made commitments that it would be obligated to pay even if the Court vacated the waiver and enjoined the FRA from disbursing funds that would be used for purchasing trains from Siemens. *Id.* ¶¶ 13–14; *see* ECF 1 at 15 (complaint requesting that relief). Because of this progress and these commitments, the Court has good reason to think that Brightline would not abandon its plan to use Siemens if the waiver was vacated but would instead try to find a path forward that does not sharply disrupt its already underway work. In fact, Brightline's counsel made that exact representation to the Court, explaining that the company "can't go back at this point" and that there is therefore "zero chance that Brightline is going to proceed with Alstom." H'rg Tr. 34:19–23. So even if the waiver may have been a factor in Alstom losing the contract in May 2024, it is wildly speculative—if not downright fanciful—to think that vacating the waiver today would lead to Brightline selecting Alstom for the project, thereby redressing Alstom's economic injury.[4]

Alstom's reliance on the D.C. Circuit's decision in *Telephone and Data Systems, Inc. v. FCC*, 19 F.3d 42 (D.C. Cir. 1994), and decisions that follow it cannot overcome this conclusion about redressability. *See* ECF 50 at 19. In *Telephone and Data Systems*, the court held that a company had standing to challenge an order of the Federal Communications Commission because vacatur of the order was a "necessary first step on a path that could ultimately lead to relief fully

---

[4] The timing of the resolution of the pending motions has not affected the redressability analysis. The declaration documenting Brightline's investments in the project and the company's representation about the possibility of using Alstom were both put before the Court less than a month after Alstom first moved for a preliminary injunction. *See* ECF 51 (motion filed November 15, 2024); ECF 63-1 (filed November 26, 2024); Dec. 13, 2024 Min. Entry (hearing).

redressing" the company's injury. 19 F.3d at 47. Alstom says the same is true here—vacatur of the waiver is a "necessary first step" to Alstom being awarded the contract by Brightline. ECF 50 at 19. But the court in *Telephone and Data Systems* explained that its "necessary first step" rule applied because the "contingency upon which the Commission relie[d] to defeat standing"—there, a subsequent decision from the agency after remand that was favorable to the company—"relate[d] solely to the Commission's own conduct in the future, rather than to the unfettered choices made by independent actors." 19 F.3d at 47. In that latter category of cases, the court reasoned, the "more exacting scrutiny of redressability" for "third-party standing cases" applies. *Id.* This case falls squarely into that latter category: It is Brightline—not the FRA—who will decide whether to award the contract to Alstom, thereby redressing Alstom's economic injury. The more "exacting" standard therefore applies, *id.*, and Alstom cannot satisfy it.

Finally, Alstom's resort to the rule that "a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal" is unavailing. *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940; *see* ECF 50 at 17–18 (invoking this rule). The alleged "injurious private conduct" at play here, *Tel. & Data Sys., Inc.*, 19 F.3d at 47, is Brightline's rejection of Alstom for its project. The FRA waiver only permitted Brightline to apply federal funding toward the cost of Siemens's trains. It had no bearing on the lawfulness of Brightline's underlying decision to select or reject Alstom. As Brightline explains, "Alstom's complaint never once alleges (nor can it allege) that Brightline's decision to select Siemens"—let alone reject Alstom, which is the conduct that caused Alstom's economic injury—"was an illegal action." ECF 58 at 14. Confirming the point: Even if the Court vacated the waiver decision, Brightline would have every right not to contract with Alstom. Alstom therefore cannot show that

the relief it seeks "would make the injurious conduct of third parties complained of in this case illegal." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 441 (D.C. Cir. 1998).

Because Alstom has offered this Court no reason to believe that the waiver caused it to lose out on the contract with Brightline or that it would be awarded the contract if the Court vacated the waiver, the company has not established standing vis-à-vis its lost revenue.

## B. Competitive Injury

Alstom's next theory is that it has standing "because the FRA's waiver . . . increased competition in a market in which Alstom competes." ECF 50 at 11. Alstom is correct that "increased competition represents a cognizable Article III injury" because an "actual or imminent increase in competition" constitutes an injury in fact. *MD Pharm., Inc. v. DEA*, 133 F.3d 8, 11 (D.C. Cir. 1998); *Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193, 1197 (D.C. Cir. 2015).

That said, although "the competitor standing doctrine supplies the link between increased competition and tangible injury[, it] does not, by itself, supply the link between the challenged conduct and increased competition." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023). So although an increase in competition is a cognizable injury, Alstom must still establish "a causal link between" the waiver decision and the alleged increase in competition. *Id.* at 279. And Alstom must also establish that its competitive injury is redressable, which in this context means that the relief it seeks "would . . . reduce competition in th[e] market." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 177 (D.C. Cir. 2022).

Alstom's competitor standing theory runs aground on these requirements. True, if the FRA incorrectly granted a waiver to Siemens—which the Court assumes it did in assessing standing, *see In re Thornburgh*, 869 F.2d 1503, 1511 (D.C. Cir. 1989)—the company certainly received a "windfall," *Air Excursions LLC*, 66 F.4th at 280. But the mere fact that the government conferred

some allegedly unlawful advantage to a competitor, even one that "skew[s] [the] playing field," does not "supply the link between the challenged conduct and increased competition." *Id.* at 281. Instead, Alstom needs to "connect" Siemens's receipt of the benefit with a "specific competitive injury." *Id.* at 280.

Alstom has failed to make that connection. The reason why will sound familiar. "Siemens and Alstom competed in Brightline's procurement process" before the FRA's final waiver decision, so the waiver could not have "alter[ed] their competitive status." ECF 55 at 3. In other words, the competition between Siemens and Alstom was done-and-dusted by the time the FRA made its decision. And while it is "possible" that Brightline's expectation that Siemens would receive the waiver played a role in Siemens's competition with Alstom, the "more likely" explanation is that Brightline chose Siemens because it had proposed building an existing type of high-speed train that met Brightline's expectations whereas Alstom had not. *Air Excursions LLC*, 66 F.4th at 278.

Equally problematic for Alstom's theory is its inability to connect the waiver to an "ongoing" or future competitive injury, as is required because the company is seeking only forward-looking relief. *Dearth*, 641 F.3d at 501. This too is for a now familiar reason. The company has not offered any reason to think that it can compete with Siemens for the contract at this stage. Given Brightline's investment in the project and Siemens's progress on fulfilling the contract, there is little reason to think that Alstom could plausibly win the job at this point. *See supra* 14–15. Because Alstom is not in "*direct* and *current*" competition with Siemens for the contract, the "challenged government action"—the waiver—cannot possibly be causing "an actual or imminent increase in competition" for Alstom. *Air Excursions LLC*, 66 F.4th at 279–80.

**C. Bidding Process Injury**

Finally, Alstom's third theory is that it suffered an injury in the form of "a loss of the right to participate in a legally valid procurement process." ECF 50 at 13. Once again, Alstom's argument starts out with a true statement of law: "A bidder in a government auction has a right to a legally valid procurement process; a party allegedly deprived of this right asserts a cognizable injury." *U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 232 (D.C. Cir. 2000). That, Alstom goes on, is what happened here. The wrongful FRA waiver gave Siemens an unlawful advantage to build its first two trains abroad, and had Alstom been allowed the same opportunity, it could have submitted a different proposal with lower costs from overseas manufacturing. ECF 50 at 14 (citing ECF 66 at 141). And, as Alstom rightly says, to establish standing under this theory a plaintiff "need not demonstrate that it would be successful if the contract were let anew but only that it was able and ready to bid and that the [challenged conduct] prevented it from doing so on an equal basis." *U.S. Airwaves*, 232 F.3d at 232. So, Alstom concludes, it is of no matter whether Alstom would have won the contract absent the unlawful waiver; it is sufficient that—on Alstom's telling—the waiver decision rendered the process unfair.

As the Government and intervenors point out, this case does not involve government procurement. *See* ECF 58 at 11 (noting that the cases upon which Alstom relies "involve direct procurements or auctions conducted by federal agencies"). Brightline, not the federal government, was choosing between Siemens and Alstom. The injury at issue in government procurement cases, however, is "the denial of equal treatment" by the government, and it is not clear to the Court how the government can be said to have prevented private bidding "on an equal basis" when there is no government procurement underway. *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 830 (D.C. Cir.

1997). Alstom has not pointed the Court to any authority applying this theory of standing to private contracting disputes, either.

But even if the Court assumes that a private party's denial of a fair bidding process inflicts an injury in fact on a bidder, this theory, like the others, suffers from traceability and redressability defects. The Circuit's decision in *National Mall Tours of Washington v. U.S. Department of Interior*, 862 F.3d 35 (D.C. Cir. 2017), is instructive on this front. There, a company that provided guided tours of the National Mall alleged that the Park Service improperly awarded a contract to its competitor because it failed to notify congressional committees of the proposed contract as required by a federal statute. *See id.* at 37. The court "recognized that a disappointed bidder has the right to a legally valid procurement process, the deprivation of which constitutes a cognizable injury." *Id.* at 44. But the disappointed company nevertheless failed to establish standing. The Park Service's allegedly unlawful failure to submit the "contract to the committees was not . . . until *after* the agency made its award decision and the competitive process was effectively over." *Id.* Thus, even if the agency failed to follow the law, the company "ha[d] not shown how that failure caused it any cognizable injury." *Id.* at 45. As previously explained, Alstom participated in the entirety of Brightline's procurement process. The FRA waiver came only after Brightline rejected Alstom and selected Siemens. So the agency action here, too, took place after "the competitive process was effectively over." *Id.* at 44. Like in *National Mall Tours*, then, Alstom has failed to establish any "connection between" the FRA's waiver decision and Brightline's "decision to award the contract to" Siemens. *Id.* at 45.

Nor has Alstom explained how this Court could remedy its "fair procurement" injury. In government procurement cases, the redressability requirement is often easily satisfied because "it is obvious that the court [can] redress [the plaintiff's] injuries by ordering" the agency to conduct

the procurement process "anew." *High Plains Wireless, L.P. v. FCC*, 276 F.3d 599, 605 (D.C. Cir. 2002). But that method of redress does not work here. Alstom has never suggested that this Court could order Brightline to open up the procurement process again and consider bids from companies other than Siemens. The remedy that usually redresses the "fair procurement" injury is therefore not available in this case, and Alstom has not suggested any other remedy that would redress this injury. This theory, like Alstom's two others, therefore fails.

*    *    *

Defendants' and intervenors' motions to dismiss for lack of subject matter jurisdiction, ECF 35, ECF 39, and ECF 44, are **GRANTED**, and as a result Alstom's complaint is **DISMISSED** without prejudice**.** Accordingly, Alstom's motion for summary judgment, ECF 12, and renewed motion for a preliminary injunction, ECF 75, are **DENIED** as moot. Alstom's prior motion for a preliminary injunction, ECF 51, and the motions for a hearing and status conference related to that motion, ECF 52 and ECF 53, are also **DENIED** as moot. A separate order accompanies this memorandum opinion.

      **SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: December 16, 2025